# 22-1223-bk

## United States Court of Appeals

*for the*

## Second Circuit

In Re: MARK A. NORDLICHT,

*Debtor.*

———————————————————

RICHARD STADTMAUER, MARISA STADTMAUER,

*Appellants,*

– v. –

MARK S. TULIS, DAHLIA KALTER, 535 W.E.A. GROUP LLC, OBH 2308 LLC, GILAD KALTER COOK ISLANDS TRUST LIMITED, TRENOR INVESTMENT PARTNERS LP, HENLEY INVESTMENT PARTNERS LP, JOHN DOES 1-50, NYFLA INVESTORS LLC,

*Appellees,*

MARK A. NORDLICHT,

*Debtor-Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR APPELLANTS

NATHANIEL KRITZER
STEPTOE & JOHNSON LLP
*Attorneys for Appellants*
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

# TABLE OF CONTENTS

JURISDICTION................................................................................1

ISSUES PRESENTED.......................................................................2

    A.    Plaintiffs' Final Arbitration Award Against the Debtor .....................4

    B.    Commencement of the State Court Proceedings...................................5

        1.    Ms. Kalter's Affidavit Opposing the Liens ...............................6

    C.    The State Court's Confirmation of Plaintiffs' Liens.........................11

    D.    Proceedings in the Bankruptcy Court ...................................................14

    E.    The District Court Order ...................................................................24

SUMMARY OF ARGUMENT .............................................................24

ARGUMENT ........................................................................................28

I.    The District Court Erred in Affirming an Order that Violates Plaintiffs' State-Law Property Rights, Which Were Unaltered by the Bankruptcy Filing...............................................................................................28

    1.    The Lower Courts Erred in Ruling that the Trustee Owns Plaintiffs' Judicial Liens..............................................................................28

    2.    The Lower Courts Erred in Ruling that the Trustee Owns Plaintiffs' Claims...........................................................................................33

II.    The District Court Erred in Affirming the Bankruptcy Court's Deprivation of Due Process by Vitiating Plaintiffs' Liens Through a Summary Proceeding. ......................................................................................38

III.    The Bankruptcy Court's Order Violated The Supreme Court's Opinion in *Jevic*.................................................................................................39

IV.    The Bankruptcy Court's Analysis of the Settlement Agreement was Marred by Factual and Legal Errors............................................................44

1.   The Bankruptcy Court Relied on Erroneous Factual Assumptions in Approving the Settlement Agreement .................................................. 44

2.   The Bankruptcy Court Relied on Erroneous Legal Conclusions in Approving the Settlement Agreement .................................................. 44

V.   Defendants' Settlement Should Have Been Denied Under the *Iridium* Factors .......................................................................................................... 47

1.   The Litigation Is Likely to Succeed ..................................................... 48

2.   The Prospect of "Protracted Litigation" Is Manageable ..................... 52

3.   The 9019 Motion Is Not in the Creditors' Interests ............................ 53

4.   The Competency of Counsel and Experience of the Court Are Not Determinative ........................................................................................ 54

5.   The Overbroad Releases Weigh Against Settlement ........................... 54

CONCLUSION ......................................................................................................... 55

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A) ..................... 56

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page(s)**

*Ahuja v. Ian Schrager Hotels, Inc.*,
    29 A.D.3d 387 N.Y.S.2d 62 (2006) ................................................36

*In re Aslanyan*,
    No. 17-24195-A-7, 2017 WL 6520450 (Bankr. E.D. Cal. Dec. 20,
    2017) ...............................................................................................30

*Butner v. United States*,
    440 U.S. 48 (1979) ..........................................................16, 24, 28, 30

*In re Bygaph, Inc.*,
    56 B.R. 596 (Bankr. S.D.N.Y. 1986) ..............................................42

*Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*,
    73 A.D.3d 960 N.Y.S.2d 123 (2010) ...............................................37

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) ................................................................*passim*

*In re Flynn*,
    238 B.R. 742 (Bankr. N.D. Ohio 1999) ...........................................30

*In re Giordano*,
    188 B.R. 84 (D.R.I. 1995) ................................................................30

*In re Grossinger Assocs.*,
    156 B.R. 8 (Bankr. S.D.N.Y. 1993) ................................................42

*Hearst Mags. v. McCaffery*,
    38 Misc. 3d 1229(A) N.Y.S.2d 867 (Sup. Ct. 2012) ...................37, 38

*Helicon Partners, LLC v. Kim's Provision Co.*,
    No. 12-01602 (SMB), 2013 WL 1881744 (Bankr. S.D.N.Y. May 6,
    2013) ...............................................................................................31

*Holme v. Glob. Mins. & Metals Corp.*,
    22 Misc. 3d 1123(A), 880 N.Y.S.2d 873 (Sup. Ct.), *aff'd*, 63
    A.D.3d 417 N.Y.S.2d 453 (2009) ....................................................49

*Hotel 71 Mezz Lender LLC v. Falor*,
    14 N.Y.3d 303 (2010) ........................................................................32

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007) ................................................26, 44, 47

*Island Holding, LLC v. O'Brien*,
    6 A.D.3d 498 (2nd Dep't 2004)........................................................49

*JPMorgan Chase Bank, N.A. v. Malarkey*,
    65 A.D.3d 718 N.Y.S.2d 787 (2009)................................................36

*In re Keene Corp.*,
    164 B.R. 844 (Bankr. S.D.N.Y. 1994)..............................................37

*Koehler v. Bank of Bermuda Ltd.*,
    911 N.E.2d 825 (N.Y. 2009)............................................................32

*McGuinness v. Standard Drywall Corp.*,
    193 A.D.2d 518 (1st Dept. 1993) .....................................................50

*In re McNeely*,
    51 B.R. 816 (Bankr. D. Utah 1985)..................................................30

*In re Morris v. New York State Department of Taxation & Finance*,
    623 N.E.2d 1157 (N.Y. 1993)....................................................*passim*

*Musso v. Ostashko*,
    468 F.3d 99 (2d Cir. 2006) ..............................................................30

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993) ...........................................................3, 39

*In re Remsen Partners, Ltd.*,
    294 B.R. 557 ............................................................48, 53, 54

*In re Schalebaum*,
    263 B.R. 684 ....................................................................................30

*Schwartz v. Aquatic Dev. Grp., Inc. (In re Aquatic Dev. Grp., Inc.)*,
    352 F.3d 671 (2d Cir. 2003) .............................................................27

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir. 1989) ...............................................................3, 35, 36, 37

*Stadtmauer et al. v. Nordlicht et al.,*
Index No. 51825/2020 (Sup. Ct. Westchester Cnty. 2020) ................................49

*In re Stage Presence, Inc.*,
592 B.R. 292 (Bankr. S.D.N.Y. 2018), *aff'd*, No. 12-10525
(MEW), 2019 WL 2004030 (S.D.N.Y. May 7, 2019).......................................35

*Torah Soft Ltd. v. Drosnin*,
224 F.Supp.2d 704 (S.D.N.Y. 2002) ..................................................................48

*In re Tovan Constr., Inc.*,
No. 19-12423-KHK, 2021 WL 1235359 (Bankr. E.D. Va. Mar. 31,
2021) .............................................................................................................42, 43

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
549 U.S. 443 (2007).............................................................................................28

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017) .......................................................................3, 35, 36

*In re Wind Power Sys., Inc.*,
841 F.2d 288 ........................................................................................................29

*Zammitto v. Guarnotta*,
No. 04-2433, 2008 WL 5780817 (Mass. Super. Oct. 15, 2008) ........................29

**Statutes**

11 U.S.C. § 108.............................................................................................20, 46

11 U.S.C. § 363......................................................................................................42

11 U.S.C. § 544.............................................................................................*passim*

28 U.S.C. § 157........................................................................................................1

28 U.S.C. § 158........................................................................................................1

28 U.S.C. § 1334......................................................................................................1

28 U.S.C. § 1450 ...................................................................46

Bankruptcy Code Section 544 ............................................21, 29

Bankruptcy Code Section 547 ............................................28, 31

CPLR 211 ..............................................................................49

CPLR 308 ..............................................................................45

CPLR 320 ....................................................................27, 44, 45

CPLR 6214 ....................................................................*passim*

CPLR 6216 ....................................................................*passim*

Fed. R. Bankr. P. 7001 ..................................................25, 30, 39

Fed. R. Bankr. P. 9019 ........................................................47, 48

N.Y. Debtor and Creditor Law § 276 .....................................49

## JURISDICTION

This is an appeal from a district court order that affirmed a final bankruptcy court order. The Bankruptcy Court had subject-matter jurisdiction over this case pursuant to 28 U.S.C. § 1334 and § 157(a), as it is related to a case under title 11, namely the chapter 7 bankruptcy proceedings of debtor Mark Nordlicht. The District Court had jurisdiction over the appeal below pursuant to 28 U.S.C. § 158(a)(1). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(d).

This appeal is timely. The District Court entered its order affirming the Bankruptcy Court's ruling on May 19, 2022, and Richard and Marisa Stadtmauer ("Plaintiffs") filed a notice of appeal on June 6, 2022.

- 1 -

## ISSUES PRESENTED

This appeal presents several issues of first impression for this Court:

1.     Over three months before the debtor's bankruptcy, Plaintiffs obtained judicial liens in the form of an order of attachment and sheriff levies over property nominally held by non-debtor defendants to secure payment of claims they had personally asserted against the Debtor and the other defendants. Although the Bankruptcy Code does not provide the trustee with express authority to void such liens and no adversary proceeding to void them was commenced, the courts below ruled that Plaintiffs' liens belonged to the chapter 7 trustee after the debtor filed for bankruptcy. Does the Bankruptcy Code tacitly treat such attachments differently from all other liens, or must the trustee have statutory authority to avoid them? The standard of review for this issue is *de novo*.

2.     The Bankruptcy Code gives trustees the power to assert certain claims that could be asserted by an "unsecured creditor." 11 U.S.C. § 544(b). Does the trustee assume an individual creditor's standing to assert such claims even when they have been secured before the bankruptcy filing by a judicial lien? The standard of review for this issue is *de novo*.

3.     New York's Court of Appeals has held that the alter ego doctrine is not an independent cause of action under New York law. *In re Morris v. New York State Department of Taxation & Finance*, 623 N.E.2d 1157, 1160-61 (N.Y. 1993). Under

- 2 -

this Court's precedents in *St. Paul* and *Tronox*, which addressed claims brought under the law of Ohio, Delaware, and Pennsylvania, can a chapter 7 trustee claim a creditor's standing to assert the alter ego doctrine under New York law even though there is no such independent "claim" that could vest in the trustee? The standard of review for this issue is *de novo*.

In addition to these legal questions that have yet to be answered by any appellate court in the United States, this appeal poses several additional issues that warrant reversal under well-settled principles articulated by this Court and the Supreme Court:

4.    In a summary proceeding where the Bankruptcy Court expressly stated "this is not an adversary proceeding where I determine merits of the attachment," A-277, the Bankruptcy Court approved a settlement agreement and entered an order that purport to give the trustee power to unilaterally set aside Plaintiffs' judicial liens. Did this process violate *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993), where this Court ruled that a bankruptcy court should not decide "underlying disputed issues" through a summary proceeding? The standard of review for this issue is *de novo*.

5.    The Bankruptcy Court approved a settlement agreement between the Chapter 7 Trustee that purports to skip Plaintiffs' higher priority, secured claims in the allocation of certain settlement proceeds and instead allocates such funds to

lower-priority unsecured claims. Was this legal error in light of the Supreme Court's opinion in *Czyzewski v. Jevic Holding Corp*., 137 S. Ct. 973 (2017), which held that a settlement of fraudulent transfer claims that "skipped" higher-priority creditors and distributed funds to "low-priority general unsecured creditors" violated the Bankruptcy Code? The standard of review for this issue is *de novo*.

6.      In approving the proposed settlement, the Bankruptcy Court erroneously interpreted New York law as requiring personal service on a party who has appeared in an action without objecting to service or jurisdiction, and as requiring commencement of an action within 90 days to preserve Plaintiffs' liens, even though that 90-day period was tolled by operation of COVID-related orders and the Bankruptcy Code. Did these legal errors, among others relating to the same ruling, constitute an abuse of discretion? The standard of review for this issue is abuse of discretion.

## STATEMENT OF THE CASE

### A.      Plaintiffs' Final Arbitration Award Against the Debtor

This case has its roots in the failure of the "Platinum" family of hedge funds, for which the Debtor, Mark Nordlicht, served as Chief Investment Officer. Plaintiffs Richard and Marisa Stadtmauer held promissory notes (the "Notes") issued by certain Platinum funds, which were subject to a personal guarantee from Mark

- 4 -

Nordlicht that would be triggered if, *inter alia*, representations made in the Notes were inaccurate. A-146, Final Arbitration Award at 2-5.

After the Platinum funds filed insolvency proceedings, it became clear that representations in the Notes regarding the debts of those funds were inaccurate. Plaintiffs asserted claims in a JAMS arbitration against Mr. Nordlicht under the personal guarantee he had signed. Plaintiffs prevailed in the arbitration and won a final award of approximately $15 million, which award issued in January 2020. A-146, Final Arbitration Award.

### B. Commencement of the State Court Proceedings

After obtaining the final arbitration award, Plaintiffs promptly took actions to secure their ability to collect it. First, Plaintiffs filed an action in the United States District Court for the Southern District of New York to confirm the arbitration award and reduce it to judgment. Second, Plaintiffs brought this later-removed action in the Westchester County Supreme Court – Commercial Division (the "State Court") against Mr. Nordlicht, his wife (Dahlia Kalter), and certain "shell" companies that Mr. Nordlicht had used to conceal, in the names of other nominees, vast assets that were in fact under his domination and control and used for his personal benefit. *See* A-94-116, ECF No. 12 at pp. 7-29. The complaint alleged facts showing that Mr. Nordlicht and his family members had gone to great lengths to shield and conceal his extensive assets. *See generally* A-29, Complaint ¶¶ 1-4, 11-19, 30-57.

- 5 -

On February 5, 2020, on Plaintiffs' *ex parte* motion, the State Court entered an Order of Attachment (the "Attachment") in favor of the Plaintiffs against various real and all personal property of the Defendants, including 535 West End Avenue, Unit No. 15, New York, New York (the "Manhattan Condo"), and 245 Trenor Drive, New Rochelle, New York (The "Trenor Drive Property"), including all partnership interests of all the defendants. On February 14, 2020, the New York County Sheriff levied on the Manhattan Condo by filing a notice of attachment with the clerk of New York County, consistent with CPLR 6216. A-138. On February 18, 2020, the Westchester County Sheriff levied on the Trenor Drive Property by filing a notice of attachment with the clerk of Westchester County, consistent with CPLR 6216. A-368. Finally, on the same date, the Westchester County Sheriff levied on Defendants' interests in personal property by service of order of attachment, consistent with CPLR 6214. A-136. By motion dated, February 8, 2020, Plaintiffs moved to confirm the order of attachment on notice.

### 1. Ms. Kalter's Affidavit Opposing the Liens

On February 28, 2020, Dahlia Kalter, a defendant in the case and the debtor's wife, submitted an affidavit in the State Court matter in opposition to the motion to confirm the attachment and in support of her own motion to vacate it. Adversary

Docket, ECF No. 13, Ex. 13[1] (the "Kalter Affidavit"). The Kalter Affidavit contained numerous false and misleading statements designed to conceal the full scope of Nordlicht's alter ego scheme and assets under Mr. Nordlicht's control. Specific examples, though not fully exhaustive, follow.

Ms. Kalter broadly stated in the Kalter Affidavit: "I have always been, and remain to this day, solely and completely in charge of the affairs of" 535 West End Avenue Associates LLC ("535 WEA")—which holds title to the Manhattan Condo—and that "[n]o other person – neither my husband nor anyone else – has *ever* exercised any dominion or control over 535 WEA or any of its assets." *Id.*, Ex. 13 at ¶ 18 (emphasis in original).

This statement was untrue. Faced with documentary evidence directly contradicting her story, Ms. Kalter admitted that Mr. Nordlicht "arranged for" and "negotiated" a purported $7.5 million mortgage by 535 WEA. *See id.*, Ex. 51 at Nos. 37-38.

The documentary evidence rebutting Ms. Kalter's initial misrepresentation is extensive. Ms. Kalter's signatures in connection with the purported mortgage of the Manhattan Condo were apparently forged. *See id.*, Exs. 41, 44, 45, 46. Further,

---

[1] Exhibit references in this section are to the exhibits filed on the adversary proceeding docket in connection with Plaintiffs' January 6, 2021, objection (ECF Doc. No. 13).

Mr. Nordlicht himself sought to lease or sell the Manhattan Condo in 2015. *See id.*, Ex. 66. Nor would it be plausible to suggest these misrepresentations were innocent, as the mortgage that was a subject of Ms. Kalter's misrepresentations was referenced prominently in the proceedings for which her affidavit was filed.

Relatedly, Ms. Kalter stated in her affidavit that she personally caused 535 WEA "to file for authority to do business in the State of New York." *Id.*, Ex. 13 at ¶ 18. This was also untrue. Indisputable documentary evidence showed that this filing was made by a company that Mr. Nordlicht controlled. *See id.*, Ex. 35. Ms. Kalter later claimed that she "does not recall who or what entity made filings with the New York Department of State." *Id.*, Ex. 13 at No. 15.

Ms. Kalter also said that she did not believe Mr. Nordlicht "ever met" or "spoke to" the attorney who negotiated the purchase of the Manhattan Condo. *Id.*, Ex. 13 at ¶ 20. She went further, stating that the only time Mr. Nordlicht would have spoken with that attorney was if the attorney "called my house and my husband happened to answer the phone before he turned it over to me." *Id.*

Again, this was untrue. Documentary evidence clearly showed communications between Mr. Nordlicht and the attorney in question. *Id.*, Exs. 67, 68. Ms. Kalter later claimed that she "does not personally know the context, if any, of Mark Nordlicht's communications with" that attorney. *Id.*, Ex. 51 at No. 24.

- 8 -

Ms. Kalter also made misrepresentations about the funds used to purchase the Manhattan Condo. Speifically, she said that Mr. Nordlicht did not "contribute[] any funds to the acquisition" of 245 Trenor Drive and the Manhattan Condo. *Id.*, Ex. 13 at ¶ 4. In fact, at a bare minimum, Mr. Nordlicht contributed over $3 million to acquisition of the Manhattan Condo. *See id.*, Exs. 32, 33, 34. Further, his income largely supported Ms. Kalter's putative ownership of 245 Trenor Drive. *See id.*, Ex. 63.

Ms. Kalter made further misrepresentations in her affidavit to conceal Mr. Nordlicht's transfer of $3.17 million in deposited funds to her, claiming "I financed the purchase of the [Manhattan Condo] through a purchase money mortgage from Wells Fargo Bank for $6 million, and putting up ***my own funds*** (including some borrowed funds) ***for the balance***." *Id.*, Ex. 13 at ¶ 23 (emphasis added).

In fact, documentary evidence showed that (1) Mr. Nordlicht made a $3.17 million down payment on the Manhattan Condo, *see id.*, Ex. 32; (2) Mr. Nordlicht transferred those funds and the associated option agreement to 535 WEA for no consideration, *see id*., Ex. 33; and (3) the down payment was applied to the purchase price of the Manhattan Condo, *see id.*, Ex. 34.

Ms. Kalter also made irreconcilable statements about her own professional knowledge and experience. Specifically, Ms. Kalter stated that in mid-2014, she hired a law firm to assist with estate planning, claiming that "[a]lthough I was an

- 9 -

attorney who drafted wills and trusts, and administered estates, I had very little experience or expertise in actual estate planning." *Id.*, Ex. 13 at ¶ 10 n. 4.

These assertions were directly contradicted by other facts. Ms. Kalter earned her law degree in 1997 and, according to the website for her firm, Ms. Kalter "counsel[s] clients in estate planning" and "trust and estate administration," and she "has been a member of the Trusts, Estates and Surrogate's Court Committee of the Association of the Bar of the City of New York and the Estate Planning Committee of the New York State Bar Association." *Id.*, Ex. 16. And elsewhere in her affidavit, Ms. Kalter stated that she could "advise the Court, as a practitioner of will drafting" as to what constitutes "a normal estate planning technique" and what "happens routinely as a matter of course in estate planning." *Id.*, Ex. 13 at ¶ 34 n. 21, 22.

In her affidavit, Ms. Kalter also misstated the history of creditor claims against her and her husband. She claimed she has "absolutely no creditors," *id.*, Ex. 13 at ¶ 4, and that "creditors . . . simply did not exist at that time *or ever* for me," *id.* at ¶ 15 (emphasis in original). She further claimed that Mr. Nordlicht did not have any creditors at the relevant times. *Id.* ¶ 4.

All of these statements were untrue. Merely by way of example, in 2011, Ms. Kalter (along with Mr. Nordlicht and others) was sued in Florida to avoid and recover millions of dollars in fraudulent transfers. Mr. Nordlicht and others formed an entity called Regent Capital Partners LLC "through their wives" in order to

engage in a side deal with Scott Rothstein, the man behind a billion-dollar Ponzi scheme. *Id.*, Ex. 69 at ¶ 36. In connection with that deal, almost $3 million was "transferred to Dahlia Kalter for the benefit of the Nordlichts." *Id.* at ¶ 43. That case settled in 2012, with the defendants (who included Mr. Nordlicht and Ms. Kalter) paying $32 million. *See id.*, Ex. 70. Further examples of Mr. Nordlicht's and Ms. Kalter's extensive actual and potential liabilities to creditors in civil litigation were filed with the state court in a chart. *See id.*, Ex. 71.

In sum, in the State Court, Ms. Kalter filed a demonstrably untrue affidavit that sought to cover up the facts regarding Mr. Nordlicht's control over assets nominally held in her name.

### C. The State Court's Confirmation of Plaintiffs' Liens

After full briefing by all parties, on May 22, 2020, the State Court issued an order granting Plaintiffs' motion to confirm the order of attachment, while denying Defendants' related motion to vacate. The State Court began by noting that Plaintiffs' evidentiary burden to secure an attachment was "onerous," requiring them to show, among other things, "the probability of [their] success on the merits of [their] cause of action." A-372. The Court found that "Plaintiffs made such a showing on their *ex parte* application" and also made "such a showing on their motion to confirm the Order." A-372.

In confirming the Order of Attachment, the State Court found that "plaintiffs paint[ed] – with multiple references to documentary evidence – *a dire picture of a family engaged in intricate attempts to insulate Nordlicht from his significant creditors, with ample, substantiated details*." A-373. In its order, the State Court also referred on a number of misrepresentations made under oath in the sworn affidavit of Dahlia Kalter:

> [I]n many instances defendants' allegations appear entirely implausible or are directly contradicted by evidence that plaintiffs submit on reply. For example, although Kalter states that she is the only one who ever had any control over WEA, plaintiffs submit to the Court on reply multiple emails showing that Nordlicht **was** involved in attempts to rent it out or sell it in 2015. Additionally, plaintiffs submit to the Court two extremely different versions of Kalter's signature, claiming that one of those versions is a forgery. Plaintiffs conclude that "The common-sense inference is that Mr. Nordlicht was in control of 535 WEA all along and simply forged Ms. Kalter's signature when he needed to." While Kalter may well have authorized someone to sign on her behalf (repeatedly), the fact is that Kalter plainly states in her affidavit that no one **ever** had any role in these transactions (with one limited exception.) By her vehement statements in her affidavit, Kalter undermines her own position. This – plus other statements about her sources of income and former wealth, and her lack of estate planning knowledge, despite being a trusts and estates lawyer – bolster plaintiffs' position significantly.

A-375-376 (emphasis in original).

By order dated June 29, 2020 (filed on June 30), the State Court denied Defendants' motion to dismiss the complaint, rejecting Defendants' arguments that Plaintiffs had failed to plead causes of action with sufficient specificity and finding

that the evidence Defendants had submitted failed to show that dismissal was warranted. A-403.

Substantial evidence supported the State Court's provisional evidentiary findings. But it quickly became clear, even with very minimal discovery from third parties,[2] that this evidence was merely the tip of a very large iceberg. In addition to the Trenor Drive Property and the Manhattan Condo (an 8,400-square-foot luxury apartment for which the last unit in the same line sold for $16 million), discovery revealed (1) a suspicious pattern of transferring large sums of cash between bank accounts by Ms. Kalter, in violation of the attachment order, A-113-116, ECF No. 12 at 26-29; (2) an immense stash of assets in an entity called 16th Avenue Associates LLC ("16AA"), amounting to at least $30 million, all of which were under Mr. Nordlicht's direct control, and which Mr. Nordlicht used for his personal benefit to pay favored creditors such as the lawyers representing him in this proceeding, his criminal proceedings, and other matters; and (3) a luxury duplex in a new condominium building in a prime Jerusalem neighborhood, worth millions of dollars. A-95, *id.* at 8-9.

---

[2] Defendants persistently ignored and stonewalled Plaintiffs' discovery requests in the State Court proceeding. A-95, at n.7.

The evidence demonstrating Mr. Nordlicht's domination and control over 16AA was extensive, and it included forging signatures on operational documents, making payments from 16AA accounts directly to his creditors, making irregular distributions to accounts in his wife's name in violation of the LLC's governing operating agreement, many millions in transactions with closely related parties, and over $5.8 million in transfers to an offshore bank where Mr. Nordlicht holds an account and his former business associate holds a senior position. A-96-102, *id.* at 9-15.[3]

On June 25, 2020, Plaintiffs moved in the State Court for leave to file a supplemental complaint asserting claims against 16AA. A-372. Four days later, on June 29, 2020, Mr. Nordlicht filed a chapter 7 bankruptcy petition. A-401.

### D.     Proceedings in the Bankruptcy Court

On July 31, 2020, the Debtor removed this matter to the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and

---

[3] Ms. Kalter later asserted that the funds in 16AA were "loaned" by the Debtor's mother, Barbara Nordlicht, to that entity. A-101, *id.* at 14. That statement was contrary to the evidence. In fact, no "interest" was ever paid to Barbara Nordlicht until very shortly before the bankruptcy filing, after litigation had been brought and shortly after a subpoena had issued in the State Court case to the bank holding funds for 16AA. *Id.* at 15.

- 14 -

this action, as removed, was assigned Adversary Proceeding No. 20-6489 (the "Adversary Proceeding").

On August 25, 2020, Mark Tulis, Chapter 7 Trustee (the "Trustee"), filed a motion to retain Plaintiffs' counsel, Steptoe & Johnson LLP ("Steptoe"), "as Special Counsel for the Chapter 7 Trustee ('Special Counsel Retention Application') to prosecute the claims asserted in the State Court Action and such additional matters as may be mutually agreed on the terms hereof." A-39. To facilitate pursuit of claims that the Trustee ultimately sought to settle, Mr. Stadtmauer offered, and the Trustee accepted the offer subject to Bankruptcy Court approval, to fund Steptoe's fees under a hybrid hourly/contingent arrangement. A-50, Bankr. ECF No. 19. On August 28, 2020, the Trustee filed a motion to approve this funding arrangement. A-58, Bankr. ECF No. 21.

On October 21, 2020, the Trustee reported to the Bankruptcy Court that it had reached a settlement at a proposed dollar amount of $1.5 million for a full release of the Debtor and all parties in the Adversary Proceeding. On October 26, 2020, in light of the proposed settlement, the Special Counsel Retention Application was withdrawn by the Trustee. A-66.

On November 6, 2020 the Trustee filed a motion to approve the proposed $1.5 million settlement (the "Settlement Motion"). A-69. On January 6, 2021, Plaintiffs filed an objection to the Settlement Motion. Plaintiffs objected on numerous

- 15 -

grounds, including that: (1) the consideration offered in the proposed settlement agreement was grossly inadequate and was in any event inferior to a $2 million offer made by Mr. Stadtmauer to acquire any and all rights the estate had in the claims asserted in the Adversary Proceeding, free and clear of its liens; (2) the relief sought, if approved, would violate Mr. Stadtmauer's state-law property rights, in violation of the Supreme Court's landmark opinion in *Butner* and its progeny; (3) certain claims and rights in the adversary proceeding were not, in any event, the trustee's rights to settle; and (4) the proposed settlement failed in any event to satisfy the relevant test for approval. A-93 and A-128, ECF Nos. 12-13.

On February 12, 2021, the Trustee filed a brief asserting that, in the Trustee's judgment, Plaintiffs' $2 million offer stated in their objection was a higher and better offer than the settlement proposal advanced by the Defendants. A-174, ECF No. 16. By order dated March 22, 2021, the Bankruptcy Court denied the Settlement Motion. A-183, ECF No. 23.

On March 30, 2021, the Trustee filed a motion seeking approval of an agreement to convey any and all rights of the estate held in this case to Mr. Stadtmauer for $2 million. A-199, ECF No. 24. The Trustee's motion explicitly stated that any competing offer had to be submitted to the Trustee no later than 5:00 P.M. on April 21, 2021, which was approximately two days before an April 23, 2021 approval hearing. *Id.* The Defendants and the Debtor filed objections to the motion on April

- 16 -

16, 2021, A-202 and A-223, ECF Nos. 26, 27, and Plaintiffs filed a reply brief supporting the motion on April 21, 2021, A-225, ECF No. 28. The Trustee then filed a reply brief on April 22, 2021. A-242, ECF No. 30.

As shown in the April 22, 2021 reply brief of the Trustee, the Defendants had not submitted any offer before the stated bidding deadline that was, in the Trustee's view, higher and better than the Stadtmauers' offer. A-242. The reply brief was filed at 5:27 P.M., after close of business on the final day before the approval hearing. A-242.

At 11:08 PM on April 22, well after the final bidding deadline and less than twelve hours before the approval hearing, the Defendants submitted an offer that the Trustee sought to accept (the "Second Amended Settlement Offer"). A-248, ECF No. 31. The offer was for $2.5 million in exchange for releases, and an additional $2.5 million to be paid "directly to the trustee for distribution to the other creditors" if the Stadtmauers' liens were not vacated. *See* A-248, ECF No. 31; A-202, ECF No. 26 at 4 (stating terms of the "indemnity" described in ECF No. 31). Even at the late hour that this offer was filed, it was not yet apparent that the Trustee intended to accept it. *See* A-250, ECF No. 31 at 3 ("we have not heard any response to the same").

At the hearing in the morning of April 23, 2021, the Trustee changed positions and sought to accept the proposal advanced by the Defendants late the night before.

- 17 -

A-261, 4/23/21 Tr. at 11:18-24. After hearing argument, Judge Drain ruled that he would approve the Trustee's acceptance of the late-night, April 22 offer by the Defendants. A-303-304, *id.* at 53:22-54:4.

In his ruling, Judge Drain began by making several recitations that incorrectly framed the dispute and misstated the procedural history in this case. Judge Drain incorrectly stated that the Stadtmauers agreed that the matter should be settled and were not "suggesting that the Trustee should settle for a substantially greater amount of money." A-295, *id.* at 45:18-25. That ruling was incorrect. In fact, the Stadtmauers objected vigorously to settlement of the claims, which they believed (and expressly asserted) should be pursued on the merits given the immense scale of assets the Debtor had concealed. *See* A-119, ECF No. 12 at 32. The fact that Mr. Stadtmauer was willing to offer millions of dollars to assert any such claims owned by the estate—and that the Trustee filed a motion to approve its acceptance of that offer—did not mean Plaintiffs agreed the claims should be settled on the terms proposed in the late-night April 22 offer.

Judge Drain next erroneously stated that "given the state of the Nordlicht estate . . . the Trustee has little to no cash with which to pursue the underlying litigation claims . . . " A-295, 4/23/21 Hr'g Tr. at 45:6-13. That finding was also inaccurate. Mr. Stadtmauer had offered to fund litigation by the Trustee on favorable terms, which the Trustee first accepted and then rejected at the very last minute before a

- 18 -

noticed approval hearing by instead seeking to approve a settlement over the Stadtmauers' objections. The April 22 offer should not have been evaluated against an assumption that the Trustee's back was effectively against the wall, with no ability to litigate if a settlement could not be reached.

Judge Drain next addressed Plaintiffs' liens, stating that the "Stadtmauers assert that they effectively have a lien on any payments by the settling parties to the Trustee based on an asserted prepetition attachment under CPLR 6214." A-297, 4/23/21 Tr. at 47:11-15. Judge Drain went on to discuss several theories on which he believed the Trustee could later contest those liens under state law. *Id.* at A-298, 48:16-53:11.

These theories were entirely lacking in merit, as explained in Part IV *infra*. For purposes of this appeal, however, several fundamental points are even more pertinent. ***First***, Judge Drain apparently assumed that all liens asserted by the Stadtmauers were obtained by levies effected under CPLR 6214, which is the only circumstance where the specific service and "failure to proceed" terms of that section would apply at all. That assumption was incorrect, and it was contrary to the evidence submitted by the Stadtmauers. In their April 21, 2021 brief (as well as other places), the Stadtmauers asserted not only liens over personal property levied under CPLR 6214, but also multiple liens over real estate levied by the Sheriffs of New York and Westchester County under CPLR 6216. *See* A-229-230, ECF No. 28, at 5-6 (and

- 19 -

exhibits cited therein). Judge Drain's ruling thus did not address the fact that, even if the meritless arguments to vacate liens obtained under CPLR 6214 were to prevail, the Stadtmauers would still hold liens over these properties. For that very reason, Plaintiffs argued that Defendants' various arguments regarding the liens over personal property were "inapposite" due to the substantial value of their liens over real property. A-231, ECF No. 28 at 7 (and n.7).

The flawed state-law arguments Judge Drain relied on have no relevance to these liens. CPLR 6216 does not require the Sheriff to serve anyone personally in order to effect a levy on real property. Instead, the Sheriff levies under that section "by filing with the clerk of the county in which the property is located a notice of attachment indorsed with the name and address of the plaintiff's attorney and stating the names of the parties to the action, the amount specified in the order of attachment and a description of the property levied upon." *See id.* Nor does a lien under CPLR 6216 have any requirement that a creditor proceed with a turnover action within 90 days (a deadline relevant only to CPLR 6214 that was in any event stayed by COVID-related orders and then by Mr. Nordlicht's bankruptcy filing pursuant to 11 U.S.C. § 108(c)).

**Second**, Judge Drain reasoned that Plaintiffs' liens were attachments on "estate cause[s] of action," even though they are in fact property rights that Plaintiffs acquired before any bankruptcy existed, and even though Judge Drain acknowledged

- 20 -

that such liens ordinarily are "not [susceptible] to avoidance under Section 544 of the Bankruptcy Code." A-301-303, 4/23/21 Hr'g Tr. at 51:20-53:11. For the sole authority on this point, Judge Drain relied on *dicta* from an unpublished bankruptcy court order. A-302 at 52:14-20. His reasoning did not address the plain language of the Bankruptcy Code, which, in Section 544(b) (where trustees have broadest authority to assert estate claims), gives the trustee the avoidance powers of "a creditor holding an ***unsecured*** claim." As Plaintiffs argued, nothing whatsoever in that section vests the trustee with the rights of a ***secured*** creditor who has obtained judicial liens. A-227.

***Third***, as was clear throughout the hearing and in his ruling, Defendants' undocumented, untimely, last-minute proposed "settlement" offer could not vacate or otherwise affect Plaintiffs' liens. This was made clear in a number of exchanges and express statements on the record.

Early in the hearing, Judge Drain asked Defendants' counsel: "This agreement is not contingent on, for example, removing an attachment on non-Debtor assets?" A-266, 4/23/21 Tr. at 16:18-19. Defendants' counsel replied: "It's not contingent on that." A-266, *id.* at 16:20. Similarly, at a later point in the hearing, Judge Drain stated "this is not an adversary proceeding where I determine merits of the attachment." A-277, *id.* at 27:18-20. He then reiterated in his ruling "this is a record of a summary proceeding, not a proceeding to ultimately determine the nature of the Stadtmauers'

- 21 -

interest . . . ." A-298, *id.* at 48:20-22. And throughout argument, it was contemplated that Plaintiffs' liens would be the subject of further litigation through plenary proceedings, not simply disposed with through a "set aside" term in a settlement agreement. *E.g.,* A-289, *id.* at 39:6-8.

When the Court entered an order approving a settlement agreement, however, the Court approved a form of agreement that explicitly disposed of Plaintiffs' liens. This was directly contrary to Judge Drain's acknowledgements on the record that the hearing was a "summary proceeding" that would not determine the merits of the liens. A-298, *id.* at 48:20-22. In particular, Paragraph 5 of the settlement agreement, which Judge Drain's order authorized the Trustee to perform, requires the Trustee to "vacate and/or set aside" Plaintiffs' liens, including by filing documents with the New York and Westchester County Clerk's office and/or entering into a putative consent order to "vacate and/or set aside the Attachment and Notices of Attachment, and any other attachment and notice of attachment filed with respect to 535 WEA and 245 Trenor Drive and any other attached property." A-333, ECF No. 35-1 at 5.

Finally, though it was not mentioned in his ruling, Judge Drain addressed during argument Plaintiffs' argument that the priority-skipping distribution scheme in the proposed settlement agreement would violate the Supreme Court's opinion in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017). Judge Drain acknowledged that *Jevic* held "one cannot approve a transaction, including a settlement, that skips

- 22 -

a priority." A-290, 4/23/21 Hr'g Tr. at 40:11-15. He concluded, however, that the case was distinguishable because Plaintiffs' priority was, based on his erroneous interpretation of New York law and apparent disregard of multiple liens, "in serious doubt." A-290, *id.* at 40:17.

The most important part of this ruling is what it failed to address. The settlement agreement proposed did not simply call for a payment that would "skip" a priority that may or may not be established later. Rather, the priority-skipping distribution would be made only in the event that the priority was in fact established. Defendants' brief describing the offer stated that if "the Stadtmauers are successful in their 'attachment lien' claim, such that they receive priority distribution of the $2.2 million to be paid . . . ***Defendants will pay an additional $2.2 million directly to the Trustee for distribution to other creditors***." A-205, ECF No. 26 at 4 (emphasis in original; some emphasis removed). That is, the "indemnity" described in the settlement offer, which the Trustee described as a material inducement to its acceptance of Defendants' offer, A-261, 4/23/21 Hr'g Tr. at 11:8, would by definition violate the rule articulated in *Jevic* that a settlement agreement may not violate the Bankruptcy Code's priority distribution rules. This same term was ultimately adopted in the settlement agreement approved by the Court, with the sole modification of stating expressly that any claim the Stadtmauers asserted against the "indemnity" payment would be treated as an unsecured claim. A-334, ECF No. 35-1, ¶ 7.

- 23 -

Though the Trustee used this change at the hearing to argue it addressed Plaintiffs' *Jevic* argument, A-261, 4/23/21 Hr'g Tr. at 11:12-17, it in fact did nothing to bring the settlement agreement into compliance with the Bankruptcy Code. The "indemnity" still provided expressly for a priority-skipping distribution.

On June 2, 2021, the Bankruptcy Court entered an amended order. Plaintiffs filed a notice of appeal to the District Court on June 16, 2021.

## E.    The District Court Order

On appeal, the District Court erroneously affirmed the Bankruptcy Court's rulings by order dated May 19, 2022. The errors in the District Court's order are discussed in the argument section below and are not repeated here. Plaintiffs filed a notice of appeal in the District Court on June 6, 2022, and this appeal followed.

## SUMMARY OF ARGUMENT

The rulings below approving the settlement agreement between the Trustee and the Defendants should be vacated and this case should be remanded for further proceedings.

***First***, the Bankruptcy Court erred as a matter of law by entering an order in a summary proceeding that, once final and unappealable, would authorize the Trustee to unilaterally "vacate and/or set aside" Plaintiffs' substantial judicial liens on property. Decades of Supreme Court law, dating at least to *Butner v. United States*, 440 U.S. 48 (1979), have held that state law property rights are unaffected by a

- 24 -

bankruptcy filing unless express statutory authority states otherwise. There is no statutory authority for the Trustee's seizure and disposition of Plaintiffs' judicial liens secured under state law more than ninety days before the debtor's bankruptcy filing. To the contrary, the Bankruptcy Code extensively enumerates the trustee's powers and rights in bankruptcy, none of which give a trustee the power to appropriate claims asserted pre-petition that are secured by liens on specific collateral. If allowed to stand, the Bankruptcy Court's ruling would disrupt Congress's intricately crafted balance of rights between trustees and creditors.

In all events, the Bankruptcy Court's order granting the Trustee authorization to "vacate and/or set aside" Plaintiffs' liens, issued in the context of a summary proceeding, violated the Federal Rules of Bankruptcy Procedure and basic notions of due process. Fed. R. Bankr. P. 7001(2) provides that any proceeding to "determine the validity, priority, or extent of a lien" must be brought as an adversary proceeding. Judge Drain recognized explicitly on the record that no such proceeding had been commenced and that the April 23, 2021 hearing was in connection with a summary proceeding. A-298, 4/23/21 Hr'g Tr. at 48:20-22. Nonetheless, Judge Drain approved a settlement—and granted the Trustee express authority to perform it—that would determine the merits of Plaintiffs' liens against them.

- 25 -

**Second**, the Bankruptcy Court erred as a matter of law in approving a settlement agreement that violated the Supreme Court's opinion in *Jevic*. The agreement expressly called for distributions to junior-priority creditors ahead of Plaintiffs' priority claims, **in the event that Plaintiffs' claims were afforded priority**. The contingent distribution in the indemnity, which the Trustee relied upon in agreeing to the settlement, directly violates the Bankruptcy Code and *Jevic*.

**Third**, the Bankruptcy Court abused its discretion in approving Defendants' proposed settlement agreement without giving it appropriate scrutiny under the factors stated by the Second Circuit in *Iridium*. Instead of conducting such an analysis and scrutinizing the Trustee's diligence in seeking to settle extremely substantial claims already found to have a likelihood of success, Judge Drain erroneously found that, contrary to indisputable statements and filings in the record, Plaintiffs had no objection to settlement in the proposed range and that no funds were available to pursue litigation. This ruling was an abuse of discretion and likewise warrants reversal.

**Fourth**, the Bankruptcy Court committed legal errors in its analysis of the Settlement Agreement and the risks that Plaintiffs would prevail on the priority they assert. The Bankruptcy Court erroneously concluded that in-person service was required under CPLR 6214, which requires service of a levy on personal property in the same manner as a summons, except that service solely by delivering a

copy to an "authorized person" is generally not permitted. The Bankruptcy Court erroneously focused on the inapposite "authorized person" carve-out, while ignoring the possibility of service under CPLR 320, which was argued expressly in Plaintiffs' papers and which was supported by the indisputable fact that each Defendant appeared in this action after the levy without ever objecting to lack of proper service. Under CPLR 320, a section that Judge Drain failed to address, this is equivalent to personal service. The Bankruptcy Court also committed clear factual error in assuming that Plaintiffs had liens only on personal property governed by CPLR 6214, while ignoring their liens over real property that were governed by CPLR 6216. Reliance upon an error of law to decide a disputed issue is an abuse of discretion. *Schwartz v. Aquatic Dev. Grp., Inc. (In re Aquatic Dev. Grp., Inc.),* 352 F.3d 671, 678 (2d Cir. 2003). Further, a clear error in a conclusion of fact likewise constitutes an abuse of discretion. *See id.* Judge Drain's erroneous conclusions of law and clearly erroneous factual findings on the record were an abuse of discretion and warrant reversal.

*Fifth*, and finally, due to the likelihood of success in litigation and the substantial amounts at issue, the Trustee's settlement did not satisfy the *Iridium* factors applicable to such agreements.

For each of these reasons, and as further explained below, the rulings below should be vacated and this case should be remanded for further proceedings.

- 27 -

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN AFFIRMING AN ORDER THAT VIOLATES PLAINTIFFS' STATE-LAW PROPERTY RIGHTS, WHICH WERE UNALTERED BY THE BANKRUPTCY FILING.**

### 1. The Lower Courts Erred in Ruling that the Trustee Owns Plaintiffs' Judicial Liens.

The lower courts first erred in concluding that Plaintiffs' judicial liens, which Plaintiffs obtained lawfully through pre-bankruptcy judicial proceedings, belonged to the Trustee.

In bankruptcy, "'property interests are created and defined by state law' and 'unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.'" *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 451 (2007). This principle dates at least to the Supreme Court's opinion in *Butner*, which held that, apart from narrow exceptions now codified in the Trustee's avoidance powers, "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Butner v. United States,* 440 U.S. at 54.

In keeping with the primacy of state law property rights under *Butner*, the Bankruptcy Code takes great pains to define the trustee's power to alter those rights upon a bankruptcy filing. Under Section 547 of the Bankruptcy Code, the

trustee may void certain liens obtained within ninety days of a bankruptcy filing. Under Section 544(a) of the Bankruptcy Code, the trustee may assert the rights of a judicial lien creditor who obtained a lien at the time of the bankruptcy filing. And under Section 544(b) of the Bankruptcy Code, the trustee may assert the avoidance powers of "a creditor holding an unsecured claim." None of these powers gave the Trustee ownership of Plaintiffs' judicial liens and secured claims that pre-dated the bankruptcy filing.

First, the Trustee's powers to avoid liens—though the Trustee never asserted them below—would not allow him to void a judicial lien obtained more than 90 days before the bankruptcy filing. Rather, the Trustee has the power of "a judicial lien" creditor whose lien was obtained "at the time of the commencement of the case." 11 U.S.C. § 544(a). The Trustee's *de facto* judicial lien dates to June 30, 2020 (the date of the bankruptcy filing) and the Stadtmauers have judicial liens obtained in February 2020.[4] State law determines the relative priority of liens in

---

[4] The overwhelming majority of courts to address the issue have concluded that a pre-judgment attachment that has been levied by a Sheriff is a "judicial lien" within the meaning of the Bankruptcy Code. *See, e.g, In re Wind Power Sys., Inc.*, 841 F.2d 288, 293 (9th Cir. 1988 (upholding attachment lien after challenge under section 544); *Zammitto v. Guarnotta*, No. 04-2433, 2008 WL 5780817, at *2 (Mass. Super. Oct. 15, 2008) (allowing post-discharge enforcement of attachment obtained prepetition); *Montano Cigarette Candy & Tobacco Inc. (In re Shivani),* No. 03-30930 (LMW), 2004 WL 484549, at *3-4 (Bankr. D. Conn. March 11, 2004 (prejudgment attachment secured under Connecticut law is a lien and creates

(Continued …)

bankruptcy, *see Butner*, 440 U.S. at 55, and New York law places the Stadtmauers' earlier-obtained liens ahead of the Trustee's. *See Musso v. Ostashko*, 468 F.3d 99, 106 (2d Cir. 2006).

Likewise, the Trustee's "strong arm" power to assert claims under Section 544(b) of the Bankruptcy Code is limited to claims available to an "unsecured creditor." The Stadtmauers obtained judicial liens securing their claims pre-peti-tion, and the interests they assert are superior to those of an "unsecured creditor" unless and until their liens are set aside, which can be attempted only through an adversary proceeding, Fed. R. Bankr. P. 7001(2).

Neither the Bankruptcy Court nor the District Court addressed this clear lan-guage in the Bankruptcy Code to assess the merit of Plaintiffs' argument that their

---

a secured claim that survives discharge, enabling creditor to proceed to judgment post-discharge); *In re Schalebaum*, 263 B.R. 684, 687-88 (Bankr. D.N.H. 2001 (or-der of attachment secured pre-judgment under New Hampshire law that placed funds in escrow pending a future judgment was a judicial lien that created a se-cured claim up to the amount of the property attached); *In re Flynn*, 238 B.R. 742, 747 (Bankr. N.D. Ohio 1999) (Ohio prejudgment garnishment against debtor's bank account, which under Ohio law was a "method for attachment," was a lien that created a secured claim under the Bankruptcy Code); *In re Giordano*, 188 B.R. 84, 89 (D.R.I. 1995) (Rhode Island prejudgment writ of attachment considered se-cured claim); *In re McNeely*, 51 B.R. 816, 819-20 (Bankr. D. Utah 1985) (holding that trustee could not avoid a lien obtained by attachment or garnishment more than ninety days before bankruptcy filing); *see also In re Aslanyan*, No. 17-24195-A-7, 2017 WL 6520450, at *3 (Bankr. E.D. Cal. Dec. 20, 2017) (upholding attach-ment lien to the extent it did not impair exemption).

liens (and thus their claims) fell outside the trustee's reach. Instead, both relied on *dicta* from a single unpublished bankruptcy court order, *Helicon Partners, LLC v. Kim's Provision Co.*, No. 12-01602 (SMB), 2013 WL 1881744 (Bankr. S.D.N.Y. May 6, 2013). The *Helicon* case involved a dispute between the debtor and a creditor in which the debtor sought to vacate an attachment based on a failure to move to confirm it within five days. The question of who was entitled to assert the attachments and the claims they secured was not litigated in *Helicon*.

*Helicon* is further distinguishable from this case in several important ways. In *Helicon*, a state court issued an order of attachment on April 27, the order was "delivered . . . to" the sheriffs and "sent . . . directly to several financial institutions" on April 30, and the Debtor filed a Chapter 11 petition the very next day, on May 1. *Helicon*, 2013 WL 1881744, at *2. It is unclear whether the sheriffs actually levied upon the property at all. *See id.* at *2 n.12. But assuming that the sheriffs in *Helicon* received the order of attachment and levied upon the property on the same day (which is unlikely), the levy would have occurred *one day* before the Chapter 11 petition. As a result, the trustee obviously had the power under Section 547 of the Bankruptcy Code to set aside the levy as a preferential transfer within 90 days of the petition. Here, by contrast, the order of attachment was issued and the property was levied upon well outside of Section 547's 90-day window.

The District Court also tried to diminish the significance of Plaintiffs' liens by citing out-of-context language from certain New York court opinions. The District Court first cited language from *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d 825, 828 (N.Y. 2009), for the proposition that an attachment "does not transfer the property to the creditor." It is unremarkable to say that an inchoate property interest such as a lien does not, wholesale, transfer the underlying asset to a creditor. And the proposition in *Koehler* is even less remarkable when viewed in its context, which was to contrast a turnover claim (which was at issue in the appeal) with an attachment (which was not).

Other opinions by New York's Court of Appeals, including one citing *Koehler*, make clear that attachments do not merely keep debtors from their property, they also provide security to creditors for their claims. In *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 311 (2010), the Court of Appeals recognized that "attachment always serves a security function," as it did here. The court further made clear that a pre-judgment attachment "operates only against the property of the defendant, not on his/her person." *Id.* at 310. This further demonstrates that Plaintiffs' attachments and sheriff levies were not the mere equivalent of personal claims, but in fact gave them inchoate property rights under state law.

Plaintiffs obtained judicial liens over specific property before the bankruptcy filing, which the trustee could void only if allowed by the Bankruptcy Code and

only if done pursuant to procedural rules that require due process. Neither condition was satisfied. Both of the lower courts misinterpreted the Bankruptcy Code and ignored the Federal Rules of Bankruptcy Procedure to allow the trustee to vitiate Plaintiffs' liens through a purported "settlement agreement" that they objected to. This error was highly prejudicial to Plaintiffs and warrants vacating the orders below and remanding for further proceedings.

## 2. The Lower Courts Erred in Ruling that the Trustee Owns Plaintiffs' Claims.

Proceeding from the premise that a pre-judgment attachment is "annulled when the action in which it was granted abates or is discontinued," the District Court reasoned that the attachments belong to the trustee because the trustee owns the claims. SPA-26, District Court Order at 11. In so ruling, the District Court ignored two key issues.

First, the statutory basis for the trustee's right to assert ownership of common-law avoidance claims is 11 U.S.C. § 544(b), which gives the trustee the right to "avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an ***unsecured claim*** . . ." (emphasis added). The Bankruptcy Code does not provide – and no opinion by this Court has ever stated – that a trustee may claim ownership of a secured claim where the lien is not otherwise voidable under the detailed statutory scheme that allows the

- 33 -

trustee to defeat certain liens. And because Plaintiffs' claims were not unsecured, they were not, under the plain language of the Bankruptcy Code, subject to usurpation by the trustee under a power that gives the trustee the rights of a mere unsecured creditor. Simply, the District Court's analysis put the cart before the horse.

Second, the District Court failed to address the Court of Appeals' seminal opinion in *In re Morris v. New York State Department of Taxation & Finance*, 623 N.E.2d 1157, 1160-61 (N.Y. 1993). In *Morris*, the Court of Appeals held that the alter ego or "veil piercing" doctrine in New York does not create an independent cause of action. *Id.* at 1160. Rather, it is a remedy available for a separate, underlying claim where facts and circumstances warrant disregarding the separateness of a corporate entity and a person who exercises domination and control over it. *Id.* Regarding this language, one court reasoned:

> Treating alter ego and veil piercing theories purely as remedies, however, seems inconsistent with the case law that addresses the issue of whether an alter ego "claim" belongs to individual creditors as opposed to a bankruptcy trustee. Those cases effectively treat alter ego arguments as "claims," and even tend to use that language in deciding who owns and may assert the "claims." If "alter ego" theories and "veil piercing" theories are not separate claims at all, and instead are just remedies for other claims, then it is difficult to see how they could belong exclusively to a bankruptcy estate. I understand the theory under which a "claim" may belong to an estate. But I know of no theory under which a "remedy" belongs exclusively to an estate, even when the estate does not own the claim to which the remedy is relevant. So long as the underlying creditor claim belongs to an individual creditor, it is hard to understand why an alter ego "remedy" would not also belong to that creditor.

- 34 -

*In re Stage Presence, Inc.*, 592 B.R. 292, 299 (Bankr. S.D.N.Y. 2018), *aff'd*, No. 12-10525 (MEW), 2019 WL 2004030 (S.D.N.Y. May 7, 2019). The court noted "[t]hese are important issues that ought to be clarified and that I am confident will be clarified in future decisions." *Id*. at 301.

The District Court ignored this issue. It did not once cite *Morris* or grapple with the important issues identified in *Stage Presence* that Plaintiffs raised below. The reasoned analysis in *Stage Presence* is correct: the Bankruptcy Code provides no basis for the trustee to usurp remedies that are attached solely to individual creditor claims and for which no "derivative claim" exists.

Turning to this Court's precedents on a trustee's standing in bankruptcy cases, the District Court unjustly criticized Plaintiffs for distinguishing the conclusions in the *St. Paul* and *Tronox* cases on the grounds that they applied non-New York law and did not involve attachments. SPA-28. District Court Opinion at n.6. In fact, in both *St. Paul* and *Tronox*, this Court recognized the primacy of state law in determining whether the trustee or a creditor has standing to assert claims. In *St. Paul*, this Court held that "[w]hether the rights belong to the debtor or the individual creditors is a question of state law" and thus the Court needed to conduct "an analysis of state alter ego and tort law." *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989). The Court concluded that, "under Ohio law, a corporation would be able to assert an alter ego ***cause of action*** against

- 35 -

its parent corporation," and thus the alter ego claim was property of the estate. *See id.* at 704 (emphasis added). Likewise, in *Tronox*, the Court expressly applied Delaware or Pennsylvania law and concluded that, under either law, a subsidiary could assert a claim "to pierce its own veil." *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir. 2017).

Here, New York law does not characterize the "alter ego" doctrine as a claim that can be asserted independently, *Morris*, 623 N.E.2d at 1160-61, much less one for which an entity could seek to pierce its own corporate veil. *See also JPMorgan Chase Bank, N.A. v. Malarkey,* 65 A.D.3d 718, 721, 884 N.Y.S.2d 787, 790 (2009) ("a corporation cannot pierce its own corporate veil to benefit either the parent or a subsidiary"); *Ahuja v. Ian Schrager Hotels, Inc.*, 29 A.D.3d 387, 815 N.Y.S.2d 62, 63 (2006) ("courts will not allow a parent to pierce the corporate veil it created for its own benefit, so as to assert the claims of its subsidiary").

After recognizing the importance of whether state law allowed the debtor to assert a veil-piercing claim, SPA-28-29, District Court Opinion at 13-14, the District Court did not answer that question. Instead, the District Court shortcut the analysis by relying on non-binding analyses in lower-court cases that do not cite *Morris*. For example, the opinion in *In re Keene Corp.*, 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994), cited by the District Court, cited only to various pre-*Morris* bankruptcy court opinions to reach its conclusion on New York law. *Cardinal*

- 36 -

*Holdings, Ltd. v. Indotronix Int'l Corp.*, 73 A.D.3d 960, 962, 902 N.Y.S.2d 123, 126 (2010), also cited by the District Court, involved a fundamentally different fact pattern, where a creditor brought an alter ego action in state court *after* the trustee had entered into a court-approved settlement agreement that expressly resolved those claims. It is thus unsurprising that the state court concluded the claims were "property of the bankruptcy estate," as a contrary ruling would have sanctioned an improper collateral attack on the bankruptcy court's ruling. Here, Plaintiffs are properly challenging the Bankruptcy Court's ruling by direct appeal and the per-functory, non-binding conclusion in *Cardinal Holdings* (which cites only *St. Paul*, a case applying Ohio law) is of no persuasive value.

Finally, the last case the District Court cited was an unpublished trial court order that contains no analysis of the nature of a New York veil piercing claim, or of how *Morris*'s holding applies under the Bankruptcy Code. *Hearst Mags. v. McCaffery*, 38 Misc. 3d 1229(A), 967 N.Y.S.2d 867 (Sup. Ct. 2012). *Hearst* relied entirely on federal court opinions applying non-New York law. It has no persua-sive value regarding New York law, and it has gained no broader recognition among New York Courts. In fact, in the decade since it was decided, the District Court's opinion was the first and only ever to cite it.

- 37 -

The District Court's reliance on such obscure and unpersuasive authorities while ignoring the Court of Appeals' significant ruling in *Morris* was error and warrants reversal.

## II. THE DISTRICT COURT ERRED IN AFFIRMING THE BANKRUPTCY COURT'S DEPRIVATION OF DUE PROCESS BY VITIATING PLAINTIFFS' LIENS THROUGH A SUMMARY PROCEEDING.

As laid out in detail in above, the Bankruptcy Court stated expressly on the record that the summary proceeding on April 23, 2021 could not be used to determine the merits of the Stadtmauers' liens or the nature of their interests relative to the Trustee. Then, without any further process or hearings, the Bankruptcy Court entered an order that did just that. *See id*. The District Court affirmed without commenting on this issue, even though Plaintiffs raised it prominently.

This was reversible error: not only would the Stadtmauers have been entitled to fair notice if the proceeding were one that could make final determinations regarding their interests, the April 23, 2021 hearing simply was not such a proceeding. As all parties (and the Bankruptcy Court) conceded at the hearing, it was a summary proceeding. *See id*. Under settled authority from this Court, such proceedings cannot determine the ultimate merits of an adversary proceeding or vacate liens. *Orion*, 4 F.3d at 1099; Fed. R. Bankr. P. 7001(2). Rather, the only means for

- 38 -

the trustee to vacate or avoid Plaintiffs' liens was by instituting an adversary proceeding. Fed. R. Bankr. P. 7001(2).

No authority holds that a summary proceeding is a path to achieve the extreme result rendered here: disposing of the Stadtmauers' validly-obtained judicial liens and a substantial lawsuit they brought personally, all over their objection. Nor was there any need to reach this extreme result for the Trustee to settle any claims that were properly his own. The settlement could have left the Stadtmauers' liens and personal claims in place to be determined in plenary proceedings. But the settlement the Trustee made, and which the Court approved, goes much further. It requires the Trustee (who is not a party to the Stadtmauers' adversary proceeding) to seize control of Plaintiffs' lawsuit, dismiss it, and vacate their associated liens with filings in the county clerk's offices, all over Plaintiffs' objection, without due process. *See* SPA-10 (requiring Trustee to vacate liens); SPA-4 (authorizing Trustee to perform the agreement according to its terms).

In light of this fundamental defect, the Bankruptcy Court's order should be vacated and this case remanded.

## III. THE BANKRUPTCY COURT'S ORDER VIOLATED THE SUPREME COURT'S OPINION IN *JEVIC*.

In addition to violating Plaintiffs' property rights, due process rights, and the governing procedural rules, the Bankruptcy Court's order ran afoul of the rules

governing bankruptcy distributions that the Supreme Court stated in *Jevic*. In *Jevic*, the Court first noted that "[t]he Code makes clear that distributions of assets in a Chapter 7 liquidation must follow [a] prescribed order":

> Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts. 11 U.S.C. § 725. Special classes of creditors, such as those who hold certain claims for taxes or wages, come next in a listed order. §§ 507, 726(a)(1). Then come low-priority creditors, including general unsecured creditors. § 726(a)(2).

*Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 979 (2017).

After recognizing that the priority of distributions to creditors in a chapter 7 case is strict and debtors cannot engineer distributions to junior creditors before senior creditors are paid in full, 137 S. Ct. at 979, the Court nonetheless considered whether a structured dismissal of a chapter 11 case might allow for such a result. *Id.* at 979-80. The Court answered that question with a "no," concluding that even in circumstances far more forgiving than this one, the type of creditor-skipping distribution that the Bankruptcy Court approved is strictly forbidden. *See id.* at 978. Specifically, the Supreme Court ruled that "[a] distribution scheme ordered in connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected parties, deviate from the basic priority rules that apply under the primary mechanisms the Code establishes for final distributions of estate value in business bankruptcies." *Id.*

- 40 -

Nonetheless, the lower courts approved a settlement structure that expressly called for payment to junior creditors ahead of Plaintiffs through a back-door "indemnity" provision. Under that term, if Plaintiffs' priority is upheld, then the Settling Parties will make an additional $2.5 million payment that *skips* Plaintiffs' priority and is to be distributed to unsecured creditors. SPA-41. The Bankruptcy Code and *Jevic* bar that result.

Both of the lower courts tried to justify this result by reasoning that the trustee disputes Plaintiffs' priority. That is legally irrelevant. Nothing in *Jevic*'s ruling or reasoning suggests that a settlement agreement may skip asserted priorities so long as some dispute is asserted.

The lower courts' reasoning also defies logic. The "indemnity," as structured, is impermissible in any scenario where it would actually be paid. If Plaintiffs' priority is somehow overcome, then the indemnity is irrelevant. But if Plaintiffs' priority is upheld, the Settlement Agreement calls for payment of junior creditors before Plaintiffs' higher-priority claims are paid in full. That is a textbook violation of the Bankruptcy Code.

The District Court further erred by elevating the form of the Settlement Agreement well above its substance. All amounts paid in connection with the Settlement Agreement were clearly being made for the trustee's cooperation in

- 41 -

helping the Settling Parties defeat Plaintiffs' claims and liens in the adversary pro-

ceeding. This was the express object of the settlement. *See* SPA-6-8.

The District Court nonetheless seemed to assume that the "indemnity" was

some entirely separate payment, unconnected to Plaintiffs' claims. SPA-34. That

was clearly wrong. The consideration for both was the same: the trustee's agree-

ment to cooperate with the Settling Parties by dismissing Plaintiffs' lawsuit, vacat-

ing Plaintiffs' liens, and releasing Plaintiffs' claims. *See* SPA-6-10, There was thus

no legal or factual basis for the District Court's conclusion that Plaintiffs' $15 mil-

lion liens could not attach to more than $2.5 million in settlement proceeds. SPA-

34, District Court Opinion at 19 (liens). *See, e.g., In re Grossinger Assocs*., 156

B.R. 8, 10 (Bankr. S.D.N.Y. 1993) ("The Chapter 7 trustee has liquidated the

debtor's properties and has sold the real estate free and clear of liens pursuant to 11

U.S.C. § 363(f), with the liens attaching to the proceeds of sale."); *In re Bygaph,*

*Inc*., 56 B.R. 596, 607 (Bankr. S.D.N.Y. 1986); *see also* 11 U.S.C. § 363(e); A-

281.

Recently, a bankruptcy court applied *Jevic* to the same question presented

here: whether a trustee's settlement of an avoidance claim in a chapter 7 case can

provide for payments to junior creditors ahead of a secured creditor. *See In re To-*

*van Constr., Inc*., No. 19-12423-KHK, 2021 WL 1235359, at *2 (Bankr. E.D. Va.

Mar. 31, 2021). In *Tovan Construction*, the trustee attempted to settle avoidance

claims asserted by a pre-petition creditor, River House. The proposed settlement

provided for payments by the non-debtor defendants of $110,000 to the estate, and

$70,000 to River House, who was an unsecured creditor of the debtor. *See id.* at

*2. The IRS, a secured creditor, objected to the settlement, and the bankruptcy

court sustained the objection. *Id.* at *3. Specifically, the court held that "[b]ecause

the proposed settlement seeks to pay River House, an unsecured creditor, $70,000

while the IRS, a senior creditor, does not receive payment in full, the Court finds

that the settlement is not 'fair and equitable' because it violates the Bankruptcy

Code's priority schemes." *Id.*

     *Tovan*'s analysis is persuasive and applies here. The "indemnity" in the set-

tlement agreement approved below contemplates paying $2.5 million "directly" to

the Trustee to distribute to junior creditor claims, without paying the Stadtmauers'

secured claim in full. A-332-333, ECF No. 35-1 at 2-3. Like the settlement pro-

posed in *Tovan*, this violates the Bankruptcy Code and the Supreme Court's opin-

ion in *Jevic*.

- 43 -

**IV.  THE BANKRUPTCY COURT'S ANALYSIS OF THE SETTLEMENT AGREEMENT WAS MARRED BY FACTUAL AND LEGAL ERRORS.**

> **1.  The Bankruptcy Court Relied on Erroneous Factual Assumptions in Approving the Settlement Agreement.**

As a threshold matter, as discussed above at p. 18 *supra*, the Bankruptcy Court erroneously concluded that the Stadtmauers did not object to the settlement on adequacy grounds. The Bankruptcy Court also erroneously concluded that there would have been no funds available to litigate if a settlement could not be achieved. Each of these conclusions was a clear factual error.

> **2.  The Bankruptcy Court Relied on Erroneous Legal Conclusions in Approving the Settlement Agreement.**

The Bankruptcy Court also committed legal errors in analyzing the Settlement Agreement.

First, Judge Drain reasoned incorrectly that there was "substantial doubt" that Plaintiffs' appearance in this action with no objection to service of the levies "would suffice" as service "under the plain terms of CPLR 6214." A-300, 4/23/31 Hr'g Tr. at 50:3-7. To reach this conclusion, Judge Drain erroneously construed Defendants' argument as relying on service on an ***authorized person*** (not by a party's appearance), which is expressly carved out from the means of service permitted under CPLR 6214.

- 44 -

At no point did Plaintiffs rely on service upon an "authorized person," either in their papers or at the hearing. Instead, Plaintiffs expressly relied on service under CPLR 320, based on Defendants' ***appearance***. A-233, ECF No. 28 at 9. It is beyond dispute that, after the February 18, 2020 filing of the Westchester Sheriff's levy, each defendant (including the Debtor) filed a motion to dismiss that did not object to service, which is, as a matter of law, an "appearance."[5] CPLR 320 states that, absent an express objection, "an appearance of the defendant is equivalent to personal service of the summons upon him." Under CPLR 6214, which states that a levy should be served "in the same manner as a summons," this is clearly sufficient, because "personal service of the summons" is valid service under CPLR 308 (for individuals) and 311-a (for limited liability companies). Judge Drain's ruling crediting the Defendants' untimely, tactical game-playing regarding service was an abuse of discretion.

Judge Drain likewise erred to the extent he reasoned that the 90-day limitations period to commence a special proceeding under CPLR 6214(d) to compel turnover of property may have expired. A-271, 4/23/21 Hr'g Tr. at 21:9-14. The

---

[5] https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=jQiWmsC7oyH8hlk7LDbXkQ==;
https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=CwgJ0u2IfO/VV5Vj0gMutw==; https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=CwgJ0u2IfO/VV5Vj0gMutw==.

- 45 -

deadline to bring such an action, which began to run on February 18, 2020, was tolled from March 20, 2021 through the commencement of the Debtor's bankruptcy filing by various Executive Orders addressing the COVID-19 pandemic. Executive Order No. 202.8, *see also* Executive Order No. 202.72. After the debtor's bankruptcy was filed, this deadline was suspended by operation of the Bankruptcy Code, 11 U.S.C. § 108(c), and the attachment and levies remained in place under 28 U.S.C. § 1450. Judge Drain's reasoning to the contrary was legal error that was an abuse of discretion.

Finally, Judge Drain committed clear error regarding the facts of the case by failing to recognize that Plaintiffs' liens extend not only to personal property, but also to real estate. Such liens are governed not by CPLR 6214, but CPLR 6216, which requires neither service of the order of attachment nor commencement of a special proceeding within ninety days. Judge Drain's erroneous analysis of levies performed under CPLR 6214 was in all events inapposite to Plaintiffs' liens over real property. This clear error regarding the facts of this case was also an abuse of discretion.

The District Court did not address these rulings, reasoning that any error by Judge Drain would be harmless due to the operation of the "indemnity." SPA-42, District Court Opinion at 27. As discussed above, the "indemnity" violated Supreme Court precedent and the Bankruptcy Code. Thus, these errors were not

"harmless," and they further warrant vacating and remanding this case to the Bankruptcy Court.

## V.   DEFENDANTS' SETTLEMENT SHOULD HAVE BEEN DENIED UNDER THE *IRIDIUM* FACTORS.

Even if the claims settled below were the trustee's to assert (and they were not), the trustee accepted far too little in exchange for them.

The baseline standard to approve a settlement under Bankruptcy Rule 9019 requires the Court to consider the seven *Iridium* factors: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment; (3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement"; (4) whether other parties in interest support the settlement; (5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court Judge" reviewing, the settlement; (6) the "nature and breadth of releases" to be granted under the settlement; and (7) "the extent to which the settlement is the product of arm's-length bargaining." *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007).

On top of the Bankruptcy Court's clear factual and legal errors identified above, which alone warrant reversal, the overall insufficiency of the settlement provides another ground for reversal.

### 1. The Litigation Is Likely to Succeed

The "probability of success in litigation" is the "key question" in evaluating a Rule 9019 motion. *In re Remsen Partners, Ltd.,* 294 B.R. 557, 565-66 (Bankr. S.D.N.Y. (2003). Here, the State Court, in the attachment order, which, by operation of law, was to be treated as an order of the Bankruptcy Court, *see Torah Soft Ltd. v. Drosnin*, 224 F.Supp.2d 704, 710 (S.D.N.Y. 2002), found that it is likely the claims against the Defendants will succeed. Further, as set forth in *Part I supra*, there is substantial evidence supporting the State Court's ruling.

The courts below gave no apparent weight to this ruling, which distinguishes this case from practically every other in which a trustee has sought leave to settle a claim. Nor did they properly credit the evidence already obtained through the discovery from third parties that took place pre-petition in determining the Trustee's likelihood of success on the merits. Instead, the lower courts erroneously assented to the excessive weight the Trustee gave to the already-rejected defenses that it fears might limit or foreclose recovery, which were "raised by the Defendants in the various pleadings filed in the State Court": (i) statute of limitations; (ii) lack of specificity in the complaint; and (iii) "the related entities are non-debtors, owned

by non-debtors and the assets owned by them were never property of the Debtor either legally or equitably." A-80.

**First**, the Defendants vociferously asserted the statute of limitations defense at every turn, and at each turn it had been rejected. That was because the Defendants generally mischaracterized the nature of the claims and when they accrue, selectively asserting that the "relevant transfers" occurred more than six years before the action was filed while ignoring later transactions.[6]

In any event, the statute of limitations is not relevant to the alter ego theory asserted in this action. *Holme v. Glob. Mins. & Metals Corp.*, 22 Misc. 3d 1123(A), 880 N.Y.S.2d 873 (Sup. Ct.), *aff'd*, 63 A.D.3d 417, 879 N.Y.S.2d 453 (2009) ("[I]f the alter ego claim is proved, the normal statute of limitations period applicable to fraud would be supplanted by the period given by CPLR 211(b), which provides for a twenty-year limitations period to enforce a judgment."). Nor was there a strict time-bar for claims involving actual intent to hinder, delay, or defraud present or future creditors under N.Y. Debtor and Creditor Law § 276, which at the time of filing could be brought within two years of ***discovery*** of the claims, and were not subject to any statute of repose. *See Island Holding, LLC v. O'Brien*,

---

[6] *See Stadtmauer et al. v. Nordlicht et al.*, Index No. 51825/2020, Doc. Nos. 92, 159 (Sup. Ct. Westchester Cnty. 2020).

- 49 -

6 A.D.3d 498, 500 (2nd Dep't 2004) ("[W]here actual fraud is alleged, the statute of limitations is six years from the fraudulent transfer or two years from the time the fraud was discovered or could have been discovered with reasonable diligence."); *see also McGuinness v. Standard Drywall Corp*., 193 A.D.2d 518, 518 (1st Dept. 1993) (action alleging actual fraud brought "after investigations in connection with attempts to satisfy judgments" was timely under two-year discovery statute). In sum, the Related Parties' twice-rejected statute of limitations argument did not warrant the enormous risk discount implied by the settlement the Bankruptcy Court approved.

*Second*, the trustee's argument that the complaint lacked specificity had no merit. The Related Parties had already filed a motion to dismiss the complaint, and that motion was denied by the State Court. A-403-404. The Trustee's assertion that pleading inadequacies might be a risk in the Adversary Proceeding is directly refuted by its procedural history.

*Third*, the Bankruptcy Court gave the Trustee undue credit in his argument that the Defendants might prevail by arguing that "the related entities are non-debtors, owned by non-debtors and the assets owned by them were never property of the Debtor either legally or equitably." A-80, 9019 Motion at ¶ 31. Again, this argument was addressed and rejected, at least provisionally, by the State Court. Not only did the State Court find that this argument lacked merit, it found that in

adamantly making such claims, Ms. Kalter made statements under oath that were directly contradicted by evidence and otherwise wholly implausible. A-375. And as Plaintiffs explained in their filings, there is already substantial evidence refuting this defense. A-94-116. Neither the Trustee nor the Bankruptcy Court adequately addressed any of this evidence.

At bottom, the Defendants have no viable defenses. They are sitting on at least tens of millions of dollars in assets that are subject to Mr. Nordlicht's domination and control and being used for his personal benefit to pay preferred creditors. Should litigation go forward, Defendants are faced with little to no chance of winning summary judgment, given the attachment order that found probable success on the merits, a much higher standard than a court applies at summary judgment. And once on the stand at trial, the primary defendant—Ms. Kalter—would need to testify having already severely compromised her own credibility by making repeated, material misrepresentations under oath in her affidavit. It is this grim litigation outlook that caused Mr. Nordlicht to file for bankruptcy in the first place.[7]

---

[7] During his Section 341 meeting, Mr. Nordlicht testified: "In terms of why I'm in bankruptcy, it's because of one over-aggressive creditor. Yes, I want a fresh start, and—but even with everything I'm facing, I could have worked with everyone, except one over-aggressive creditor, you know, who—who did some—who did some very, very aggressive things." A-119.

Not only are the chances of success high, there is significant money to recover far in excess of the consideration under the Second Amended Settlement Offer. Under limited discovery in the Adversary Proceeding, tens of millions of dollars in assets were discovered to be in Mr. Nordlicht's possession. On top of what has been learned to date, there are connections between Mr. Nordlicht and other substantial entities that should be investigated and, if appropriate, added to the Adversary Proceeding. One example is a company called Sunwave, which is, in essence, the next incarnation of one of Platinum Partners' most lucrative investments, Agera, which was sold for $315 million. A-120. Sunwave's ties to Mr. Nordlicht were discussed in detail in the proceedings below. *Id*. The Trustee was aware of this entity and do not pursue it with any discovery.

The key factor of the probability of success in litigation weighs strongly in favor of reversing the Bankruptcy Court's approval of the 9019 Motion.

## 2. The Prospect of "Protracted Litigation" Is Manageable

Though frank assessment of almost any case means that "protracted litigation" is possible, here the risk of protracted litigation and non-recovery was mitigated by many factors, including the existence of hard assets in 16AA's portfolio, the Attachment and related liens that the Stadtmauers have obtained, and the fact that the litigation had already survived a motion to dismiss. This factor also

- 52 -

weighed against approving the 9019 Motion. Further, Appellants offered to fund the litigation and Appellants' counsel offered to be retained as Trustee's special counsel for that very purpose. Instead, the Trustee unreasonably compromised tens of millions of dollars in recoverable claims for a mere $2.5 million without conducting any due diligence or discovery.

One fact of many starkly reveals the Trustee's astounding lack of diligence. Plaintiffs' pre-petition discovery uncovered over $5.8 million dollars in transfers from 16AA, which Mr. Nordlicht controls, to International Financial Enterprise Bank ("IFEB"), an offshore financial institution where a former business associate of Mr. Nordlicht holds a senior position. Mr. Nordlicht personally holds an account at IFEB. Yet there is no evidence that the Trustee *ever* looked into these facts to investigate whether the Debtor is hiding assets from his creditors before seeking to grant a full release.

### 3. The 9019 Motion Is Not in the Creditors' Interests

The $2.5 million settlement was not in the interests of creditors. As explained earlier, the settlement did not account for even the minimum expected value of the litigation claims. Moreover, it would not provide meaningful recovery to creditors. The Bankruptcy Court abused its discretion in finding to the contrary.

### 4. The Competency of Counsel and Experience of the Court Are Not Determinative

The Appellants acknowledge that the Trustee and his counsel are experienced bankruptcy professionals and the Bankruptcy Court was qualified to determine bankruptcy matters. This factor, however, is "not dispositive." *Remsen*, 295 B.R. at 565. The Bankruptcy Court abused its discretion in giving too much weight to the Trustee's position and insufficient weight to the factors weighing in favor of seeking a higher recovery.

### 5. The Overbroad Releases Weigh Against Settlement

The extensive releases contemplated under the Second Amended Settlement Offer released all of the estate's claims – known and unknown – against the Debtor and all Defendants. The scope of the releases was extremely broad and extended to all claims "anticipated or unanticipated" that the "Trustee, his professionals, and the Debtor's estate had, have, may ever have, or may ever claim to have" against the Related Parties. *Id.* These broad releases weighed against approving the settlement, especially given the paltry amount of consideration being given to the estate under the Second Amended Settlement Offer.

- 54 -

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court vacate the orders below and remand this case to the Bankruptcy Court for further proceedings.

Dated: September 14, 2022
New York, NY

Respectfully Submitted,

/s/ Nathaniel J. Kritzer
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
Tel: (212) 506-3900
nkritzer@steptoe.com
Nathaniel J. Kritzer, Esq.

*Counsel for Richard and
Marisa Stadtmauer*

- 55 -

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(A)

1.      This brief complies with the type-volume limitation of Local Rule 32.1 because it contains 12,759 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point font.

Dated: September 14, 2022          Respectfully submitted,
New York, NY

/s/ Nathaniel J. Kritzer
STEPTOE & JOHNSON LLP

*Counsel for Richard and Marisa Stadtmauer*

- 56 -

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Amended Order Granting Trustee Authority to
    Settle Claims Pursuant to Modified Settlement
    Offer from Settling Parties, dated June 2, 2021..... SPA-1

Opinion and Order of the Honorable Kenneth M.
    Karas, dated May 19, 2022, Appealed From ......... SPA-16

SPA-1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
In re:

MARK A. NORDLICHT,

                        Debtor.
------------------------------------------------------------------------x
Richard Stadtmauer and Marisa Stadtmauer,

                        Plaintiffs,

-against-

Mark Nordlicht, Dahlia Kalter, 535 W.E.A. Group LLC, OBH
2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands
Trust Limited, Trenor Investment Partners LP, Henley
Investment Partners LP and John Does 1-50,

                        Defendants.
------------------------------------------------------------------------x

Chapter 7
Case No.: 20-22782 (RDD)

Adv. Pro. No.: 20-06489 (RDD)

### AMENDED ORDER GRANTING TRUSTEE AUTHORITY TO SETTLE CLAIMS PURSUANT TO MODIFIED SETTLMENT OFFER FROM SETTLING PARTIES

      Upon the motion [Dkt. No. 24] (the "**Motion**") of Mark S. Tulis, as Chapter 7 trustee (the

"**Trustee**") of the estate of Mark A. Nordlicht, the debtor herein (the "**Debtor**"), by his counsel,

LaMonica Herbst & Maniscalco, LLP, pursuant to 11 U.S.C. §§ 105(a) and 363 and Rules 2002,

6004 and 9019 of the Federal Rules of Bankruptcy Procedure, seeking entry of an order: (i)

approving a Purchase and Assignment Agreement dated March __ (the "**Agreement**") by and

between Richard Stadtmauer ("**Stadtmauer**") (and, as to paragraph 1.3 thereof, Marisa

Stadtmauer) and the Trustee, providing for the sale and assignment of the estate's interest in the

claims and causes of action asserted against the defendants in the above-captioned adversary

proceeding, as well as claims and causes of action of the estate herein against other parties (as

more particularly defined in the Agreement and hereinafter, the "**Claims**"), subject to  higher or

better offers that may be tendered to the Trustee, and (ii) granting the Trustee such other relief as

SPA-2

the Court deems proper; and upon the Affidavit of Service of the Motion [Dkt. No. 25], there being due and sufficient notice of the Motion; and upon the Joint Objection to the Motion by the Adversary Proceeding Defendants and 16ᵗʰ Avenue Associates, LLC, Trenor Trust, Jerome Management, LLC, and Barbara Nordlicht, filed on April 16, 2021 [Dkt. No. 26]; and upon the Debtor's Objection to the Motion dated April 16, 2021 [Dkt. No. 27]; and upon the Response of Stadtmauer to the Joint Objection, filed on April 21, 2021 [Dkt. No. 28]; and upon the Declaration of Nathaniel Kritzer, Esq., filed on April 21, 2021 [Dkt. No. 29]; and upon the Reply of the Trustee, filed on April 22, 2021 [Dkt. No. 30]; and upon the Joint Response of the Adversary Proceeding Defendants and Interested Parties responding to the Trustee's Reply and increasing and clarifying their offer to settle claims, filed on April 22, 2021 [Dkt. No. 31]; and upon the Reply to the Motion by the Debtor filed on April 23, 2021 [Dkt. No. 32], and all other pleadings pertaining to the Motion; and there being no objections to the Trustee's determination to sell and/or settle the Claims, the only issue being the proper price and or settlement amount therefor and the terms thereof;

And upon the record of the hearings held by the Court on the Motion on March 11, 2021 [Dkt. No. 22] (the "**March 11 Hearing**") and April 23, 2021 [Dkt. No. 33] (the "**April Hearing**" and with the March Hearing, the "**Hearings**"); and, after due deliberation and for the reasons stated by the Court in its bench rulings at the Hearings, the Court having determined that (a) the Modified Stipulation of Settlement, a copy of which is attached as an exhibit hereto (the "**Modified Agreement**") is the highest and best offer with respect to the estate's Claims following a fair process to elicit and evaluate higher and better offers as required by the Court's ruling at the March 11, 2021 Hearing, (b) the Trustee's entry into and performance of the Modified Agreement is a proper exercise of the Trustee's judgment and is in the best interests of

the Debtor's estate and creditors, and (c) accordingly, the Trustee's entry into and performance of the Agreement should be denied and the Motion should granted as provided herein; and upon the Court's review of (x) counsel for Stadtmauer's emailed letter to the Court, dated March 27, 2021 regarding the proposed form of this Order and (y) counsel for certain of the Settling Parties' (as such term is defined in the Modified Agreement) emailed letter to the Court, dated March 27, 2021 in response, as well as (z) the version of the Modified Agreement blacklined to show changes against the Settling Parties' originally proposed agreement, emailed to chambers by counsel at the Court's request on June 1, 2021; and no additional notice or hearing being required, the Court entered an Order on June 1, 2021 granting the Motion as provided therein (the "**June 1 Order**"); and by email dated June 1, 2021 counsel for certain of the Settling Parties having informed the Court that the June 1 Order contained a typographical error in the third-to-last decretal paragraph and failed to attach a copy of the Modified Agreement as an exhibit; and good and sufficient cause appearing to correct such errors under Fed. R. Bankr. P. 9023 and 9024; and no additional notice or hearing being required, it is hereby

**ORDERED**, that the June 1 Order is modified as set forth herein; and it is further

**ORDERED**, that Motion is granted to the extent set forth herein; and it is further

**ORDERED,** that to the extent that the Motion sought approval of the Agreement, it is denied, the Court having determined not to approve the Trustee's entry into the Agreement; and it is further

**ORDERED**, that, in accordance with section 3.8 of the Agreement, the Trustee shall return the Deposit (as such term defined in the Agreement) to Stadtmauer via wire transfer five days after this Order becomes final, provided that Stadtmauer provides the Trustee with wire instructions; and it is further

3

SPA-4

**ORDERED,** that the Trustee is authorized to enter into the Modified Agreement, and the Trustee and the parties thereto are authorized to perform the Modified Agreement according to its terms; and it is further

**ORDERED,** that the Trustee is authorized to expend such funds and execute and deliver any and all documents as reasonably necessary to implement the terms of this Order.

Dated: White Plains, New York
     June 2, 2021

*/s/Robert D. Drain*
UNITED STATES BANKRUPTCY JUDGE

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

In Re:

Mark A. Nordlicht,                                          Chapter 7
                                                            Case No. 20-22782 (RDD)

                                    Debtor.

------------------------------------------------------------------------x

Richard Stadtmauer and Marisa Stadtmauer,

                                    Plaintiffs,

        -against-                                           Adv. Pro. No. 20-06489 (RDD)

Mark Nordlicht, Dahlia Kalter, 535 W.E.A. Group LLC,
OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook
Islands Trust Limited, Trenor Investment Partners LP, Henley
Investment Partners LP and John Does 1-50,

                                    Defendants.

------------------------------------------------------------------------x

## MODIFIED STIPULATION OF SETTLEMENT

        Mark S. Tulis, as Chapter 7 Trustee (the "Trustee") of the estate of Mark A. Nordlicht

("Debtor"), (a) defendants Mark Nordlicht, Dahlia Kalter, 535 W.E.A. Group LLC, OBH 2308

LLC, NYFLA Investors LLC, The Trenor Trust (sued as Gilad Kalter Cook Islands Trust Limited),

Trenor Investment Partners LP, Henley Investment Partners LP, John Does 1-50 (collectively, the

"Initial Defendants", (b) 16th Avenue Associates, LLC, Trenor Trust, Jerome Management LLC

(collectively, the "Proposed Supplemental Defendants") (collectively, the "Settling Defendants"),

and (c) non-party Barbara Nordlicht (the Settling Defendants, together with Barbara Nordlicht, are

collectively the "Settling Parties", together with the Trustee, the "Parties"), by and through the

undersigned, hereby stipulate and agree as follows (the "Modified Settlement Stipulation"):

WHEREAS, on June 29, 2020 ("Petition Date"), the Debtor filed a voluntary petition for relief pursuant to Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York ("Court"); and

WHEREAS, Mark S. Tulis was appointed as the Chapter 7 Trustee of the Debtor's estate and, by operation of law, is the permanent Chapter 7 Trustee of the Debtor's estate; and

WHEREAS, on February 5, 2020, Richard Stadtmauer and Marisa Stadtmauer (the "Stadtmauer Parties"), commenced an action in the Supreme Court of the State of New York, County of Westchester, under Index No. 51825/2020 (the "State Action"), captioned *Richard Stadtmauer and Marisa Stadtmauer v. Mark Nordlicht, Dahlia Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands Trust Limited, Trenor Investment Partners LP, Henley Investment Partners LP, and John Does 1-50*; and

WHEREAS, the complaint in the State Action (the "Complaint") alleges, among other things, that the Initial Defendants had received fraudulent transfers from, or on behalf of, the Debtor and that the Initial Defendants were the Debtor's alter egos; and

WHEREAS, on February 5, 2020, the Court in the State Action granted the Stadtmauer Parties' *ex parte* motion for a pre-judgment Order of Attachment Without Notice (the "Attachment"), including against certain property located at 535 West End Avenue, Unit No. 15, New York, New York ("535 WEA") and 245 Trenor Drive, New Rochelle, New York ("245 Trenor Drive") (collectively, the "Properties"); and

WHEREAS, on February 14, 2020, the Stadtmauer Parties filed a Notice of Attachment on Real Property against 535 WEA (the "535 Notice of Attachment"); and

WHEREAS, on February 18, 2020, the Stadtmauer Parties filed a Notice of Attachment on Real Property against 245 Trenor Drive (the "245 Notice of Attachment") (the 535 Notice of Attachment and the 245 Notice of Attachment are collectively referred to herein as the "Notices of Attachment"); and

WHEREAS, on June 1, 2020, the Court in the State Action granted the Stadtmauer Parties' motion to confirm the Attachment; and

WHEREAS, on June 25, 2020, the Stadtmauer Parties filed a motion in the State Action to supplement the Complaint together with a proposed supplemental complaint (the "Supplemental Complaint"), which sought to add new proposed defendants 16th Avenue Associates, LLC, Trenor Trust, and Jerome Management LLC, and new supplemental claims; and

WHEREAS, the Settling Parties dispute the allegations in the Complaint and Supplemental Complaint; and

WHEREAS, on July 29, 2020, certain of the Initial Defendants filed a Notice of Removal with the District Court thereby removing the State Action to the District Court which was referred to the Bankruptcy Court and designated Adversary Proceeding No. 20-06489-rdd (the "Removed Action"); and

WHEREAS, upon the filing of the Debtor's voluntary petition on the Petition Date, the Trustee alleges that all the claims asserted in the Removed Action became property of the Debtor's bankruptcy estate; and

WHEREAS, on October 23, 2020 the Stadtmauer Parties filed a proof of claim in this case in the aggregate amount of $15,459,849.82, of which the sum of $14,896,316.16 was claimed to be secured and the balance of $563,533.66 is claimed to be unsecured [Claim #3-1]; and

SPA-8

**WHEREAS**, on December 7, 2020 the Stadtmauer Parties filed an unsecured claim against the debtor in this case for $17,988,582.22 [Claim 13-1] (collectively Claim 3-1 and Claim 13-1 are the "Stadtmauer Claims"]; and

**WHEREAS**, the Trustee and the Settling Parties have engaged in arm's-length negotiations and determined, without admitting liability of any kind, to resolve all of the claims by and between them, including all the claims asserted in the Removed Action, on the terms and subject to the conditions set forth in this Stipulation of Settlement ("Stipulation"); and

**WHEREAS**, the Stadtmauer Parties having entered into a Purchase and Assignment Agreement with the Trustee for the sale and assignment of the claims asserted in the Removed Action (the "Assignment Agreement"), and the Trustee, pursuant to the instruction of the Court at a hearing held on March 11, 2021, having solicited any higher or better offers to the Assignment Agreement, and the Settling Parties having made a higher and better offer, and the Court having conducted a hearing on April 23, 2021 to receive and consider any additional offers, and no such additional offers having been submitted to the Court either before or at the said hearing, and the Court having determined that the Settling Parties' said counter-offer was the highest and best offer regarding the subject matter of the Removed Action; and

**WHEREAS**, the parties are desirous of setting forth in this Modified Settlement Stipulation the agreed terms of the Settling Parties' higher and better offer so as to avoid any future uncertainty.

**NOW THEREFORE**, for good and valuable consideration, it is hereby stipulated, consented and agreed to by and between the Parties, subject to the approval of the Court, as follows:

SPA-9

1.      The Settling Parties shall pay to the Trustee the sum of $2.5 million.  The Settling Parties have heretofore remitted to the Trustee the sum of $1.5 Million ("the Down Payment"), the receipt of which is acknowledged as credit toward the settlement sum of $2.5 million (the "Settlement Sum").  The $1 million balance of the Settlement Sum shall be paid to the Trustee upon the Court's approval of this Modified Settlement Stipulation.  The Settlement Sum shall be in full and complete satisfaction of any and all claims that the Trustee has or may have, whether known or unknown, against the Settling Parties, including but not limited to the claims asserted in, or which could have been asserted in, the Removed Action.

2.      Upon the entry of an Order approving this Modified Settlement Stipulation, and that Order becoming final and non-appealable, the Settling Parties shall be deemed to have, and shall have, released and forever discharged the Trustee, his professionals, and the Debtor's estate from any and all claims and causes of action, of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or fixed, and whether anticipated or unanticipated, which the Settling Parties have, had, may ever have, or may ever claim to have, against the Trustee, his professionals, and the Debtor's estate, up to the date of this Stipulation, except for the Trustee's obligations under this Stipulation and subject to the conditions set forth herein.

3.      Upon the entry of an Order approving this Stipulation and that Order becoming final and non-appealable, the Trustee, on behalf of himself and the Debtor's estate, shall be deemed to have, and shall have, released and forever waived against the Settling Parties and their members, officers and shareholders, any and all claims and causes of action, of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other

applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or fixed, and whether anticipated or unanticipated, which the Trustee and the Debtor's estate had, have, may ever have, or may ever claim to have, against the Settling Parties, including but not limited to the claims asserted in the Complaint, Supplemental Complaint, State Action and Removed Action, and/or any claims that the Debtor's property and/or assets are being held by the Settling Parties, and/or any fraudulent conveyance and/or alter ego claims, and/or any claims under 11 U.S.C. Sections 541, 542, 544, 547, 548, 549, 550 & 551 against the Settling Parties.

4.     Upon entry of an Order approving this Stipulation and that Order becoming final and non-appealable, the Trustee shall, within five business days, discontinue the Removed Action with prejudice, including the filing of a Notice of Dismissal with Prejudice.

5.     Upon entry of an Order approving this Stipulation and that Order becoming final and non-appealable, the Trustee shall within 30 days vacate and/or set aside the Attachment and Notices of Attachment, and any other attachment and notice of attachment with respect to 535 WEA, 245 Trenor Drive and any other attached property, including (a) the filing of any and all documents required by this Court, the New York and/or Westchester County Clerk's Office and/or any other required places, (b) stipulating, as necessary, and/or (c) consenting to any order required; to vacate and/or set aside the Attachment and Notices of Attachment, and any other attachment and notice of attachment filed with respect to 535 WEA and 245 Trenor Drive and any other attached property.

6.     Barbara Nordlicht hereby agrees to pay the legal fees incurred by the estate (without any claim for reimbursement) for any attorney selected by the Trustee (or, at the election of the Trustee, the Settling Parties shall provide such counsel) to defend against (i) any purported "attachment lien" or secured claim asserted by the Stadtmauer Parties, and (ii) any appeal(s) taken

by the Stadtmauer Parties of the Court's approval of this Settlement Stipulation or any determination on the Stadtmauer Parties' "attachment lien" claim; provided however, that if the Trustee selects its own counsel, the Settling Parties shall retain the right to independently, through their own counsel, also defend against the items described in this paragraph or move for (i) dismissal of any purported "attachment lien" claim of the Stadtmauer Parties and/or (ii) reclassification of the Stadtmauer Claim [3-1] from secured to unsecured. In order to secure the obligation to fund the estate's legal fees under this paragraph, Barbara Nordlicht shall deposit the sum of $150,000 in a separate account of the Trustee to be held therein until further order of the Court.

7.    Barbara Nordlicht hereby indemnifies and holds harmless the Debtor's estate to the extent that Barbara Nordlicht will pay an additional $2.5 million (the "Indemnity Sum") directly to the Trustee for distribution to the allowed claims against the Debtor's estate in the event that the Stadtmauer Parties are successful in their "attachment lien" claim such that they receive priority distribution of the Settlement Sum. The Indemnity Sum will be either deposited by Barbara Nordlicht into a separate account of the Trustee to be held therein until further order of the Court or Barbara Nordlicht shall provide the Trustee with a Letter of Credit in the amount of the Indemnity Sum within one week of approval of this Modified Settlement Stipulation by the Court. In the event that the Stadtmauer Parties' "attachment lien" is dismissed or vacated, or their claim reclassified to be unsecured, and their time to appeal has expired (or, having appealed the order dismissing, vacating or reclassifying, the same is affirmed) then, as the case may be, the parties will mutually seek an Order from the Court directing the Indemnity Sum to be returned to Barbara Nordlicht or the Letter of Credit discharged or revoked.

SPA-12

8.      Barbara Nordlicht, Dahlia Kalter and 16th Avenue Associates LLC hereby waive any and all claims against the Estate for reimbursement of legal fees and expenses heretofore expended on behalf of the Debtor and any other claims against the Debtor.

9.      Further, the remaining Settling Parties agree to guaranty, jointly and severally, the obligation to pay such legal fees in paragraph 6 hereof and the Indemnity Sum in paragraph 7.

10.     The Settling Parties acknowledge that, to the extent that any claims of the Stadtmauers are deemed allowed claims against the Debtor's estate, they are entitled to recover, as creditors, their *pro rata* percentage of the Settlement Sum.

11.     This Modified Settlement Stipulation is a compromise and settlement of disputed claims and is the product of arm's-length negotiations. The Parties understand and agree that the payment of the Settlement Sum and the execution and delivery of this Modified Settlement Stipulation shall not constitute or be construed as an admission or adjudication, express or implied, of any fact or liability whatsoever with respect to any claims that are the subject matter of this Modified Settlement Stipulation, or any issue of fact, law, or liability of any type or nature with respect to any matter whether or not referred to herein, and none of the Parties hereto has made such an admission.

12.     In the event the Court or, if applicable, an Appellate Court, declines to approve this Modified Settlement Stipulation in its entirety: (a) the Modified Settlement Stipulation shall become null, void, and of no further force or effect, and nothing contained herein shall be deemed an admission by any of the Parties; and (b) the Trustee shall return the Settlement Sum to the Settling Parties who paid the Settlement Sum within five (5) business days.

13.    This Modified Settlement Stipulation sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof.

14.    This Modified Settlement Stipulation shall be binding upon the Parties, their respective heirs, executors, successors, administrators and assigns.

15.    This Modified Settlement Stipulation may not be amended or modified other than in writing executed by each of the Parties.

16.    The undersigned represent and warrant that they have full authority to execute this Modified Settlement Stipulation on behalf of their respective Party or client and have obtained all necessary approvals, but the Trustee's authority to bind the Debtors' estate to the settlement is subject to approval by the Court.

17.    This Modified Settlement Stipulation may be executed in one or more counterparts, including by facsimile and/or electronic mail, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

18.    The Court shall retain exclusive jurisdiction over the subject matter of this Modified Settlement Stipulation.

Dated: May 25, 2021
    New York, New York

BACKENROTH, FRANKEL & KRINSKY, LLP
*Attorneys for Mark A. Nordlicht*

By: _____
    Abraham Backenroth, Esq.
    800 Third Avenue, 11th Floor
    New York, New York 10022
    Telephone: (212) 593-1100
    abackenroth@bfklaw.com

Dated: May 26, 2021
      Wantagh, New York

                LaMONICA HERBST & MANISCALCO, LLP
                *Attorneys for Mark S. Tulis, as Chapter 7 Trustee*
                *of the Estate of Mark Nordlicht*

           By: _____

                Salvatore LaMonica, Esq.
                A Member of the Firm
                3305 Jerusalem Avenue, Suite 201
                Wantagh, New York 11793
                Telephone: (516) 826-6500
                sl@lhmlawfirm.com

Dated: May 25, 2021
      Edgemont, New York

                LEVINE & ASSOCIATES, P.C.
                *Attorneys for Dahlia Kalter, 535 W.E.A. Group LLC,*
                *OBH 2308 LLC, and Gilad Kalter Cook Islands Trust*
                *Limited, Trenor Investment Partners LP and Trenor Trust*

           By: _____

                Michael Levine, Esq.
                15 Barclay Road
                Scarsdale, New York 10583
                Telephone: (914) 600-4528
                ml@levlaw.org

Dated: May 25, 2021
      New York, New York

                COHEN TAUBER SPIEVACK & WAGNER P.C.
                *Attorneys for NYPLA Investors LLC*

           By: _____

                Sari E. Kolatch, Esq.
                420 Lexington Avenue, Suite 2400
                New York, New York 10170
                Telephone: (212) 381-8729
                skolatch@ctswlaw.com

Case 22-1223, Document 30, 09/14/2022, 3382212, Page80 of 108

SPA-15

Dated: May 25, 2021
New York, New York

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP
*Attorneys for Mark Nordlicht and*
*Henley Investment Partners LP*

By: _____

Gabriel Hertzberg, Esq.
101 Park Avenue
New York, NY 10170
Telephone: (212) 696-8856
ghertsberg@curtis.com

Dated: May 25, 2021
New York, New York

_____
Barbara Nordlicht

16th Avenue Associates, LLC

By: _____
Dahlia Kalter, Managing Member

Jerome Management LLC

By: _____
Dahlia Kalter, Managing Member

SPA-16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: MARK A. NORDLICHT,

                  Debtor.

RICHARD STADTMAUER *and* MARISA
STADTMAUER,

                  Appellants,

      v.

MARK A. NORDLICHT, DAHLIA
KALTER, 535 W.E.A. GROUP LLC, OBH
2308 LLC, NYFLA INVESTORS LLC,
GILAD KALTER COOK ISLANDS TRUST
LIMITED, TRENOR INVESTMENT
PARTNERS LP, HENLEY INVESTMENT
PARTNERS LP, JOHN DOES 1–50, *and*
MARK S. TULIS, as Chapter 7 Trustee,

                  Appellees.

No. 21-CV-5990 (KMK)

OPINION & ORDER

James B. Glucksman, Esq.
Davidoff Hutcher & Citron LLP
White Plains, NY
*Counsel for Appellants*

Nathaniel J. Kritzer, Esq.
Jason E. Meade, Esq.
Steptoe & Johnson LLP
New York, NY
*Counsel for Appellants*

Salvatore LaMonica, Esq.
Jacqulyn S. Loftin, Esq.
LaMonica Herbst & Maniscalco, LLP
Wantagh, NY
*Counsel for Appellee Mark S. Tulis, as Chapter 7 Trustee*

SPA-17

Michael Levine, Esq.
Levine & Associates, P.C.
Scarsdale, NY
*Counsel for Appellees Dahlia Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Island Trustee Limited, Trenor Investment Partners LP, and Henley Investment Partners LP*

Scott Krinsky, Esq.
Backenroth Frankel & Krinsky, LLP
New York, NY
*Counsel for Debtor Mark A. Nordlicht*

KENNETH M. KARAS, United States District Judge:

Richard and Marisa Stadtmauer ("Appellants" or the "Stadtmauers") bring this appeal seeking reversal of the June 2, 2021 Amended Order Granting the Trustee the Authority to Settle Claims Pursuant to the Modified Settlement Offer from the Settling Parties (the "Order") from the Honorable Robert D. Drain ("Judge Drain" or the "Bankruptcy Court"). (*See generally* Not. of Appeal (Dkt. No. 1).) For the reasons set forth herein, the Court affirms the Order.

## I. Background

### A. Factual Background

#### 1. Underlying Arbitration & State Court Action

Mark A. Nordlicht ("Nordlicht" or the "Debtor") was the founder and general partner of the now-defunct Platinum Management (NY) LLC, which—in turn—was the general partner and investment advisor to Platinum Partners Value Arbitrage Fund LLP, a set of hedge funds known collectively as "PPVA." (*See* A.R. A119–35 ("Arbitration Decision"), at A120, A122.)[1] Nordlicht also served as a manager of PPVA. (*See id.* at A122.) The Stadtmauers were investors

---

[1] Citations to "A.R." refer to the record on appeal, filed as a series of appendices to both Appellants' opening brief, (*see* Dkt. No. 10), and Appellees' answering brief, (*see* Dkt. No. 16). Record citations included in the appendices filed by Appellants are referenced in the format "A[page number]"; record citations included in the appendices filed by Appellees are referenced in the format "RA[page number]."

SPA-18

in PPVA, and on May 27, 2016, PPVA issued two promissory notes to the Stadtmauers, which Nordlicht personally guaranteed via a separate agreement executed the same day. (*See id.* at A120.) PPVA ultimately defaulted on its promissory notes to the Stadtmauers, triggering Nordlicht's guaranty; however, Nordlicht refused to honor the guaranty, leading the Stadtmauers to pursue enforcement via arbitration.[2] (*See id.*) On January 10, 2020, the Stadtmauers received a final award of $14,896,316.16. (*See id.* at A115–17.)

On February 5, 2020, the Stadtmauers attempted to collect on the debt via a complaint brought in Westchester County Court (the "State Court Action") against Nordlicht; Nordlicht's wife, Dahlia Kalter ("Kalter"); a number of entities controlled by Nordlicht, Kalter, and Nordlicht's father (535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Island Trust Limited, Trenor Investment Partners LP, and Henley Investment Partners LP); and John Does 1–50, representing "onshore and offshore LLCs, partnerships, trusts, holding companies, and other entities of various jurisdictions and legal statuses . . . , as well as family members and associates of [] Nordlicht" (collectively, the "State Court Defendants"). (*See id.* at A093–113 ("State Court Complaint"), at A095–97.) The Stadtmauers alleged that Nordlicht had "engaged in a complex, far-reaching scheme to alienate assets and property to make himself 'judgment proof'" in order to "defraud and frustrate his creditors," and

---

[2] The Platinum Partners entities were ultimately shuttered after the Securities and Exchange Commission brought securities fraud charges against the entities and a number of their officers and managers, including Nordlicht. *See, e.g.*, Press Release, *SEC Charges Platinum Funds and Founder With Defrauding Investors*, U.S. Securities and Exchange Commission (Dec. 19, 2016), https://www.sec.gov/news/pressrelease/2016-267.html. Nordlicht was convicted at trial of conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud. *See United States v. Landesman*, 17 F.4th 298, 317 (2d Cir. 2021). The district court granted Nordlicht's motion for a new trial, but this order was vacated by the Second Circuit in November 2021. *See id.* at 317, 332. Nordlicht has filed a petition for a writ of certiorari to the Supreme Court. *See* Pet. for Writ of Certiorari, *Nordlicht v. United States* (No. 21-1319).

put forth fraudulent conveyance and alter ego claims to target assets held by the various

corporate entities controlled by Kalter and Nordlicht's family members.  (*Id.* at A093.)

Simultaneously, the Stadtmauers moved ex parte for an order of attachment against certain real

property identified by the Stadtmauers as allegedly belonging to Nordlicht, though not held in his

name.  (*See id.* at A195–97.)  On February 14, 2020, the Stadtmauers filed a notice of attachment

on real property against a property located at 535 West End Avenue, Unit No. 15, New York,

NY ("535 WEA"), and on February 18, 2020, the Stadtmauers filed a notice of attachment on

real property against a property located at 245 Trenor Drive, New Rochelle, NY ("245 Trenor

Drive").  (*See id.* at A192–94, A198–99.)  On May 22, 2020, the County Court granted the

Stadtmauers' motion to confirm the attachment.  (*See id.* at A203–10.)

On June 25, 2020, the Stadtmauers filed a motion to supplement their complaint in the

County Court with three additional entities as defendants: 16th Avenue Associates LLC, Trenor

Trust, and Jerome Management LLC (the "Proposed Supplemental State Court Defendants").

(*See id.* at A216–38.)  However, on June 29, 2020, Nordlicht filed a voluntary petition under

Chapter 7 of the Bankruptcy Code, which stayed the State Court Action before the County Court

could rule on the Stadtmauers' motion.  (*See id.* at A239–40.)  On the same day, certain of the

State Court Defendants removed the State Court Action to federal court, which was referred to

Judge Drain and designated an adversary proceeding.  (*See id.* at A241–45.)

### 2.  Bankruptcy Court Proceedings

On July 6, 2020, Mark S. Tulis was appointed as the interim Chapter 7 Trustee (the

"Trustee") of Nordlicht's estate, and by operation of law became the permanent trustee of the

estate.  (*See id.* at A268.)  On October 26, 2020, the Trustee entered into a stipulation with the

State Court Defendants, the Proposed Supplemental State Court Defendants, and Nordlicht's

mother, Barbara Nordlicht ("Ms. Nordlicht"; collectively, the "Settling Parties") to resolve the

SPA-20

estate's interest in the fraudulent conveyance and alter ego claims brought in the State Court

Action (the "Claims") and any other claims that could be asserted on behalf of the estate against

the Settling Parties for $1.5 million. (*See id.* at RA168–93.) On November 6, 2020, the Trustee

moved before Judge Drain for an order approving the stipulation of settlement. (*See id.*)

The Stadtmauers objected to the Trustee's motion on January 6, 2021, and presented a

counteroffer, offering "$2 million to the estate, free and clear of [the Stadtmauers'] judicial liens

secured pre-petition, in exchange for all of the rights, claims, and interests that the Trustee seeks

to settle and release." (*See id.* at A142–86 (emphasis omitted).) In response, the Trustee advised

the Bankruptcy Court that "[t]he offer made by the Stadtmauers . . . presents the estate with a

change in circumstances and significant benefits of increased compensation for the sale and

assignment of the very same claims that are being compromised in the [s]tipulation," as such,

that the Trustee had determined that "the Stadtmauer[s'] [o]ffer presents the estate with

significant benefits over the terms of the [s]tipulation and is in the best interests of the estate."

(*Id.* at A308–16.) Nordlicht disagreed and requested that Judge Drain approve the stipulation

entered into between the Trustee and the Settling Parties. (*See* Bankr. Dkt. No. 18.)[3]

On March 4, 2021, the Trustee and the Stadtmauers entered into a purchase and

assignment agreement by which the Trustee agreed to sell and assign the Claims to the

Stadtmauers for $2 million, (*see* A.R. RA221–26), which was put before the Bankruptcy Court

via the Stadtmauers' March 8, 2021 response to Nordlicht's reply, (*see id.* at RA228–35). On

March 10, 2021, the Settling Parties opposed the Stadtmauers' purchase and assignment

agreement as not in the best interest of the estate, and presented an increase to their original

_____

[3] The Court uses "Bankr. Dkt." To refer to filings on the adversary Bankruptcy Court
docket, *Stadtmauer, et al. v. Nordlicht, et al.*, No. 20-AP-6489 (Bankr. S.D.N.Y.).

offer: (1) $2 million to settle the Claims; (2) payment of legal fees necessary to defend against the Stadtmauers' asserted liens and other claims, and (3) waiver of Ms. Nordlicht and Kalter's claims for reimbursement of legal fees and expenses. (*See id.* at RA250–60.)

The Bankruptcy Court held a hearing on March 11, 2021 to consider the Trustee's motion to approve the original stipulation with the Settling Parties and the objections thereto. (*See id.* at RA264–300.)  During the hearing, the Trustee informed the Bankruptcy Court that he had determined that the Stadtmauers' increased offer was more valuable to the estate than the Settling Parties' increased offer because the Stadtmauers' offer included the additional consideration of freeing the estate from costly litigation over the Stadtmauers' asserted liens. (*See id.* at RA278.)  The Bankruptcy Court agreed and denied the Trustee's motion to approve the original stipulation. (*See id.* at A317–18.)  The Bankruptcy Court also instructed the Trustee to move for approval of the Stadtmauers' increased offer, and, accordingly, to invite other parties in interest to submit higher and better offers for the sale and assignment of the Claims. (*See id.* at RA296.)

On April 21, 2021, the Settling Parties submitted a competing offer for $2.2 million, which the Trustee rejected as not a higher and better offer in light of the value of the Stadtmauers' release of their asserted liens. (*See id.* at A025–26.)  On April 22, 2021, the Settling Parties submitted a new competing offer, this time which included: (1) $2.5 million to purchase the Claims; (2) payment of legal fees and expenses in connection with any future litigation over the Stadtmauers' asserted lien and other claims, including this Appeal; and (3) $2.5 million to be paid by Ms. Nordlicht to indemnify the estate if the Stadtmauers prevailed in the litigation over their asserted liens (the "Modified Offer"). (*See id.* at A005–15.)  The Trustee determined that in light of the indemnification, the Settling Parties' Modified Offer was

a higher and better offer than the Stadtmauers' increased offer, and recommended that the Bankruptcy Court approve it.  (*See id.* at A026.)

The Bankruptcy Court held a hearing on April 23, 2021 to consider the approval of the Stadtmauers' purchase and assignment agreement and any competing offers.  (*See id.* at A016–70.)  After the Trustee presented the offers outlined above, the Bankruptcy Court opened the floor for bidding; the Stadtmauers rested on their outstanding offer.  (*See id.* at A033–34.)  After hearing oral argument, the Bankruptcy Court ultimately agreed with the Trustee, and approved the Settling Parties' Modified Offer as the highest and best offer, (*see id.* at A056–69); the Bankruptcy Court entered an Order to this effect on June 2, 2021, (*see id.* at A001–04 (the "Order")).  This Appeal followed.[4]

B.  Procedural History

Appellants filed their Notice of Appeal on July 13, 2021.  (*See* Dkt. No. 1.)  On the same day, Appellants filed a designation of items to be included in the record on appeal, (*see* Dkt. No. 3); the Trustee and Appellees filed counter-designations on August 17, 2021, (*see* Dkt. Nos. 4–6).  After seeking and receiving an extension of time to file their opening brief, (*see* Dkt. Nos. 8–9), Appellants filed their brief on October 22, 2021, (*see* Br. of Appellants in Supp. of Appeal ("Appellants' Br.") (Dkt. No. 10)).  After seeking and receiving an extension of time to file their answering briefs, (*see* Dkt. Nos. 11–12), the Trustee and Appellees separately filed their briefs on January 10, 2022, (*see* Br. of Trustee ("Trustee's Br.") (Dkt. No. 14); Joint Br. of

---

[4] Due to the procedural history of this Action, the Appellees include the State Court Defendants (Nordlicht, Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands Trust Limited, Trenor Investment Partners LP, Henley Investment Partners LP, and John Does 1–50) and the Trustee.  The Trustee is individually represented on this appeal, and the State Court Defendants are jointly represented.  For clarity, the Court will refer to the State Court Defendants as "Appellees" and the Trustee as the "Trustee."

Appellees ("Appellees' Br.") (Dkt. No. 15)). After seeking and receiving another extension of time, (*see* Dkt. Nos. 20–21), Appellants filed their Reply brief on March 15, 2022, (*see* Reply Br. of Appellants ("Appellants' Reply") (Dkt. No. 22)).

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

The Court has jurisdiction to review this appeal pursuant to 28 U.S.C. § 158(a)(1). *See Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 700 (S.D.N.Y. 2014). "This Court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *Diane Melton Tr. v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, No. 15-CV-1151, 2016 WL 183492, at *8 (S.D.N.Y. Jan. 14, 2016) (quotation marks omitted), *aff'd*, 697 F. App'x 708 (2d Cir. 2017).[5] A district court reviews a bankruptcy court's conclusions of law de novo, its discretionary decisions for abuse of discretion, and its findings of fact for clear error. *See Lubow Machine Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000). Under the clear error standard, "there is a strong presumption in favor of a [bankruptcy] court's findings of fact if supported by substantial evidence," and a reviewing court will not upset a factual finding "unless [it is] left with the definite and firm conviction that a mistake has been committed." *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1574 (2d Cir. 1994) (alteration and quotation marks omitted). "Where there are two permissible views of the same evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 1574–75 (citation omitted); *see also UFCW Local One Pension Fund v. Enivel Props., LLC*, 791 F.3d 369, 372 (2d Cir. 2015).

---

[5] While the quoted language, formerly found in Rule 8013, is no longer contained in the Federal Rules of Bankruptcy Procedure, "logic still compels the same conclusion with respect to the appellate powers of the District Court." *In re Madoff*, 2016 WL 183492, at *8 n.14.

B.  Analysis

Appellants present six separate arguments on appeal, certain of which overlap:

(1) Appellants obtained valid judicial liens in the State Court Action, which conferred a property

right on Appellants that the Bankruptcy Court improperly allowed the Trustee to divest

Appellants of via a summary proceeding to approve a settlement agreement; (2) in approving a

settlement agreement that does not acknowledge Appellants' higher priority, secured claims in

the allocation of certain settlement proceeds, the Bankruptcy Court violated the Bankruptcy

Code as interpreted by the Supreme Court in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973

(2017) ("*Jevic*"); (3) the Bankruptcy Court abused its discretion in approving a settlement with a

purchase price of only $2.5 million when litigation in the State Court Action had established a

probability of success on the merits of the fraudulent conveyance and alter ego claims, which

were worth tens of millions of dollars; (4) the Bankruptcy Court abused its discretion in

approving a settlement that did not follow the proper procedure; (5) the Bankruptcy Court erred

in finding the Modified Offer to be a higher and better offer than Appellants' offer; and (6) the

Bankruptcy Court erred in identifying certain legal weaknesses in Appellants' arguments as to

the validity of their asserted liens, contributing to its erroneous finding that the Modified Offer

was a higher and better offer than Appellants' offer.  (*See* Appellants' Br. 1–3.)  Broadly,

Appellants raise four issues: (1) whether the Bankruptcy Court erred in finding the Claims—and,

by extension, the attachments—to be the property of the estate and eligible to be auctioned and

sold by the Trustee; (2) whether the Bankruptcy Court's approval of the settlement violated

*Jevic*; (3) whether the Bankruptcy Court properly considered the factors set forth in *Iridium Cap.*

*Corp. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452 (2d

Cir. 2007) in approving the settlement; and (4) whether the Bankruptcy Court erred in finding the

9

SPA-25

Modified Offer by the Settling Parties to be a higher and better offer than Appellants' offer.  (*See id.* at 18–21.)

The Court will discuss each in turn.

### 1.  Ownership of the Claims & Attachments

Appellants vociferously argue that their prejudgment attachments—awarded ex parte at the inception of the State Court Action—conferred a property right on Appellants that could not be disturbed without constitutional due process, which Appellants argue they were not afforded here.  (*See* Appellants' Br. 23–28; *see also, e.g.*, Appellants' Reply Br. 6–16.)  Both Appellees and the Trustee respond by pointing to the well-settled principle that fraudulent conveyance and alter ego claims such as those brought by Appellants are the property of the estate, and argue that because the attachments were predicated on these claims, the attachments too belong to the estate and will properly be annulled when the State Court Action is discontinued pursuant to the settlement agreement.  (*See* Appellees' Br. 21–27; Trustee's Br. 19–22.)  As such, no rights of Appellants were violated.  (*See id.*)  The Court considers this issue de novo, and agrees with Appellees and the Trustee.

First, it is worth making clear at the outset the function of the prejudgment attachments obtained by Appellants in the State Court Action.  While Appellants appear to characterize the attachments as quasi-mortgages the Appellants held against 535 WEA and 245 Trenor Drive, the function of the attachments in actuality was to secure Appellants' judgment in the event that the Claims succeeded.  As the New York Court of Appeals has explained: "By means of attachment, a creditor effects the prejudgment seizure of a debtor's property, to be held by the sheriff, so as to apply the property to the creditor's judgment *if* the creditor should prevail in court. Attachment simply keeps the debtor away from his property or, at least, the free use thereof; *it does not transfer the property to the creditor*."  *Koehler v. Bank of Bermuda Ltd.*, 911 N.E.2d

10

825, 828 (N.Y. 2009) (emphases added); *see also Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 783 N.Y.S.2d 758, 773 (Sup. Ct. 2004) ("Prejudgment attachment is a provisional remedy to secure a debt by preliminary levy upon the property of the debtor in order to conserve the property for eventual execution." (citing *Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 647 N.Y.S.2d 839, 840 (App. Div. 1996))).  It is for this reason that the statute provides that "[a]n order of attachment is annulled when the action in which it was granted abates or is discontinued, or a judgment entered therein in favor of the plaintiff is fully satisfied, or a judgment is entered therein in favor of the defendant."  N.Y. C.P.L.R. § 6224.  Because a prejudgment attachment is contingent on the success of the creditor's claims and the entry of judgment in the creditor's favor, a prejudgment attachment depends on the existence of such a claim.  *See, e.g.*, *In re Int'l Banking Corp. B.S.C.*, 439 B.R. 614, 621 (S.D.N.Y. 2010) ("The attachment provisions of the CPLR give the attaching creditor a priority in the distrained property which it can look to in satisfaction of a future judgment. . . . The attaching creditor's priority secures the defendant's debt contingent on the entry of judgment in the former's favor."); *see also Lankenau v. Coggeshall & Hicks*, 350 F.2d 61, 64 (2d Cir. 1965) ("[T]he attachment lien is contingent and inchoate—merely a lis pendens notice that a right to perfect a lien exists." (quotation marks omitted)).  As such, Appellants' attachments on 535 WEA and 245 Trenor Drive were dependent on the existence of the Claims, and contingent on the success of the Claims and an entry of judgment in Appellants' favor.

Second, it is clear that the Claims belong to the estate and thus were properly subject to sale by the Trustee.  It is a well-settled principle of bankruptcy law that when a debtor files for bankruptcy, "the automatic-stay provisions of the Bankruptcy Code . . . operates to prevent certain creditors from 'pursuing their own remedies against the debtor's property.'"  *Tronox Inc.*

11

SPA-27

*v. Kerr-McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84, 99 (2d Cir. 2017) ("*Tronox*") (alteration omitted) (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("*St. Paul*")). "Congress's intent was 'to protect all creditors by making the trustee the proper person to assert claims against the debtor,'" and "'[t]his reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion.'" *Id.* (quoting *St. Paul*, 884 F.2d at 701). However, "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995). Thus, bankruptcy courts must distinguish between "so-called 'derivative claims'—i.e., claims 'based on rights derivative of, or derived from, the debtor's,'" *Tronox*, 855 F.3d at 99 (quoting *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 88 (2d Cir. 2013) ("*Madoff*")), and claims that are "particularized" to individual creditors.

"Whether the rights belong to the debtor or the individual creditors is a question of state law." *St. Paul*, 884 F.2d at 700. However, the Second Circuit has broadly explained that:

> Derivative claims in the bankruptcy context are those that arise from harm done to the estate and that seek relief against third parties that pushed the debtor into bankruptcy. In distinguishing derivative claims from particularized claims exclusive to individual creditors, labels are not conclusive, since plaintiffs often try, but are not permitted, to plead around a bankruptcy. In other words, we are wary of putting form over substance. Thus, we inquire into the factual origins of the inquiry and, more importantly, into the nature of the legal claims asserted. If the claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action. Whereas a derivative injury is based upon a secondary effect from harm done to the debtor, an injury is said to be particularized when it can be directly traced to the third party's conduct. Non-derivative claims are personal to the individual creditor and of no interest to the others.

*Tronox*, 855 F.3d at 100 (alterations, quotation marks, and citations omitted); *see also Madoff*,

721 F.3d at 70–71 ("The point is simply that the trustee is confined to enforcing entitlements of

the corporation.  He has no right to enforce entitlements of a creditor. . . . [T]here is a difference

between a creditor's interest in the claims of the corporation against a third party, which are

enforced by the trustee, and the creditor's own direct—not derivative—claim against the third

party, which only the creditor himself can enforce." (citation omitted)).[6]

Alter ego and fraudulent conveyance claims are quintessentially derivative, as they

definitionally seek to return assets to the estate that were wrongfully taken from it.  *See, e.g.*,

*Tronox*, 855 F.3d at 106 (characterizing fraudulent transfer claims as "paradigmatic example[s]

of claims general to all creditors").  It is for this reason that the Second Circuit has held that "[i]f

under governing state law the debtor could have asserted an alter ego claim to pierce its own

corporate veil, that claim constitutes property of the estate and can only be asserted by the

---

[6] In their Reply brief, Appellants heavily nitpick the cases cited by Appellees for these principles in an effort to obfuscate the governing law.  For example, Appellants attempt to dismiss in a cursory fashion the Second Circuit's decisions in *St. Paul* and *Tronox* as "irrelevant" because *St. Paul* applied Ohio law to the analysis of the alter ego claims at issue and *Tronox* applied Pennsylvania and Delaware law.  (*See* Appellants' Reply Br. 12–13.)  However, Appellants make no attempt to distinguish between the portions of those binding opinions expounding general principles of bankruptcy law and the portions applying state law, nor do Appellants demonstrate that Ohio, Pennsylvania, or Delaware law differs from New York law in any relevant way.  Indeed, as Appellees point out, (*see* Appellees' Br. 24 n.17), the court in *Stage Presence*—a case on which Appellants heavily rely, (*see, e.g.*, Appellants' Br. 28; Appellants' Reply Br. 13)—noted that while "in *Tronox* the alter ego claims were not governed by New York law, . . . the test affirmed by *Tronox is the same test* that has been used by other courts in deciding whether claims under New York law belong to the trustee or to individual creditors."  *Music Mix Mobile LLC v. Newman (In re Stage Presence)*, 592 B.R. 292, 298–99 (Bankr. S.D.N.Y. 2018) (emphasis added).  And, *St. Paul* has been cited favorably on multiple occasions by the New York Appellate Division—among other New York courts—applying New York law.  *See, e.g.*, *Cardinal Holdings, Ltd. v. Indotronix Int'l Corp.*, 902 N.Y.S.2d 123, 126 (App. Div. 2010); *Corman v. LaFountain*, 835 N.Y.S.2d 201, 203 (App. Div. 2007).  In short, Appellants' halfhearted attempts to distinguish these cases and dismiss the legal principles they set out are unconvincing.

13

**SPA-29**

trustee." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).  And, "under New York law, the trustee has standing to assert claims based upon piercing the corporate veil or alter ego liability, and creditors are precluded from pursuing those claims until they have been abandoned." *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994) (collecting cases); *see also Cardinal Holdings*, 902 N.Y.S.2d at 126 ("[T]he cause of action seeking recovery on the . . . judgment on an alter-ego theory was the property of the bankruptcy estate."); *Hearst Mags. v. McCaffery*, No. 101303/2011, 2012 WL 7658628, at *5 (N.Y. Sup. Ct. Aug. 31, 2012) ("The remedy for an injustice to creditors caused by [the] defendants is to allow the bankruptcy trustee to institute the alter ego claim as property of the [debtor's] estate.  The trustee's exclusive standing to institute this claim furthers the bankruptcy proceeding's objective of ensuring similar treatment of similarly situated creditors by maximizing the pool of assets available to satisfy all creditors' debts proportionately: an objective that a continuation of this action based on the alter ego claim would frustrate." (citation and italics omitted)).  Accordingly, the Bankruptcy Court properly found the Claims to be the property of Nordlicht's estate.

Appellants attempt to contend with this caselaw by disingenuously arguing that "each of these cases specifically emphasizes that a trustee could have standing to assert alter ego claims, if at all, only to the extent that they are not 'personal to any creditor'" and that "[h]ere, the alter ego allegations were clearly personal to particular creditors, namely the Stadtmauers who personally filed the lawsuit to collect on an award they personally won, and then personally obtained attachments over specific property."  (Appellants' Reply Br. 13–14 (emphases and italics omitted) (quoting *Gosconcert v. Hillyer*, 158 B.R. 24, 28 (S.D.N.Y. 1993)).)  But Appellants' repeated use of the word "personal" cannot convert Appellants' generalized, derivative claims

14

into particularized, individual claims.  *See Tronox*, 855 F.3d at 100 ("[P]laintiffs often try, but are not permitted, to plead around a bankruptcy.").

The Second Circuit's decision in *Tronox* is, again, instructive.  There, the court analyzed *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014), a Third Circuit case which "arose in the context of a motion to enforce a court order approving the settlement of a claim for fraudulent transfer." *Tronox*, 855 F.3d at 102.  The debtor, Emoral, manufactured a chemical that had caused many individuals to suffer personal injury and subjected Emoral to many toxic tort lawsuits, forcing Emoral to file for bankruptcy.  *See id.*  But before Emoral filed for bankruptcy, the company sold certain assets to Aaroma.  *See id.*  After Emoral filed for bankruptcy, the trustee brought fraudulent transfer claims against Aaroma, which the parties later settled; as part of the settlement, the trustee agreed to release Aaroma from any claims that were property of the estate. *See id.*  At the hearing to approve the settlement, a group of individuals with toxic tort claims against Emoral challenged the release and later sought to recover from Aaroma based on a theory of successor liability.  *See id.*  The bankruptcy court found the toxic tort plaintiffs' successor liability claim to be individual, and thus not the property of the estate and not subject to the release, but the district court reversed—a ruling that was upheld by the Third Circuit.  *See id.* The Third Circuit found the successor liability claim to be the property of the estate because "'recovery on [the plaintiffs'] successor liability cause of action would . . . benefit all creditors of Emoral given that Aaroma, as a mere continuation of Emoral, would succeed to all of Emoral's liabilities.'"  *Id.* at 103 (quoting *Emoral*, 740 F.3d at 880).  The Second Circuit agreed with the Third Circuit's reasoning, explaining:

> That the plaintiffs in *Emoral* had an underlying harm specific to them did not put the claims automatically outside the estate.  Indeed, *every creditor in bankruptcy has an individual claim (set forth in a proof of claim) against the debtor, whether it be in tort (as here), contract, or otherwise*.  But often there are claims against

15

third parties that wrongfully deplete the debtor's assets. Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor. *The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate.* Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.

*Tronox*, 855 F.3d at 103–04 (emphases added).

Such is the case here. While Appellants may have a personal claim against Nordlicht to collect on the arbitration award, Appellants' alter ego and fraudulent conveyance claims are secondary claims against third parties (namely, Kalter, 535 W.E.A. Group LLC, OBH 2308 LLC, NYFLA Investors LLC, Gilad Kalter Cook Islands Trust Limited, Trenor Investment Partners LP, Henley Investment Partners LP, and John Does 1–50): that these third parties "wrongfully deplete[d] [Nordlicht's] assets," *id.* at 103, leaving him with insufficient assets to satisfy the arbitration award. Thus, the Claims are "not tied to the harm done to [Appellants] by [Nordlicht], but rather are based on an injury to [Nordlicht's] estate," *id.* at 103–04, and thus, can only be raised by the estate, *see also Madoff*, 721 F.3d at 70 ("[W]hen a creditor seeks relief against third parties that pushed the debtor into bankruptcy, the creditor is asserting a derivative claim that arises from harm done to the estate."); *Helicon Partners, LLC v. Kim's Provision Co., Inc.*, No. 12-CV-1602, 2013 WL 1881744, at *9 (Bankr. S.D.N.Y. 2013) (explaining that "the fraudulent conveyance claims" and the "claims alleging that [a third party] is a fraudulent

transferee or alter ego of the [d]ebtor," which had led to a prejudgment attachment, "must be pressed by the [t]rustee as the estate representative").[7]

Accordingly, the Court affirms the Bankruptcy Court's ruling that the Claims and, thus, the attachments, are the property of the estate.

## 2. Application of *Jevic*

Appellants appear to argue in their opening brief that because the proceeds from the sale of the Claims will be distributed to the general, unsecured creditors in Nordlicht's estate, the Order approving the settlement agreement functions to improperly skip over Appellants' secured claim, violating *Jevic*. (*See* Appellants' Br. 28–31.) In their reply brief, Appellants appear to change tack, arguing that it is Ms. Nordlicht's indemnification that violates *Jevic*, because the terms of the indemnification provide that it will be paid to general, unsecured creditors in the event that Appellants are found to have a secured claim in the sale proceeds by function of their asserted liens. (*See* Appellants' Reply Br. 16–18.) Appellees and the Trustee argue that (1) *Jevic* is inapplicable here because it does not apply to asset sales; and (2) that Appellants' argument is premised on the notion that they currently hold a secured claim, when in reality,

---

[7] Appellants make several attempts to convince the Court not to consider *Helicon*. (*See* Appellants' Reply Br. 14–16.) None is availing. First, Appellants argue that this portion of *Helicon* was "dicta, not a ruling," (*id*. at 15 (italics omitted)), but the Court fails to understand why the distinction between dicta and ruling has any relevance here. Distinguishing between rulings can be important because rulings are binding on lower courts while dicta is not. However, *Helicon* is a decision from the U.S. Bankruptcy Court for the Southern District of New York, and as such, no part of its decision is binding on this Court—dicta or otherwise. Rather, the Court has cited to *Helicon* because its reasoning is persuasive. Second, Appellants seem to argue that *Helicon* is distinguishable because the sheriff's levy in *Helicon* occurred one day before the debtor entered into bankruptcy and thus, was avoidable by the trustee as a preferential transfer within 90 days of the petition. (*See id*. at 15–16.) But the status of Appellants' attachments has no bearing on whether the Claims are properly characterized as general or particularized; that analysis is based on the well-settled principles of bankruptcy law set forth above.

their asserted liens are disputed.  (*See* Appellees' Br. 28–30; Trustee's Br. 27–29.)  The Court also considers this issue de novo, and again agrees with Appellees and the Trustee.

Put plainly, Appellants' argument is a nonstarter.  As Appellants point out, *Jevic* concerns the distribution of assets via a Chapter 7 liquidation, and at the outset recites the Bankruptcy Code's "basic system of priority," in which "[s]ecured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts," "[s]pecial classes of creditors, such as those who hold certain claims for taxes or wages, come next in a listed order," and "[t]hen come low-priority creditors, including general unsecured creditors."  (Appellants' Br. 29 (quotation marks omitted) (quoting *Jevic*, 137 S. Ct. at 979).) *Jevic* thus clearly upholds and applies the principle that priority distribution of assets depends on a creditor's status as holding a secured claim or an unsecured claim.  Therefore, Appellants could only conceivably have an argument under *Jevic* or with respect to priority distribution in general if their claim against Nordlicht's estate is secured.  However, the status of Appellants' claim is unsettled because their asserted liens—which would function to secure their claim against Nordlicht's estate—are disputed.  (*See, e.g.*, A.R. A055 (Apr. 23, 2021 Hr'g Tr.) (Appellants' counsel: "We all know the lien is in dispute.").)  Thus, Appellants' argument presupposes a finding that simply has not (yet) been made: that Appellants' asserted liens are valid.[8]

Appellants' argument as to Ms. Nordlicht's indemnification fares even worse. Appellants argue that "there is no merit to the Trustee's argument that, because the Stadtmauers did not have a lien over [Ms.] Nordlicht's assets, the settlement agreement could freely skip the Stadtmauers' lien priority to distribute [the indemnification] proceeds to junior, unsecured

---

[8] Appellants' response is to simply state without explanation or support that the unsettled status of their asserted liens is "beside the point."  (Appellants' Reply Br. 16.)  This Court disagrees: it is entirely "the point."

SPA-34

creditors." (Appellants' Reply Br. 17.) But a claim that is "secured by a lien on a property in which the estate has an interest . . . is a secured claim to the extent of the value of the creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1). Thus, a creditor that holds a secured claim against a debtor's asset is entitled to the proceeds of the sale of that asset up to the amount necessary to satisfy the creditor's claim, but if the proceeds are less than the value of the creditor's claim, then the remainder of the creditor's claim is considered unsecured. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 239 & n.3 (1989) ("[A] claim is secured only to the extent of the value of the property on which the lien is fixed; the remainder of that claim is considered unsecured. Thus, a $100,000 claim, secured by a lien on a property of a value of $60,000 is considered to be a secured claim to the extent of $60,000, and to be an unsecured claim for $40,000."). As such, if Appellants are ultimately found to have a valid lien against the $2.5 million proceeds of the sale of the Claims, their approximately $15 million claim against Nordlicht's estate will only be considered a secured claim to the extent of $2.5 million, and will be considered an unsecured claim for $12.5 million. *See id.* Because Appellants have no claim whatsoever to a lien over Ms. Nordlicht's indemnification, they will not be entitled to Ms. Nordlicht's indemnification except to the extent that they are ultimately distributed a portion of the indemnification to satisfy their unsecured $12.5 million claim.[9]

---

[9] Appellants also seem to press an argument that Ms. Nordlicht's indemnification must be considered as part of the sum paid to purchase the Claims, and therefore must be paid to Appellants if their asserted lien is found to be valid. (*See* Appellants' Reply Br. 17.) But, Appellants offer no authority for this proposition, which would vitiate the very purpose of the indemnification.

SPA-35

Accordingly, the Court affirms the Bankruptcy Court's ruling that the settlement agreement does not violate *Jevic*.

### 3.  Analysis of *Iridium* Factors

Next, Appellants argue that Judge Drain improperly weighed the factors set forth in *Iridium* in approving the settlement agreement.  (*See* Appellants' Br. 31–41; Appellants' Reply Br. 18–21.)  The Trustee does not address this argument, (*see generally* Trustee's Br.), but Appellees argue that Judge Drain's consideration of the *Iridium* factors was reasonable and thus merits the Court's deference, (*see* Appellees' Br. 31–43).  The Court reviews this issue for abuse of discretion and finds that Judge Drain did not abuse his discretion in approving the settlement agreement.

Bankruptcy Rule 9019(a) provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  FED. R. BANKR. P. 9019(a).  "The Supreme Court set forth the standard a [b]ankruptcy [c]ourt should follow in determining whether or not it should approve a compromise agreement in [*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968) ('*TMT Trailer Ferry*')][,] . . . requir[ing] that the [b]ankruptcy [c]ourt make an informed, independent judgment as to whether a settlement is 'fair and equitable' and 'in the best interests of the estate.'"  *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991) (quoting *TMT Trailer Ferry*, 390 U.S. at 424).  The Second Circuit has made clear that "[i]n undertaking an examination of the settlement," a bankruptcy court's "responsibility . . . is not to decide the numerous questions of law and fact raised by [the] appellants but rather to canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'"  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (alteration omitted) (quoting *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972)).  Moreover, the

20

SPA-36

court "may give weight to the informed judgment of the trustee . . . and their counsel that a

compromise is fair and equitable" and "may approve a settlement even if it believes that the

trustee . . . ultimately would be successful at trial," considering the principle that "the law favors

compromise." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert

Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991) ("*Drexel*") (quotation marks omitted).

> "Courts have developed standards to evaluate if a settlement is fair and equitable, and to

that end, courts in this Circuit have set forth factors for approval of settlements." *Iridium*, 478

F.3d at 462. As explained in *Iridium*,

> Those interrelated factors are: (1) the balance between the litigation's possibility of
> success and the settlement's future benefits; (2) the likelihood of complex and
> protracted litigation, with its attendant expense, inconvenience, and delay,
> including the difficulty in collecting on the judgment; (3) the paramount interests
> of the creditors, including each affected class's relative benefits and the degree to
> which creditors either do not object to or affirmatively support the proposed
> settlement; (4) whether other parties in interest support the settlement; (5) the
> competency and experience of counsel supporting, and the experience and
> knowledge of the bankruptcy court judge reviewing, the settlement; (6) the nature
> and breadth of releases to be obtained by officers and directors; and (7) the extent
> to which the settlement is the product of arm's length bargaining.

*Id.* (quotation marks omitted); *accord Nuevo Pueblo, LLC v. Napolitano (In re Nuevo Pueblo,

LLC)*, 608 F. App'x 40, 41 (2d Cir. 2015) (summary order) (same).

> As a preliminary matter, it is worth noting which factors Appellants do not argue that the

Bankruptcy Court considered improperly or weigh against approval. Appellants do not argue:

(1) that the settlement agreement was not the product of arm's length bargaining; (2) that the

Trustee, his counsel, and Judge Drain are not competent, experienced, and more than qualified to

review the settlement, (*see* Appellants' Br. 40 ("Appellants acknowledge that the Trustee and his

counsel are experienced bankruptcy professionals and the Bankruptcy Court was qualified to

determine bankruptcy matters.")); or (3) that other creditors or parties in interest either objected

to or did not affirmatively support the settlement, (*see, e.g.*, A.R. A029–30, A052 (Apr. 23, 2021

21

Hr'g Tr.) (counsel for two other creditors supporting the Trustee's position)).  Rather, Appellants

argue primarily that given the County Court's entry of the attachments and denial of the State

Court Defendants' motion to dismiss and the law of the case doctrine, the litigation was certain

to succeed and result in a huge recovery, warranting the risk of a protracted dispute.  (*See, e.g.*,

Appellants' Br. 33–39.)  Secondarily, Appellants argue that the releases provided in the

settlement agreement are overbroad.  (*See id.* at 40–41.)

Starting with the likelihood of success of the underlying litigation, the Court finds that

Appellants have overstated their case.  While Appellants are correct that they received favorable

rulings on preliminary motions made in the State Court Action and that "[t]he law of the case

doctrine generally applies to decisions made by a state court prior to removal to federal district

court," *Torah Soft Ltd. v. Drosnin*, 224 F. Supp. 2d 704, 710 (S.D.N.Y. 2002), Appellants all but

ignore the fact that these rulings were *preliminary*.  The County Court may have found that

Appellants' claims were likely to succeed on the merits in, for instance, granting their motion to

confirm their attachment, but the County Court also made clear that attachment is a "provisional"

remedy.  (*See, e.g.*, A.R. A204–05.)  The County Court's determination as to Appellants'

likelihood of success on the merits was therefore not binding.  "If it were otherwise, then

determination of the application for provisional remedy or interlocutory relief would be the be-

all and end all of such litigation.  Once, for example, a preliminary injunction is granted and

some of the issues have been passed on, it would be fruitless to set the matter down for trial if the

comments of the judge passing on the provisional remedy were to be therefore binding as 'the

law of the case.'"  *Credit Français Int'l, S.A. v. Sociedad Financiera De Comercio, C.A.*, 490

N.Y.S.2d 670, 680, 576 (N.Y. Sup. Ct. 1985); *see also Madison Square Garden Boxing, Inc. v.

Shavers*, 562 F.2d 141, 144 (2d Cir. 1977) ("The preliminary injunction was by its very nature

22

interlocutory, tentative and impermanent. The findings of fact made therein were not controlling on the ultimate issues, and the parties would have been free to retry those issues during the hearing on the merits leading to a final judgment." (citation omitted)); *Bannon v. Bannon*, 1 N.E.2d 975, 978 (N.Y. 1936) ("A judicial decision can constitute a conclusive adjudication of question of fact or law only when rendered in a proceeding in which a court had jurisdiction to render an irrevocable and final decision upon such a question. . . . Though an interlocutory judgment may require the immediate performance of acts which irremediably affect the rights of the parties, and in that sense may be final, yet in so far as it purports to decide the issues litigated in the action, the decision is subject to alteration and revision.").

The Court understands that it is Appellants' position that State Court Defendants "have no viable defenses," "are faced with little to no chance of winning at summary judgment," and generally face a "grim litigation outlook," (Appellants' Br. 36), but the reality is that if the State Court Action were to proceed, Appellants' success on the merits is not yet assured. Therefore, Judge Drain did not abuse his discretion in noting that defenses would be available to the State Court Defendants when considering the litigation's possibility of success—particularly given the fact that in considering a settlement, it is not the responsibility of a bankruptcy court "to *decide* the numerous questions of law and fact raised by [the] appellants," *W.T. Grant*, 699 F.2d at 608 (emphasis added), and a bankruptcy court "may approve a settlement *even if it believes that the trustee . . . ultimately would be successful at trial*," *Drexel*, 134 B.R. at 505 (emphasis added).

Second, as to the likelihood of complex and protracted litigation, Appellants implicitly concede that this factor weighs in favor of settlement. Appellants admit that a "frank assessment of almost any case means that 'protracted litigation' is possible," but argue that this risk here is "mitigated by many factors, including the existence of hard assets in [one Proposed

23

Supplemental State Court Defendant's] portfolio, the [a]ttachment and related liens that the

Stadtmauers have obtained, and the fact this litigation has already survived a motion to dismiss."

(Appellants' Br. 38–39.)  But this argument is merely a restatement of Appellants' argument as

to the litigation's possibility of success, which the Court has already found does not warrant

reversal of the Bankruptcy Court's Order.  *See supra*.  And, as Appellees point out, Appellants

have conceded that "extensive discovery remains to be taken" and that the litigation would likely

go to trial, (*see* Appellees' Br. 37 (emphasis omitted)), which clearly indicates that the litigation

would cause substantial delay to the administration of Nordlicht's estate.  *Cf. In re Hilsen*, 404

B.R. 58, 75 (Bankr. E.D.N.Y. 2009) (explaining that "the expense, burden, and delay of complex

and protracted litigation . . . is of particular consequence in the bankruptcy context, where the

prompt administration of the bankruptcy estate, for the benefit of the debtor and creditors alike,

is among a trustee's central objectives").  Therefore, the Court has little trouble finding that

Judge Drain did not abuse his discretion in finding the legitimate risk of protracted litigation to

counsel in favor of settlement.  *See, e.g.*, *In re Pursuit Holdings (NY), LLC*, No. 18-BR-12738,

2019 WL 1220928, at *8 (Bankr. S.D.N.Y. Mar. 12, 2019) (finding risk of protracted litigation

to counsel in favor of settlement where "[t]he [t]rustee believes that continuing the

litigation . . . would likely take more than a year").

    Third and finally, Appellants argue in their opening brief that the broad scope of the

release in the settlement weighed against approval.  (*See* Appellants' Br. 40–41.)  However, in

opposition, Appellees point out that the *Iridium* factor as to releases actually concerns "the

nature and breadth of releases to be obtained by *officers and directors*," and thus is inapplicable

here, (Appellees' Br. 38), and in reply, Appellants abandoned this argument entirely, (*see*

Appellants' Reply Br. 18–21).  "By failing to respond to [Appellees'] argument in [their] Reply

24

SPA-40

Memorandum, [Appellants] concede[] the point for purposes of [the Appeal]." *Cornelius v. Macy's Retail Holdings, Inc.*, No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019) (collecting cases); *see also Elliott v. Motors Liquidation Co. GUC Tr. Adm'r (In re Motors Liquidation Co.)*, No. 19-CV-5666, 2020 WL 3120379, at *6 (S.D.N.Y. June 12, 2020) (rejecting argument in bankruptcy appeal because, inter alia, "to the extent [the appellants] [made the argument] in their opening brief, they expressly abandoned any such argument in their reply").

Accordingly, the Court affirms the Bankruptcy Court's approval of the settlement agreement based on its consideration of the *Iridium* factors.

### 4. Analysis of the Higher & Better Offer

Finally, Appellants argue that the Bankruptcy Court erred in finding the Modified Offer by the Settling Parties to be a higher and better offer than Appellants' offer because the Bankruptcy Court misapplied New York law in evaluating the validity of Appellants' asserted liens. (*See* Appellants' Br. 41–44; Appellants' Reply Br. 21–25.) The Trustee does not address this argument, (*see generally* Trustee's Br.), but Appellees argue that the Bankruptcy Court's comparison of the offers was sound, (*see* Appellees' Br. 43–44). The Court reviews this issue for abuse of discretion and finds that Judge Drain did not abuse his discretion in finding the Settling Parties' Modified Offer to be a higher and better offer than Appellants' offer.

Appellants' argument on this issue appears to rest on the notion that the Bankruptcy Court improperly discounted the value of Appellants' offer to release their asserted liens by misapplying New York law to find that there were meritorious defenses against the liens. In evaluating this argument, it is useful to recall the timeline of the auction process for the Claims. The Settling Parties originally offered to purchase the Claims for $1.5 million, an offer that the Trustee rejected in favor of Appellants' offer to purchase the Claims for $2 million plus the

25

SPA-41

release of Appellants' asserted liens. *See supra* I.A.2. In finding Appellants' offer to be the higher and better offer as compared to the Settling Parties' initial offer, the Trustee explained that Appellants' offer provided "increased compensation for the sale and assignment of the very same [C]laims" and "avoids future litigation with the Stadtmauers regarding their claim that the proceeds of the settlement are subject to their asserted judicial lien." (A.R. A309.) The Settling Parties then offered $2 million to purchase the Claims plus payment of legal fees for the litigation over the Stadtmauers' liens, *see supra* I.A.2., an offer which the Trustee rejected as not a higher and better offer because "the Stadtmauers['] [offer] comes with the additional consideration . . . that we don't even have to fight over the [asserted lien]." (A.R. RA278.) It was for this same reason that the Trustee rejected the Settling Parties' next offer to purchase the Claims for $2.2 million. *See supra* I.A.2. The Settling Parties' Modified Offer—which the Trustee did ultimately find to be the highest and best offer and the Bankruptcy Court accepted— was for $2.5 million to purchase the Claims, plus the $2.5 million indemnification from Ms. Nordlicht and the separate payment of attorneys' fees to cover the litigation over Appellants' asserted liens. *See id.* The Trustee specifically explained that it was Ms. Nordlicht's $2.5 million indemnity that "change[d] the landscape," (A.R. A026), and Judge Drain found Ms. Nordlicht's $2.5 million indemnity to be "the major change," (*id.* at A045). Judge Drain also explained his belief that there were viable defenses to Appellants' asserted liens, including that the notices of attachments were not properly served and that the levy is void by the passage of time, and therefore that there was only a modest risk that the liens would operate to deprive the estate of the full $2.5 million proceeds, even in the absence of Ms. Nordlicht's indemnification. (*See id.* at A063–69.)

SPA-42

Now, Appellants seem to argue that had the Bankruptcy Court properly applied New York law in considering the likely validity of Appellants' liens, he would have found it likely that Appellants' liens would be upheld, entitling Appellants to the full $2.5 million proceeds from the sale of the Claims.  (*See* Appellants' Br. 41–44.)  And as a result, Appellants seem to urge that their offer of $2 million was the better offer, because the end result of Appellants' offer is that the estate (and its many creditors) would be enriched by $2 million and the end result of the Settling Parties' Modified Offer is that only Appellants would be enriched by $2.5 million. The fundamental flaw of this argument is that it entirely ignores Ms. Nordlicht's indemnification, which will be paid to the estate in the event that Appellants' asserted liens are upheld and Appellants thus receive the $2.5 million proceeds from the sale of the Claims as secured creditors.  The end result of the Settling Parties' Modified Offer is thus that the estate will be enriched by $2.5 million no matter what the outcome is as to Appellants' asserted liens— i.e., $500,000 more than the end result of Appellants' offer.  And, as Judge Drain rightly pointed out, "the Trustee never abandons $500,000."  (A.R. A053.)  Therefore, even if Judge Drain did misapply New York law as Appellants argue, this error was harmless.  *See, e.g.*, *Hart Env't Mgmt. Corp. v. Sanshoe Worldwide Corp. (In re Sanshoe Worldwide Corp.)*, 993 F.2d 300, 305 (2d Cir. 1993) (holding that the harmless error rule, which provides that "no error or defect in any ruling or order or in anything done or omitted by the court is ground for disturbing an order unless refusal to take such action appears to the court inconsistent with substantial justice and the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties" applies in bankruptcy proceedings (quotation marks omitted)).

Moreover, the Court must remind Appellants that in evaluating New York law as to Appellants' asserted liens, Judge Drain was not "decid[ing] the numerous questions of law and

27

SPA-43

fact raised by [A]ppellants but rather [simply] canvass[ing] the issues and see[ing] whether the settlement falls below *the lowest point* in the range of reasonableness." *W.T. Grant*, 699 F.2d at 608 (emphasis added) (quotation marks omitted).  Appellants have failed to demonstrate that Judge Drain abused his discretion as part of this exercise.

### III.  Conclusion

Accordingly, the Stadtmauers' appeal is denied and the Order of the Bankruptcy Court is affirmed.  The Clerk of Court is directed to close this case.

SO ORDERED.

Dated:   May 19, 2022
         White Plains, New York

_____
     KENNETH M. KARAS
     United States District Judge

28