UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2023

(Argued: March 29, 2023      Decided: August 15, 2024)

Docket No. 22-1223-bk

———————————————

IN RE MARK A. NORDLICHT,

*Debtor.*

———————————————

RICHARD STADTMAUER, MARISA STADTMAUER,

*Appellants,*

v.

MARK S. TULIS, DAHLIA KALTER, 535 W.E.A. GROUP LLC, OBH 2308 LLC, GILAD KALTER COOK ISLANDS TRUST LIMITED, TRENOR INVESTMENT PARTNERS LP, HENLEY INVESTMENT PARTNERS LP, JOHN DOES 1–50, NYFLA INVESTORS LLC,

*Appellees,*

MARK A. NORDLICHT,

*Debtor-Appellee.*

———————————————

Before:      LIVINGSTON, *Chief Judge*, SACK, *Circuit Judge.**

In this Chapter 7 bankruptcy proceeding, the United States Bankruptcy Court for the Southern District of New York (Robert D. Drain, *Bankruptcy Judge*) approved a settlement agreement among the trustee of the bankruptcy estate Mark

---

* Judge Rosemary S. Pooler, originally a member of the panel, died on August 10, 2023. The two remaining members of the panel, who are in agreement, have determined the matter. *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

S. Tulis (the "Trustee"), the debtor-in-bankruptcy Mark A. Nordlicht ("Nordlicht"), the non-bankrupt appellees, and Nordlicht's mother Barbara Nordlicht (who is not a party to this case) (together, the "Settling Parties"). The settlement released claims that appellants Richard and Marisa Stadtmauer (the "Stadtmauers") had originally asserted in a New York state court action. In that action, the Stadtmauers alleged an elaborate scheme by Mark Nordlicht and the non-bankrupt appellees to conceal Nordlicht's assets to avoid paying his debts to his creditors. When Nordlicht filed for bankruptcy, the state court proceedings were automatically stayed, and the Trustee took possession of the Stadtmauers' state court claims in the course of his administration of the bankruptcy estate. In exchange for the release of the Stadtmauers' claims against all defendants in the state court action, Barbara Nordlicht obligated herself to (1) pay the estate $2.5 million to be distributed to Nordlicht's creditors; (2) indemnify that $2.5 million payment in the event the Stadtmauers successfully established priority-creditor status; and (3) reimburse the estate for its legal fees arising from defending against the Stadtmauers' continued prosecution of their state court claims.

The Stadtmauers objected to the settlement and, after the bankruptcy court approved it, appealed the decision to the United States District Court for the Southern District of New York (Kenneth M. Karas, *Judge*). Key to their appeal, the Stadtmauers maintained that the state court had granted them valid liens on two of Nordlicht's real estate holdings. These liens, they argued, gave them secured property rights to enforce if they prevailed on their fraudulent-conveyance claims in state court. Based on that theory, the Stadtmauers contended, *inter alia*, that (1) the Trustee lacked the authority to settle the Stadtmauers' claims; (2) settling those claims over their objection violated both due process and basic bankruptcy principles of creditor priority as articulated in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017); and (3) the bankruptcy court abused its discretion in approving the settlement. The district court rejected all these arguments and affirmed the approval of the settlement agreement. For the reasons set forth below, we agree with the district court, and therefore

AFFIRM.

NATHANIEL J. KRITZER, Steptoe & Johnson LLP, New York, NY, *for Appellants*;

1    LON J. SEIDMAN (Salvatore LaMonica, *on the*
2    *brief*), LaMonica Herbst & Maniscalco, LLP,
3    Wantagh, NY, *for Appellee Mark S. Tulis*;
4
5    SARI E. KOLATCH, Cohen Tauber Spievack
6    & Wagner P.C., New York, NY, *for Appellee*
7    *NYFLA Investors LLC*;
8
9    SCOTT KRINSKY, Backenroth, Frankel &
10   Krinsky, LLP, New York, NY, *for Appellee*
11   *Mark A. Nordlicht*;
12
13   MICHAEL LEVINE, Levine & Associates,
14   P.C., Scarsdale, NY, *for Appellees Dahlia*
15   *Kalter, 535 W.E.A. Group LLC, OBH 2308*
16   *LLC, Gilad Kalter Cook Islands Trust Limited,*
17   *Trenor Investment Partners LP, Henley*
18   *Investment Partners LP, John Does 1–50.*
19

20   SACK, *Circuit Judge*:

21       In this Chapter 7 bankruptcy proceeding, the United States Bankruptcy

22   Court for the Southern District of New York (Robert D. Drain, *Bankruptcy Judge*)

23   approved a settlement agreement among the trustee of the bankruptcy estate

24   Mark S. Tulis (the "Trustee"), the debtor-in-bankruptcy Mark A. Nordlicht

25   ("Nordlicht"), the non-bankrupt appellees, and Nordlicht's mother Barbara

26   Nordlicht (who is not a party to this case) (together, the "Settling Parties").  The

27   settlement released claims that appellants Richard and Marisa Stadtmauer (the

28   "Stadtmauers") had originally asserted against Mark Nordlicht and the non-

3

bankrupt appellees—various individuals and corporate entities affiliated with

Nordlicht—in a New York state court action.  In that action, the Stadtmauers

brought claims for actual fraudulent conveyance, constructive fraudulent

conveyance, and "reverse veil-piercing" by alleging that Nordlicht, his wife, and

a web of shell companies had schemed to conceal Nordlicht's assets from his

creditors to avoid paying his debts.  Central to this appeal, the Stadtmauers also

requested and obtained attachment orders against two of Nordlicht's real estate

holdings in satisfaction of the amounts owed to them.

When Nordlicht filed for bankruptcy, the state court proceedings were

automatically stayed, and the Trustee took possession of the Stadtmauers' claims

in the course of his administration of the bankruptcy estate.  In exchange for the

release of the Stadtmauers' claims against all named and prospective defendants

in the state court action, Barbara Nordlicht obligated herself to (1) pay the estate

$2.5 million to be distributed to Nordlicht's creditors; (2) indemnify and hold

harmless the estate to the extent that Barbara Nordlicht would pay an additional

$2.5 million in the event that the Stadtmauers successfully established priority-

creditor status; and (3) reimburse the estate for its legal fees arising from

defending against the Stadtmauers' continued pursuing their state court claims.

1    The Stadtmauers objected to the settlement and, after the bankruptcy court

2    approved it, appealed the decision to the United States District Court for the

3    Southern District of New York (Kenneth M. Karas, *Judge*).  Crucially, the

4    Stadtmauers maintained that the state court's grant of an attachment on two of

5    Nordlicht's real estate holdings had given the Stadtmauers valid judicial liens.

6    These liens, they argued, gave them secured property rights to enforce if they

7    prevailed on their fraudulent-conveyance claims in state court.  Based on that

8    theory, the Stadtmauers contended, *inter alia*, that (1) the Trustee lacked the

9    authority to settle the Stadtmauers' claims; (2) settling those claims over their

10   objection deprived them of due process as well as violated basic bankruptcy

11   principles of creditor priority as articulated in *Czyzewski v. Jevic Holding Corp.*, 580

12   U.S. 451 (2017); and (3) the bankruptcy court had abused its discretion in

13   approving the settlement.

14   The district court rejected all these arguments and affirmed the approval of

15   the settlement agreement.  For the reasons set forth below, we agree with the

16   district court, and affirm its judgment.

**BACKGROUND**

## I.     The Original Dispute

Appellee Mark A. Nordlicht ("Nordlicht"), the debtor in the underlying

Chapter 7 bankruptcy proceedings, founded and managed Platinum

Management (NY) LLC, the general partner and investment advisor to a set of

hedge funds named collectively, Platinum Partners Value Arbitrage Fund LLP

("PPVA").  Appellants Richard and Marisa Stadtmauer (the "Stadtmauers") were

investors in PPVA.

In early 2016, Richard Stadtmauer requested that PPVA pay out their

interest in PPVA.  Lacking sufficient liquidity at the time, PPVA instead issued

the Stadtmauers two promissory notes on May 27, 2016, personally guaranteed

by Nordlicht.  PPVA defaulted on the notes, but Nordlicht refused to honor the

guaranty.  The Stadtmauers initiated an arbitral proceeding to enforce

Nordlicht's obligation, and on January 10, 2020, won a final award of

$14,896,316.16.  Four days later, the Stadtmauers filed an action in the United

States District Court for the Southern District of New York (Cathy Seibel, *Judge*)

seeking to confirm the arbitral award.  *See Stadtmauer et al. v. Nordlicht*, 20 Civ.

347 (CS) (S.D.N.Y. Jan. 14, 2020).  Nordlicht opposed the motion to confirm and

cross-moved to vacate the award.

1       **II.    The State Court Action**

2       On February 5, 2020, with the motion to confirm the arbitral award still

3   pending, the Stadtmauers filed an action in New York state court (the "State

4   Court Action") to collect on the award and thus satisfy Nordlicht's alleged debt

5   to them.  *See, e.g.*, App'x at 48 (State Compl. ¶ 82) (alleging that "[p]laintiffs are

6   entitled to a money judgment against defendant Mark Nordlicht" in light of their

7   final arbitration award "in the amount of $14,896,316.16").  The case was

8   assigned to the Honorable Linda S. Jamieson (*Justice*).  Beyond Nordlicht's

9   approximately $15 million debt to the Stadtmauers, the complaint in the State

10  Court Action (the "State Complaint") alleged a sprawling scheme by which

11  "Nordlicht and [his wife Dahlia] Kalter" had "transfer[red] tens of millions of

12  dollars [in] assets to offshore trusts, LLCs, and other shell companies . . . , over

13  which Mr. Nordlicht exercise[d] dominance and control but disclaims legal

14  ownership."  App'x at 30 (State Compl. ¶ 4).  These transfers, the Stadtmauers

15  alleged, "were intended to make Mr. Nordlicht judgment[-]proof," App'x at 35

16  (State Compl. ¶ 30) against not only the Stadtmauers, but against all his creditors,

17  *see, e.g., id.* (alleging intent to make Nordlicht judgment proof and thereby

18  "defraud Mr. Nordlicht's creditors, including [the Stadtmauers].").

7

1    In accordance with their theory, the Stadtmauers pleaded four counts in

2    state court under New York state law:  (1) actual fraudulent conveyance, (2)

3    constructive fraudulent conveyance, (3) "reverse veil piercing" against the

4    business entities named as defendants, App'x at 47, and (4) as interim relief,

5    requests for *ex parte* prejudgment orders of attachment[1] against two pieces of real

6    estate allegedly owned by Nordlicht, but held in the name of his wife Dahlia

7    Kalter (together, the "State Causes of Action").  The two properties were an

8    apartment unit located at 535 West End Avenue, New York, NY (the "535 W.E.A.

9    property"), and a property located at 245 Trenor Drive, New Rochelle, NY (the

10   "Trenor Drive property") (together, the "Properties").

11       On February 5, 2020, the state court issued an order to show cause why the

12   *ex parte* motion should not be granted.  The Stadtmauers moved to confirm it on

13   February 7, 2020.  On February 14, 2020, the Stadtmauers filed a notice of

14   attachment on real property as to the 535 W.E.A. property on the state court

---

[1] Under New York law, "[a]ttachment is a provisional remedy designed to secure a debt by preliminary levy upon the property of the debtor to conserve it for eventual execution." *Hume v. 1 Prospect Park ALF, LLC*, 28 N.Y.S.3d 125, 126 (N.Y. App. Div. 2016).  An attachment "does not transfer the property to the creditor," but "simply keeps the debtor away from his property." *Koehler v. Bank of Berm. Ltd.*, 911 N.E.2d 825, 828 (N.Y. 2009).  The attached property is used to satisfy "the creditor's judgment *if* the creditor should prevail in court." *Id.* (emphasis added).

docket, and on February 18, 2020, an analogous notice of attachment on real

property as to the Trenor Drive property.  The parties dispute whether the

Stadtmauers effected legally adequate service of those notices on Nordlicht.  On

May 22, 2020, the state court confirmed the attachment order against the

Properties.

On June 25, 2020, the Stadtmauers filed for leave to amend the State

Complaint, seeking to add more named defendants to the alleged scheme.

### III.    The Bankruptcy Proceedings

A.    <u>Initial Stages</u>

Days later, on June 29, 2020, Nordlicht filed a voluntary petition for

bankruptcy under Chapter 7 of the Bankruptcy Code.  As a result, the State

Court Action was stayed pursuant to the Bankruptcy Code's automatic stay

provision, 11 U.S.C. § 362(a).[2]  Notice of removal of the State Court Action to the

United States District Court for the Southern District of New York pursuant to 28

---

[2]  The Stadtmauers' motion for leave to add more defendants to the State Complaint was not decided before the action was removed to federal court.

The federal action in which the Stadtmauers sought to confirm their arbitration award, which was still pending by the date of the bankruptcy filing, was stayed on July 8, 2020, in light of the bankruptcy filing, and dismissed without prejudice on July 26, 2021, on request by the Stadtmauers.

1    U.S.C. § 1452(a) was filed on July 29, 2020.  On July 31, 2020, the State Court

2    Action was referred to the United States Bankruptcy Court for the Southern

3    District of New York (Robert D. Drain, *Bankruptcy Judge*), and designated as an

4    adversary proceeding.

5          On July 6, 2020, Mark S. Tulis was named as the interim trustee of the

6    bankruptcy estate, and then became its permanent trustee (the "Trustee") by

7    operation of law.  "A trustee has the statutory duty to protect and preserve

8    property of the estate for the purpose of maximizing a distribution to creditors . .

9    . . A trustee also owes a fiduciary duty to each creditor of the estate."  *In re Ngan*

10   *Gung Rest.*, 254 B.R. 566, 570 (Bank. S.D.N.Y. 2000) (citing *Commodity Futures*

11   *Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985))).

12         On October 23, 2020, the Stadtmauers filed a proof of claim in the

13   bankruptcy court against the bankruptcy estate, claiming a "secured" interest in

14   $14,896,316.16, the amount of their arbitral award against Nordlicht.  Supp.

15   App'x at 163.[3]  The Stadtmauers maintained that their interest was secured and

16   perfected because a "[s]heriff's levy pursuant to [an] order of attachment" in the

17   State Court Action, *id.*, had endowed them with "judicial liens" on the 535

---

[3] The proof of claim additionally claimed an unsecured interest in the amount of $563,533.66.

1  W.E.A. and 245 Trenor Drive properties, *e.g.*, App'x at 90–92.  The validity of

2  those purported liens would soon become a central issue to the bankruptcy

3  litigation.

4      Meanwhile, the Trustee, exercising his "'strong arm' power," *Cumberland*

5  *Oil Corp. v. Thropp*, 791 F.2d 1037, 1042 (2d Cir. 1986), granted him by the

6  Bankruptcy Code, 11 U.S.C. § 544, negotiated with the defendants in the State

7  Court Action, the additional defendants the Stadtmauers had sought to add, and

8  non-party Barbara Nordlicht (the "Settling Parties") to settle all claims that could

9  be asserted on behalf of debtor Nordlicht's bankruptcy estate.  *See* 11 U.S.C. §

10  105(a), Fed. R. Bankr. P. 2002, 9019.  This included the Stadtmauers' causes of

11  action for actual and constructive fraudulent conveyance, alter ego liability, and

12  any property rights possibly created by an order of attachment awarded to the

13  Stadtmauers in the State Court Action.[4]  The Trustee and the Settling Parties

---

[4] The causes of action initially brought by the Stadtmauers against Nordlicht (the eventual debtor in bankruptcy) and the defendants in the State Court Action were now pursued by the Trustee on behalf of Nordlicht's bankruptcy estate.  "[T]he paramount duty of a trustee," acting as a fiduciary to the bankrupt debtor's creditors, "is the amassing of estate assets for a *pro rata* distribution to all creditors."  *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987); *see also Weintraub*, 471 U.S. at 355.  This may sometimes include pursuing legal claims against the debtor and his affiliates—here, the Stadtmauers' claims against Nordlicht and the defendants in the State Court Action.  Based on the theory that pursuing fraudulent-conveyance and alter-ego claims against Nordlicht would, if successful, enhance the basket of assets to be distributed to creditors, the Trustee exercised his jurisdiction over them—and decided to settle

1 initially agreed to settle all claims the estate could assert against the Settling

2 Parties in exchange for a payment of $1.5 million to the estate.  On November 6,

3 2020, the Trustee moved the bankruptcy court to approve the settlement on the

4 ground that, in his business judgment, the settlement was "fair and equitable and

5 in the best interest of the [bankruptcy] estate in accordance with Bankruptcy

6 Code § 105(a) and Bankruptcy Rules 2002(a)(3) and 9019(a)."  App'x at 76 ¶ 21.

7 <u>Bidding War Over the Stadtmauers' Claims</u>

8 A bidding war ensued.

9 On January 6, 2021, the Stadtmauers objected to the proposed $1.5 million

10 settlement and counter-offered $2 million to the bankruptcy estate in exchange

11 for ownership of the claims the Trustee could assert on behalf of the estate.  In

12 effect, the Stadtmauers sought to repurchase the right to litigate their State

13 Causes of Action that the Trustee had taken over.  In addition, the Stadtmauers

14 offered not to assert the liens they claimed to hold against the Properties against

15 the $2 million paid to the estate.

---

those claims in exchange for an immediate and certain lump-sum payment to the estate instead
of pursuing likely costly, time-consuming, and uncertain litigation.

1    The Trustee agreed that the Stadtmauers' $2 million offer was superior

2    because (1) it exceeded the initial $1.5 million to be distributed to the creditors by

3    $500,000, and (2) unlike the prior offer from the Settling Parties, it relieved the

4    bankruptcy estate of the cost and risk of having to defend against the

5    Stadtmauers' assertion of their purported liens against the estate's settlement

6    proceeds.  The Trustee moved in the bankruptcy court to approve the

7    Stadtmauers' $2 million offer instead of the earlier $1.5 million offer, subject to

8    yet better offers.  The Settling Parties submitted their own objection and

9    counteroffer on March 10, 2021.

10    At a hearing held on March 11, 2021, the bankruptcy court found that the

11    Stadtmauers' "$2 million proposal[] . . . [was] clearly superior" to both "the

12    original proposal" for $1.5 million and the Settling Parties' March 10 counter-

13    offer.  Supp. App'x at 98:13–16.  On March 30, 2021, the Trustee therefore filed a

14    motion seeking approval of the Stadtmauers' $2 million offer, again subject to

15    better offers.  The bankruptcy court scheduled, for April 23, 2021, a hearing

16    pursuant to Section 363 of the Bankruptcy Code and other applicable statutes

1   and rules.  Until that date, the Trustee would entertain competing offers, and at

2   the hearing itself, the court would open the floor for bidding.[5]

3   B.      <u>The April 22 Offer and the April 23, 2021 Sale Hearing</u>

4          On April 22, 2021, the Settling Parties submitted a new offer (the "April 22

5   Offer").  Under its terms, Barbara Nordlicht—who was neither a named nor

6   proposed defendant in the State Court Action—would (1) pay $2.5 million to the

7   bankruptcy estate to be distributed to the estate's creditors; (2) reimburse the

8   estate for any costs arising from defending against the Stadtmauers' claims

9   related to their asserted liens; and (3) fully indemnify and hold harmless the

10  estate to the extent that Barbara Nordlicht would pay an additional $2.5 million

11  to the estate in the event that the Stadtmauers prevailed on their State Causes of

12  Action and collected on any portion of the $2.5 million as higher-priority

13  creditors.

---

[5] On April 14, 2021, the Settling Parties offered the Trustee $2.2 million for all legal claims to be asserted on behalf of the bankruptcy estate, and an additional $2.2 million indemnity against the litigation costs in defending against the Stadtmauers' prosecution of their liens, and against liability in the event the Stadtmauers prevailed.  The Trustee rejected that offer, concluding that it was not higher or better than the Stadtmauers' $2 million offer.  *See* App'x at 260:22–261:2 (Trustee's counsel stating to the bankruptcy court that "[i]t was obvious to the Trustee for the additional $200,000 . . . that it was not in the best interest of the estate for the extra $200,000 to go down the road of fighting over the security interest to certify the Stadtmauers, notwithstanding the indemnity"); Supp. App'x at 159 (Stadtmauers supporting the Trustee's motion to approve the $2 million offer notwithstanding the $2.2 million counter-offer).

1       The next day, April 23, 2021, the bankruptcy court held its hearing

2   pursuant to Sections 363(b) and (f) of the Bankruptcy Code to consider which of

3   the existing offers to approve, and to entertain possible bids for yet better offers

4   (the "Sale Hearing").  The Trustee represented to the bankruptcy court that, in

5   his business judgment, the April 22 Offer was superior to all other existing offers

6   and "in the best interest of the [bankruptcy] estate."  App'x at 261:20–21.  After

7   colloquies with the parties, Bankruptcy Judge Drain opened the floor for

8   bidding, specifically asking the Stadtmauers' counsel whether he was prepared

9   to make a "higher and better [offer] than the April 22 proposal."  *Id.* at 268:7.  The

10  Stadtmauers' counsel declined, responding that "the Stadtmauers rest on their

11  current offer."  *Id.* at 268:10–11.  Judge Drain emphasized that "[n]ow is the time

12  to make, if one is prepared to make, a higher and better offer than the April 22

13  offer," *id.* at 268:18–20, that absent bidding, "the only proposals to be considered

14  [would be] the [Stadtmauers' $2 million offer] and the April 22 [Offer]," *id.* at

15  269:4–6, and that "there won't be an opportunity for additional bidding," *id.* at

16  269:7–8.  The Stadtmauers' counsel again stood by its existing $2 million offer.

17  Instead, counsel opposed the approval of the April 22 Offer on the basis that the

18  Trustee lacked the authority to reduce that offer to a settlement because it would

15

1    dispose of the Stadtmauers' perfected judicial liens on the 535 W.E.A. property

2    and the Trenor Drive property—liens that were the Stadtmauers' property, and

3    thus beyond the reach of the Trustee's strong-arm power.

4         The bankruptcy court disagreed.  It reasoned that the Stadtmauers'

5    purported judicial liens on the Properties were in "bona fide dispute," which did

6    authorize the Trustee to settle the Stadtmauers' claims "free and clear of any

7    interest" encumbering those claims pursuant to Section 363(f)(4) of the

8    Bankruptcy Code.  *Id.* at 303:14–19 (quoting and discussing 11 U.S.C. § 363(f)(4)).

9    Indeed, the Stadtmauers' counsel admitted at the hearing that "[w]e all know the

10   lien is in dispute."  *Id.* at 290:1–2.  The bankruptcy court therefore agreed with

11   the Trustee that the April 22 Offer was in the best interest of the bankruptcy

12   estate, approved the offer, and directed the Trustee to file a proposed settlement

13   order reflecting its terms.  In reaching that conclusion, the bankruptcy court

14        On June 2, 2021, the bankruptcy court entered an order (the "Sale Order")

15   approving a purchase and assignment agreement (the "Settlement") that

16   reflected the terms of the April 22 Offer.

## IV. The Stadtmauers' Appeals to the District Court and this Court

The Stadtmauers challenged the Settlement by appealing to the United States District Court for the Southern District of New York, raising five issues: (1) whether the bankruptcy court erroneously concluded that the Trustee had the authority to settle and sell the State Causes of Action (including the attachments); (2) whether the bankruptcy court's approval of the Settlement effectively reduced the Stadtmauers' claims, secured by their purported liens, to unsecured claims, and thus violated basic principles of creditor priority as articulated in *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017); (3) whether the bankruptcy court, in approving the April 22 Offer, abused its discretion by failing to follow the proper procedure and the factors set forth in *In re Iridium Operating LLC*, 478 F.3d 452 (2d Cir. 2007); (4) whether the bankruptcy court had erred in finding the April 22 Offer to be superior to the Stadtmauers' $2 million offer; and (5) whether the bankruptcy court's approval of the Settlement deprived the Stadtmauers of their property rights in violation of their constitutional right to due process.

On May 19, 2022, the district court affirmed the bankruptcy court's Sale Order, reasoning as follows: First, the Trustee had the authority to settle the

Stadtmauers' fraudulent-conveyance and alter-ego claims because those claims

sought to recover assets from the debtor that were wrongfully taken from the

estate by a scheme that injured all prospective creditors equally.  Such claims

were quintessentially property of the estate, and thus within the Trustee's

authority to settle.  The attachments, too, were property of the estate because

they were contingent on and non-divorceable from the fraudulent-conveyance

and alter-ego claims.  Second, the Settlement did not violate *Jevic* because the

bona fide dispute over validity of their judicial liens defeated the notion that

their claims were in fact secured.  Third, the district court saw no abuse of

discretion in the bankruptcy court's assessment of the *Iridium* factors, especially

in light of the fact that a bankruptcy court ought merely "to canvass the issues

and see whether the settlement 'falls below the lowest point in the range of

reasonableness.'"  Spec. App'x at 35 (quoting *In re W.T. Grant Co.*, 699 F.2d 599,

608 (2d Cir. 1983) (further citation omitted)).  Fourth, the bankruptcy court had

not committed any error of law or clear error of fact in finding that the April 22

Offer was better than the Stadtmauers' previous $2 million offer, and that in any

event any error leading to that conclusion was harmless because the April 22

18

1    Offer was in fact better.  The district court therefore affirmed the bankruptcy

2    court's approval of the Settlement reflecting the terms of the April 22 Offer.[6]

3        The Stadtmauers appealed to this Court, raising the same issues as they

4    did in the district court.  For substantially similar reasons given by the district

5    court, we affirm.

6                        **STANDARD OF REVIEW**

7        Because "[b]ankruptcy court decisions are subject to appellate review in

8    the first instance by the district court, . . . . we engage in plenary, or de novo,

9    review of the district court decision."  *In re Anderson*, 884 F.3d 382, 387 (2d Cir.

10   2018), *cert. denied sub nom. Credit One Bank, N.A. v. Anderson*, 139 S. Ct. 144 (2018).

11   "We thus apply the same standard of review that the [d]istrict [c]ourt employed,

12   reviewing the bankruptcy court's findings of fact for clear error[,] . . . its legal

13   determinations de novo[,] [and its] discretionary rulings . . . for abuse of

14   discretion."  *In re Tingling*, 990 F.3d 304, 307 (2d Cir. 2021) (internal quotation

15   marks and citation omitted).  A bankruptcy court abuses its discretion when its

16   decision "rest[s] on an error of law[,] . . . or a clearly erroneous factual finding,"

---

[6] Although the district court did not expressly address the due-process issue, the Stadtmauers raised it in their brief to the district court.  *See In re Mark A. Nordlicht*, 21 Civ. 5990 (KMK) (S.D.N.Y. July 13, 2021), Dkt. 10 at 23–28.  We therefore address it in this opinion.

1    or "cannot be located within the range of permissible decisions."  *In re Aquatic*

2    *Dev. Grp., Inc.*, 352 F.3d 671, 678 (2d Cir. 2003) (internal quotation marks omitted).

3         Relevant here, we review for abuse of discretion a bankruptcy court's

4    approval of a sale of assets or claims pursuant to 11 U.S.C. § 363, *see In re Chrysler*

5    *LLC*, 576 F.3d 108, 119 (2d Cir. 2009) ("[T]he bankruptcy court's approval of the

6    [section-363] Sale was no abuse of discretion."), *vacated as moot*, 592 F.3d 370 (2d

7    Cir. 2010), and "the reasonableness of [the bankruptcy] court's application of

8    [Bankruptcy Rule 9019] in approving [a s]ettlement," *In re Iridium*, 478 F.3d at 461

9    n.13 (citation omitted).  We review *de novo* the legal questions whether the

10   Settlement comported with *Jevic* and due process.

11                                    **DISCUSSION**

12       **I.    The Trustee's Authority to Settle the Stadtmauers' Legal**
13              **Claims at the Section 363 Sale Hearing**

14       We turn first to the Stadtmauers' argument that the bankruptcy court

15   erred in approving the Trustee's sale and settlement of the Stadtmauers' State

16   Causes of Action in accordance with the April 22 Offer at the Sale Hearing held

17   pursuant to 11 U.S.C. §§ 363(b) and (f).

1   A.   Background Principles and Legal Framework

2   "In [a] Chapter 7 [bankruptcy proceeding], a trustee liquidates the debtor's

3   assets and distributes them to creditors." *Jevic*, 580 U.S. at 455.   "A trustee is the

4   legal representative and fiduciary of the [bankruptcy] estate," and therefore

5   "must represent all creditors without partiality." *In re AFI Holding, Inc.*, 355 B.R.

6   139, 147 (B.A.P. 9th Cir. 2006) (internal quotation marks and citations omitted),

7   *aff'd and adopted*, 530 F.3d 832 (9th Cir. 2008).   The Bankruptcy Code grants a

8   trustee certain "'strong arm' power[s]" to meet those obligations. *Cumberland*,

9   791 F.2d at 1042.   Relevant here, section 363(b)(1) provides that "[t]he trustee,

10   after notice and a hearing, may use, sell, or lease, other than in the ordinary

11   course of business, property of the estate."   11 U.S.C. § 363(b)(1).   As is apparent

12   from the statute, the trustee can only "use, sell, or lease" what is indeed

13   "property of the estate."   The parties disagree whether the "property of the

14   estate" includes the causes of action pleaded by the Stadtmauers in the State

15   Court Action (*i.e.* actual fraudulent conveyance, constructive fraudulent

16   conveyance, "reverse veil-piercing," and attachment of property to aid collection

17   on those claims) and settled by the Trustee at the April 23, 2021 Sale Hearing

18   held pursuant to section 363(b) and (f).

1    A claim constitutes "property" of the bankruptcy estate if it falls within the

2    scope of Bankruptcy Code § 541(a).  *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*

3    *("Kalb")*, 8 F.3d 130, 132 (2d Cir. 1993).  Section 541(a) provides that property of

4    the bankruptcy estate includes "all legal or equitable interests of the debtor in

5    property as of the commencement of the [bankruptcy] case," "wherever [the

6    property is] located and by whomever [it is] held."  11 U.S.C. § 541(a)(1).  We

7    have interpreted this definition broadly.  "[E]very conceivable interest of the

8    debtor, future, nonpossessory, contingent, speculative, and derivative, is within

9    the reach of § 541," and is therefore property of the estate.  *Chartschlaa v.*

10    *Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (alteration in original,

11    internal quotation marks and citation omitted).  A creditor's legal claim asserted

12    against the debtor or a third party to the bankruptcy, too, is property of the estate

13    if "[the claim's] outcome might have any 'conceivable effect' on the bankruptcy

14    estate."  *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81, 88 (2d Cir. 2014)

15    (citation omitted).  A "central purpose . . . of extending bankruptcy jurisdiction to

16    actions against certain third parties[ and] suits against debtors themselves[] is to

17    protect the assets of the estate [and] to ensure a fair distribution of those assets at

18    a later point in time."  *In re Quigley Co.*, 676 F.3d 45, 57 (2d Cir. 2012) (alterations

adopted, internal quotation marks and citation omitted); *see Cumberland*, 791 F.2d

at 1042 ("Making the pursuit of certain causes of action the sole responsibility of

the trustee in bankruptcy furthers the fundamental bankruptcy policy of

equitable distribution among creditors.  It allows the trustee to exercise the

'strong arm' power and recover corporate assets for the benefit of all creditors of

the corporation." (internal citation omitted)).

However, not all claims asserted by a creditor are "property of the estate."

Only "general" claims are; "personal" claims are not.  General claims "arise[]

from [the] harm done to the estate," *In re Tronox Inc.*, 855 F.3d 84, 100 (2d Cir.

2017) (first alteration in original), and thus "could be brought by any creditor,"

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc. ("St. Paul")*, 884 F.2d 688, 701 (2d

Cir. 1989).[7]  General claims are "property of the estate," *id.* at 701, because they

"inure[] to the benefit of all creditors" by enlarging the estate, *In re Emoral, Inc.*,

740 F.3d 875, 879 (3d Cir. 2014), thereby making "the trustee . . . the proper

person to assert the claim," *St. Paul*, 884 F.2d at 701.  "[T]he creditors are bound

by the outcome of the trustee's action."  *Id.*

---

[7] General claims are often referred to as "derivative" claims.  *See, e.g., In re Tronox*, 855 F.3d at
99–100.  For simplicity, we use the term "general claim" throughout this opinion.

23

1    Personal claims, on the other hand, are "claim[s] for injury that [are]

2    particular[]" to the creditor, *In re Tronox*, 855 F.3d at 99, and in which "other

3    creditors generally have no interest," *In re Emoral*, 740 F.3d at 879 (citing *Bd. of*

4    *Trs. of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 170 (3d Cir.

5    2002)).[8]  Personal claims therefore are in the "legal or equitable interest only of

6    the creditor." *Bd. of Trs. of Teamsters Loc. 863*, 296 F.3d at 170.  Creditors "are

7    exclusively entitled to pursue [personal] claim[s], and the bankruptcy trustee is

8    precluded from doing so." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d

9    Cir. 1995).  "The distinction between general and personal claims promotes the

10   orderly distribution of assets in bankruptcy by funneling all asset-recovery

11   litigation through a single plaintiff: the trustee." *In re Wilton Armetale, Inc.*, 968

12   F.3d 273, 282 (3d Cir. 2020) (internal quotation marks omitted).

13   "In distinguishing [general] claims from [personal] claims . . ., labels are

14   not conclusive, since plaintiffs often try, but are not permitted, to plead around a

15   bankruptcy." *In re Tronox*, 855 F.3d at 100 (citation omitted).  Instead, "we

16   inquire into the factual origins of the injury and, more importantly, into the

---

[8] Personal claims are often referred to as "particularized," or "direct" claims.  *See, e.g., In re Tronox*, 855 F.3d at 99–100, 105.  We use the term "personal claim" throughout this opinion.

1  nature of the legal claims asserted." *Id.* (internal quotation marks and citation

2  omitted).  For this analysis, we look to the state law applicable to each claim.

3  *Kalb*, 8 F.3d at 132.

4  B.  <u>Actual and Constructive Fraudulent-Conveyance Claims</u>

5  With this framework in place, we must now consider whether the Trustee

6  had the authority to settle the actual and constructive fraudulent-conveyance

7  claims asserted by the Stadtmauers against the defendants in the State Court

8  Action (including debtor-in-bankruptcy Nordlicht).  We conclude that the

9  Trustee did have that authority.

10  "Fraudulent[ t]ransfer [claims] are easy: they are the paradigmatic example

11  of claims general to all creditors," *In re Tronox*, 855 F.3d at 106, because "[e]very

12  creditor has a similar claim for the diversion of assets of the debtor's estate," *id.*

13  at 103.  This general observation is borne out by the Stadtmauers' allegations in

14  the State Court Action.  The actual and constructive fraudulent-conveyance

15  claims, evaluated under New York state law, *see Kalb*, 8 F.3d at 132, are not based

16  on any allegations of a harm, injury, or theory of liability that is unique to the

17  Stadtmauers.  Instead, the State Complaint alleges a sophisticated "scheme to

18  defraud Mr. Nordlicht's creditors, *including Plaintiffs* [*i.e.*, the Stadtmauers],"

App'x at 35 (Compl. ¶ 30) (emphasis added), by transferring Nordlicht's assets to

"shell companies" created to obscure that Nordlicht was the true owner of those

assets.  The State Complaint further alleges that "the Shell Companies have been

used to defraud Mr. Nordlicht's creditors, *including* Plaintiffs," *id.* at 36 (Compl.

¶ 34) (emphasis added); that "Nordlicht caused the Shell Companies to make

[certain conveyances] with actual intent to hinder, delay or defraud Plaintiffs *and*

*other creditors*," *id.* at 45 (Compl. ¶ 62) (emphasis added); and that Nordlicht

"knew or should have known that these conveyances would hinder creditors

*such as* Plaintiffs," *id.* (Compl. ¶ 62) (emphasis added).[9]

The "factual origins of th[is] injury," *In re Tronox*, 855 F.3d at 100 (citation

omitted), are, by their "nature," *id.*, general to all creditors.  If proven, this

fraudulent-conveyance scheme wronged *every* creditor, as Nordlicht's alienation

of his assets into a web of independent shell companies necessarily removed

recoverable assets for every creditor.  *See In re Wilton Armetale*, 968 F.3d at 282

("Claims alleging that third parties wrongfully depleted the debtor's assets are

general . . . because every creditor has a similar claim for the diversion of assets

---

[9] Many other allegations speak of Nordlicht's "creditors" generally, without any reference to the Stadtmauers. *See, e.g.*, App'x at 36 (Compl. ¶ 32), 39 (Compl. ¶ 34(d)), 43 (Compl. ¶¶ 48, 49), 44 (Compl. ¶¶ 50, 54), 45 (Compl. ¶ 56), 46 (Compl. ¶ 72), 47 (Compl. ¶ 76), 48 (Compl. ¶ 85).

1  of the debtor's estate." (alterations adopted, internal quotation marks and

2  citation omitted)).

3       Accordingly, we agree with the district court that the Stadtmauers' claims

4  of actual and constructive fraudulent conveyance are general claims, and

5  therefore were "property of the estate" and within the Trustee's authority to

6  settle.

7  C.     <u>Alter Ego ("Reverse Veil-Piercing") Theory of Liability</u>

8       We next consider whether the Stadtmauers' alter ego, or "reverse veil-

9  piercing," claim is general or personal.[10]  We again conclude that it is general,

10  and therefore within the Trustee's authority to settle.  We also consider the

11  Stadtmauers' contention that alter-ego theories of liability are not claims under

12  New York state law at all (and therefore beyond the Trustee's authority to settle

---

[10] A reverse veil-piercing theory is one of several ways in which to establish liability of a defendant's alter ego.  *See, e.g., 149-51 Sullivan St. Co. v. Lopez*, 141 N.Y.S.3d 16, 17 (N.Y. App. Div. 2021) (affirming dismissal of reverse veil-piercing claim because counter-claimant failed to establish that plaintiff company was the alter ego of an individual); *State v. Easton*, 647 N.Y.S.2d 904, 908 (N.Y. Sup. Ct. 1995) (observing that a reverse veil-piercing claim can be established based "on an alter ego theory").  We refer to reverse veil-piercing and alter-ego theories synonymously in this opinion.

1  because he can only settle general *claims*), but remedies.  We reject that notion as

2  baseless.

3  **1.**    *New York law and the Stadtmauers' relevant allegations.*

4  Looking to New York state law, *see Kalb*, 8 F.3d at 132, we see that it

5  recognizes "reverse" veil-piercing theories,[11] which "entail[] an effort to hold a

6  *corporation liable* for the debts of its owners," *State v. Easton*, 647 N.Y.S.2d 904, 909

7  (N.Y. Sup. Ct. 1995) (emphasis in original); *see also Sweeney, Cohn, Stahl & Vaccaro*

8  *v. Kane*, 773 N.Y.S.2d 420, 423–24 (N.Y. App. Div. 2004).  To succeed on such a

9  claim, a plaintiff must show that (1) the owner exercised "complete domination"

10  over the corporate entity with respect to the transactions at issue; and (2) "such

11  domination was used to commit a fraud or wrong" that injured the party seeking

12  to pierce the veil.  *Easton*, 647 N.Y.S.2d at 908.[12]  To satisfy that standard, the

---

[11] Under a regular veil-piercing claim, an otherwise immune shareholder or director of a corporate entity may be held personally liable for the debts of the corporate entity.  *See Easton*, 647 N.Y.S.2d at 905; *Etage Real Est. LLC v. Stern*, 182 N.Y.S.3d 47, 48 (N.Y. App. Div. 2022).  A reverse veil-piercing claim is the conceptual inverse: a corporate entity may be held liable for the debts of an individual who is the corporate entity's owner or director.

[12] To determine whether the domination prong has been met, triers of fact ordinarily consider ten equitable factors:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate

1    Stadtmauers alleged that Nordlicht "strategically placed substantially all of his

2    assets under the names of his wife [Dahlia Kalter], various LLCs, trusts, overseas

3    entities and other shell entities, which allow[s] him to continue exercising *de facto*

4    control and ownership over those assets while claiming that they are beyond the

5    reach of his creditors."  App'x at 29 (Compl. ¶ 1).  "Nordlicht dominated each of

6    the Shell Companies," the complaint continues, either by virtue of being "the sole

7    corporate officer," or by exercising "effective control over the corporate officers."

8    *Id.* at 47 (Compl. ¶ 77).  Moreover, "the Shell Companies failed to observe

---

purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991) (citations omitted).  To meet the second prong, "the party seeking to pierce the corporate veil [has the burden] to establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene."  *Easton*, 647 N.Y.S.2d at 908 (internal quotation marks and citation omitted).

1    corporate formalities and were established to conceal and protect Mr. Nordlicht's

2    assets from his creditors." *Id.* (Compl. ¶ 76).[13]

3    **2.**    *The Stadtmauers' reverse veil-piercing claim is general.*

4    The Stadtmauers' reverse veil-piercing claim is a general claim under New

5    York law.  As we observed in *Tronox*, "claims based on allegations . . . [of] a

6    general failure to adhere to corporate formalities and abuse of the corporate

7    form," 855 F.3d at 106 (internal quotation marks and citation omitted), "qualify

8    as 'general' claims," *id.* at 104, if they are "capable of increasing the basket of

9    assets that could be used to satisfy *any and all liabilities* owed by the . . . debtor[],"

---

[13] *See also* App'x at 36 (Compl. ¶ 32) ("[U]pon information and belief, each of the Shell Companies was operated as an alter ego of Mr. Nordlicht.  Though the entities were typically 'owned' in the name of Mr. Nordlicht's wife, [Nordlicht] was deeply involved in managing and controlling them."  This scheme "position[ed Nordlicht] as a *de facto* owner of assets for which he would disclaim control whenever it suited him.  Mr. Nordlicht, with Ms. Kalter's knowledge and cooperation, in fact exercised domination and control over the Shell Companies and each of them functioned as an alter ego."), *id.* (Compl. ¶ 34) (alleging that Nordlicht used "the Shell Companies" as alter egos "to defraud [his] creditors"), *id.* at 40 (Compl. ¶ 35) (similar), *id.* at 41 (Compl. ¶ 39) (similar), *id.* at 43 (Compl. ¶ 49) (similar), *id.* at 46 (Compl. ¶ 62) (alleging Nordlicht "caused the Shell Companies to make [conveyances] with actual intent to hinder, delay or defraud . . . creditors").

*id.* at 106 (emphasis added) (internal quotation marks and citation omitted).  That

is the case here.

The State Complaint repeatedly alleges that Nordlicht's web of shell

companies defrauded not just the Stadtmauers, but all of his creditors and

business partners.  For example, the Complaint states that "[t]hough the [shell

companies] were typically 'owned' in the name of Mr. Nordlicht's wife,

[Nordlicht] was deeply involved in managing and controlling them," and used

those companies to "operate as a fraud *against his creditors and others doing*

*business with him* by positioning him as a *de facto* owner of assets for which he

would disclaim control whenever it suited him." App'x at 36 (Compl. ¶ 32)

(emphasis added).  The Complaint reiterates that "[t]he Shell Companies . . . . do

not observe corporate formalities. . . . [and] have been used to *defraud Mr.*

*Nordlicht's creditors, including Plaintiffs.*"  *Id.* (Compl. ¶¶ 33, 34) (emphasis

added)); *see also id.* at 29 (Compl. ¶ 1) (alleging that Nordlicht "exercis[ed] *de facto*

control and ownership over [alienated] assets while claiming that they are

beyond the reach *of his creditors*." (emphasis added)); *id.* at 47 (Compl. ¶ 76)

("[T]he Shell Companies failed to observe corporate formalities and were

established to conceal and protect Mr. Nordlicht's assets *from his creditors.*"

1  (emphasis added)).  These allegations[14] against the shell companies amount to

2  textbook "[c]laims alleging that 'third parties wrongfully . . . deplete[d] the

3  debtor's assets," which "are general or derivative because '[e]very creditor has a

4  similar claim for the diversion of assets of the debtor's estate.'"  *In re Wilton*

5  *Armetale*, 968 F.3d at 282 (quoting *In re Tronox*, 855 F.3d at 103).

6       District and bankruptcy courts, too, have regularly found that alter-ego

7  claims brought under New York law are general where the creditor failed to

8  establish a basis for why the claim arose from an injury particular to the creditor

9  in issue.  *See In re Keene Corp.*, 164 B.R. 844, 852 (Bankr. S.D.N.Y. 1994) ("[U]nder

10  New York law, the trustee has standing to assert claims based upon . . . alter ego

11  liability, and creditors are precluded from pursuing those claims until they have

12  been abandoned.  Thus, alter ego claims, like fraudulent transfer claims, must be

13  asserted by the trustee." (internal citations omitted)); *Cocoletzi v. Fat Sal's Pizza*

---

[14] *See also* App'x at 40 ¶ 35 ("To allow him to claim poverty to creditors while controlling substantial assets, Mr. Nordlicht has adopted a specific *modus operandi* in his financial arrangements.  First, Mr. Nordlicht organizes a shell company with his wife, Ms. Kalter, having nominal ownership and control.  Second, notwithstanding his ownership in name, Mr. Nordlicht in fact controls and dominates the shell company, directing or participating in substantially all financial decisions for it.  Third, any funds or interests in the shell company are extracted to accounts held by Ms. Kalter or another closely affiliated party, such as a family-owned LLC or trust.  *By conducting his affairs this way*, Mr. Nordlicht enjoys all the benefits of owning very significant assets while *telling creditors* they are not his." (emphases added)).

1  *Corp.*, No. 15 Civ. 2696 (CM), 2015 WL 4655164, at *2 (S.D.N.Y. Aug. 5, 2015)

2  (similar); *In re 10th Ave. Records Distribs., Inc.*, 97 B.R. 163, 166 (S.D.N.Y. 1989)

3  ("Since the . . . alter ego cause of action here is without doubt an attempt to

4  collect property of the estate for the benefit of *all* creditors and is not personal to

5  any particular creditor, it may be maintained by the bankruptcy trustee."

6  (emphasis in original)).  We see no reason to deviate from their analyses.

7       **3.**      *Alter-ego theories of liability are not remedies under New York law.*

8           As an alternative theory, the Stadtmauers argue that New York law does

9  not classify alter-ego theories of liability as "claims" at all, but as *remedies*.[15]  They

10  base their argument on an apparent inconsistency in *Tronox*'s reasoning, which

11  was pointed out and discussed by United States Bankruptcy Judge Wiles in *In re*

12  *Stage Presence, Inc.*, 592 B.R. 292 (Bankr. S.D.N.Y. 2018), *aff'd*, No. 12 Civ. 10525

13  (MEW), 2019 WL 2004030 (S.D.N.Y. May 7, 2019).  While recognizing that he was

14  bound by *Tronox*, Judge Wiles observed that

---

[15] The Trustee argues in his brief that the Stadtmauers failed to raise this argument in the district court and have therefore waived it.  Tulis Br. at 27.  However, "we are free to exercise our discretion to consider waived arguments.  Exercise of that discretion is particularly appropriate where an argument presents a question of law and does not require additional fact finding." *United States v. Brunner*, 726 F.3d 299, 304 (2d Cir. 2013) (internal quotation marks and citation omitted).  Because the Stadtmauers raise an issue that is a pure question of law, we exercise our discretion to decide it.

the New York Court of Appeals has made clear that under New York law an "alter ego" or "veil piercing" argument is *not a separate, stand-alone cause of action*.  Instead, piercing the corporate veil, or awarding alter ego relief, is a *remedy* that a plaintiff may pursue to collect a claim against a company.

592 B.R. at 299 (emphases added) (citing *Matter of Morris v. N.Y. State Dept. of Tax'n & Fin.*, 623 N.E.2d 1157, 1160–61 (N.Y. 1993)).  *Stage Presence* continues:

Treating alter ego and veil piercing theories purely as remedies, however, seems inconsistent with the case law that addresses the issue of whether an alter ego "claim" belongs to individual creditors as opposed to a bankruptcy trustee. . . . If "alter ego" theories and "veil piercing" theories are not [standalone] claims at all, and instead are just remedies for other claims, then it is difficult to see how they could belong exclusively to a bankruptcy estate.  I understand the theory under which a "claim" may belong to an estate.  But I know of no theory under which a "remedy" belongs exclusively to an estate.

*Id.*  The Stadtmauers take up this point in their brief, arguing that the New York Court of Appeals's decision in *Matter of Morris v. New York State Department of Taxation and Finance*, 623 N.E.2d 1157, 1160–61 (N.Y. 1993), establishes that, under New York law, alter-ego theories of liability such as their reverse veil-piercing theory alleged in the State Court Complaint are not "claims" at all.  Appellants' Br. at 34–35.  It therefore cannot be considered "property of the estate," and the

1    Trustee had no authority to settle it at the April 23, 2021 Sale Hearing. We

2    disagree.

3         We think that *Stage Presence*—and the Stadtmauers—misconstrue *Morris*.

4    New York's Court of Appeals explained that an attempt to pierce the corporate

5    veil "is an assertion of facts and circumstances [intended to] persuade the court

6    to impose the corporate obligation on its owners." *Morris*, 623 N.E.2d at 1160.

7    This doctrine is typically used "in order to circumvent the limited liability of the

8    owners and to hold them liable." *Id.* This understanding of alter-ego theories is

9    commonplace in New York caselaw. *See, e.g., Cortlandt St. Recovery Corp. v.*

10    *Bonderman*, 96 N.E.3d 191, 203 (N.Y. 2018) (quoting *Morris*); *Americore Drilling &*

11    *Cutting, Inc. v. EMB Contracting Corp.*, 156 N.Y.S.3d 355, 360 (N.Y. App. Div. 2021)

12    (same); *Open Door Foods, LLC v. Pasta Machs., Inc.*, 25 N.Y.S.3d 357, 360 (N.Y. App.

13    Div. 2016) (same); *Old Republic Nat. Title Ins. Co. v. Moskowitz*, 747 N.Y.S.2d 556,

14    558 (N.Y. App. Div. 2002) (same); *Tap Holdings, LLC v. Orix Fin. Corp.*, 970

15    N.Y.S.2d 178, 183 (N.Y. App. Div. 2013) (same). It is, in other words, a demand

16    for a remedy, premised on facts that, if and after they are proven, establish a *right*

17    *to* that remedy. This description of alter-ego theories of liability neatly falls

18    within the Bankruptcy Code's definition of "claim":

(A) *right to payment*, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) *right to an equitable remedy* for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5) (emphases added). Therefore, to the extent that New York law anywhere states or implies that an alter-ego theory of liability is a "remedy," that notion is trumped by the Bankruptcy Code. *See BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 546 (1994). ("[W]here the meaning of the Bankruptcy Code's text is itself clear, its operation is unimpeded by contrary state law. . . ." (internal quotation marks and citation omitted)).

But even if the Code's definition were somehow ambiguous and its "intent to override" any conflicting state law definition "doubtful," and we therefore had to "defer[] to long-established traditions of state regulation," *id.*, New York state law would lead us to the same result. True, the New York Court of Appeals explained in *Morris* that "an attempt of a third party to pierce the corporate veil does not constitute a cause of action *independent* of that against the corporation." 623 N.E.2d at 1160 (emphasis added). But *Morris* nowhere holds, states, or even suggests that *because* an argument to pierce the corporate veil is not a standalone

cause of action, it *is* a remedy.  New York state cases have drawn on *Black's Law*

*Dictionary*'s definition of the term "claim" under New York law.  *See John II. v.*

*Kristen JJ.*, 174 N.Y.S.3d 158, 160 (N.Y. App. Div. 2022); *Matter of Est. of Pressley*,

206 N.Y.S.3d 896, 900 (N.Y. Sur. Ct. 2024).  That definition, similar to its

counterpart in the Bankruptcy Code, includes (1) "[t]he assertion of an existing

right; any right to payment or to an equitable remedy, even if contingent or

provisional," and (2) "[a] demand for money, property, or a legal remedy to

which one asserts a right; esp., the part of a complaint in a civil action specifying

what relief the plaintiff asks for."  *Claim*, *Black's Law Dictionary* (12th ed. 2024).

*Morris*'s explanation that a veil-piercing theory "is an assertion of facts and

circumstances [intended to] persuade the court to impose the corporate

obligation on its owners," 623 N.E.2d at 1160, comfortably fits within New York

state courts' definition of "claim."

Conversely, *Morris*'s understanding of what a veil-piercing theory is does

*not* fit New York state courts' definition of "remedy."  (The Bankruptcy Code

does not define that term.)  New York courts have drawn their definition of

"remedy" from *Black's Law Dictionary* as well.  *See Butler v. Fort Hudson Nursing*

*Ctr., Inc.*, 142 N.Y.S.3d 714, 722 (N.Y. Sup. Ct. 2021), *aff'd*, 161 N.Y.S.3d 374 (N.Y.

App. Div. 2021); *Syracuse Univ. v. Nat'l Union Fire Ins. Co.*, 975 N.Y.S.2d 370, 370

(N.Y. Sup. Ct. 2013) (unreported), *aff'd*, 976 N.Y.S.2d 921 (N.Y. App. Div. 2013).

*Black's Law Dictionary* defines "remedy" as "[t]he means of enforcing a right or

preventing or redressing a wrong; legal or equitable relief." *Remedy*, *Black's Law

Dictionary* (12th ed. 2024) (citing Douglas Laycock, Modern American Remedies 1

(4th ed. 2010) ("A remedy is anything a court can do for a litigant who has been

wronged or is about to be wronged. The two most common remedies are

[money] judgments . . . and [injunctions].")). A remedy, in other words, is a

relief a court may impose *after* a party has proven its theory of liability. An alter-

ego theory of liability is antecedent to this notion.

The tension that the Stadtmauers see between *In re Stage Presence* and

*Tronox* on the one hand, and New York decisional law on the other, is therefore,

as far as we can tell, illusory. *Morris* does not distinguish between "claims" and

"remedies," but between standalone claims and claims that become viable only if

a predicate claim succeeds. Veil-piercing claims fall into the latter category:

Before a court or jury can decide whether to impose liability on an entity or

individual's alter ego, it must first be persuaded that liability ought to be

imposed on the entity or individual in the first place.

1    We accordingly reaffirm our prior understanding, as stated in *Tronox*, that

2    an alter-ego theory of liability is a claim, not a remedy.

3    In sum, the district court correctly determined that the reverse veil-

4    piercing theory asserted by the Stadtmauers in the State Complaint constituted a

5    general claim, was the property of the bankruptcy estate, and thus within the

6    Trustee's authority to settle.

7    D.    The Prejudgment Attachments

8    Finally, the Stadtmauers assert that their attachment orders obtained in the

9    State Court Action against the 535 W.E.A. and Trenor Drive properties gave

10   them valid judicial liens that were beyond the Trustee's authority to settle.  We

11   conclude that this argument, too, fails—albeit for reasons different from the ones

12   discussed above or relied upon by the district court.

13   As we have already concluded above, the district court correctly held that

14   the fraudulent-conveyance and alter-ego claims asserted in the State Complaint

15   were "property of the estate" and thus within the power of the Trustee to sell at

16   the April 23, 2021 Sale Hearing held pursuant to sections 363(b)(1) and (f).  *See* 11

17   U.S.C. § 363(b)(1) ("The [bankruptcy] trustee, after notice and a hearing, may use,

18   sell, or lease, other than in the ordinary course of business, property of the estate

19   . . . .").  Section 363(f) provides that "[t]he trustee may sell property [of the estate]

1    under [section 363](b) . . . *free and clear of any interest in such property* of an entity

2    other than the estate, only if," among other conditions, "such interest is in bona

3    fide dispute."  11 U.S.C. § 363(f)(4) (emphasis added).  After discussing the issue

4    with all the parties, the bankruptcy court concluded that the Stadtmauers'

5    purported liens were in bona fide dispute.  The court therefore permitted the

6    Trustee to settle the fraudulent-conveyance and alter-ego claims free and clear of

7    those liens.[16]

8        The question for us to decide is therefore whether the bankruptcy court

9    committed an error of law, or a clear error of fact, by deciding that the purported

10   liens on the 535 W.E.A. and Trenor Drive properties were in bona fide dispute.

11   We conclude that the bankruptcy court did not commit such an error.

---

[16] The Bankruptcy Code makes it clear that liens are "interest" in property.  It defines "[t]he term 'lien' [to] mean[] charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).  *See also id.* § 101 (making all definitions in section 101 applicable to all of Title 11).

Unlike the district court, we therefore do not read the bankruptcy court to have held or reasoned that the Stadtmauers' purported liens were "property of the estate."  *See* Spec. App'x at 31–32.  Rather, we understand the bankruptcy court to have concluded that, through their purported liens, the Stadtmauers asserted an interest in property of the estate—to wit, the fraudulent-conveyance and alter-ego claims—, and that the Trustee had the authority to settle the fraudulent-conveyance and alter-ego claims irrespective of the liens because the liens were in bona fide dispute.

The Stadtmauers, through counsel, conceded at the Sale Hearing that "[w]e all know the lien is in dispute." App'x at 290:1–2. Counsel made that admission in response to Judge Drain's question whether a creditor could thwart a trustee's efforts to settle a claim by purporting to hold a higher-priority interest in the settlement proceeds, even "when that interest in itself is in dispute? I think . . . Congress said no under [section] 363(f)(4)." *Id.* at 289:22–24. On appeal, the Stadtmauers do not contest that their counsel made this concession, and "[i]t is well-settled law that 'litigants are bound by the concessions of freely retained counsel.'" *State by Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 138 (2d Cir. 2023) (quoting *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014)); *see also Bergerson v. N.Y. State Off. of Mental Health,* 652 F.3d 277, 289 (2d Cir. 2011) (same); *Hoodho v. Holder,* 558 F.3d 184, 192 (2d Cir. 2009) (same). The Stadtmauers are therefore bound by their counsel's admission.

Even absent the Stadtmauers' concession, however, Judge Drain made several factual determinations that were not clearly erroneous and correctly applied the relevant New York law to those facts to provide an independent basis to conclude that the Stadtmauers' purported liens were in bona fide dispute.

1    The parties dispute whether the Stadtmauers properly served their

2    attachment notices on the relevant parties under N.Y. C.P.L.R. 6214(a)—a

3    requirement to perfect their liens and create an enforceable property interest

4    under New York state law.  We do not decide that issue.  Rather, even assuming

5    *arguendo* that the attachment orders were properly served, C.P.L.R. 6214(e)

6    provides that

7        [a]t the expiration of *ninety days after a levy is made* by service of the
8        order of attachment, or of such further time as the court, upon motion
9        of the plaintiff on notice to the parties to the action, has provided, the
10       *levy shall be void* except as to property or debts which the sheriff has
11       taken into his actual custody, collected or received or as to which a
12       proceeding under subdivision (d) has been commenced.
13
14   N.Y. C.P.L.R. 6214(e) (emphasis added).  According to the Stadtmauers, the

15   notices of attachment were served on the relevant parties on February 18, 2020.

16   But it is undisputed that no property was taken into custody and that no special

17   proceeding pursuant to subsection (d) was commenced within the 90 days

18   following February 18.  And as the bankruptcy court observed, the Stadtmauers

19   had not filed any motion or request "to extend that 90-day period," App'x at

20   300:19–20, thus likely rendering their attachments "void," *id.* at 300:17.  This

21   theory, even if ultimately incorrect, at the very least created a "bona fide

1   dispute" authorizing the Trustee to sell the Stadtmauers' claims "free and clear"

2   of those disputed liens.  11 U.S.C. § 363(f)(4).

3       The Stadtmauers do not contest their failure to move for an extension.

4   Rather, they argue that their deadline was automatically tolled by (1) New York

5   State's Executive Orders 202.8 and 202.72, issued by New York Governor

6   Andrew Cuomo in response to the onset of the COVID-19 pandemic; and (2)

7   section 108(c) of the Bankruptcy Code, which tolls expiration periods for

8   statutory liens until "30 days after notice of the termination or expiration of [an

9   automatic stay triggered by section 362(a)]," 11 U.S.C. § 108(c)(2).

10      These arguments are meritless.  To be sure, Executive Order 202.8 tolled

11  "any specific time limit for the commencement, filing, or service of any legal

12  action, notice, motion, or other process or proceeding."  Joint App'x at 245.  But

13  according to the Stadtmauers' own admission to the bankruptcy court, this

14  suspension lasted until no later than November 4, 2020.  Thus, even if we

15  credited that contention, the Stadtmauers' 90-day window would have expired

16  on February 2, 2021.  The Stadtmauers do not assert that they took the necessary

17  action before that deadline.

1    Nor was this deadline further extended by section 108(c).  It is true that,

2    pursuant to section 108(c), a bankruptcy stay triggered by section 362(a) tolls the

3    time deadline by which a lienholder under New York law must enforce the lien.

4    *See In re Morton*, 866 F.2d 561, 565–66 (2d Cir. 1989).  But section 362(a)'s stay

5    provision does not apply here because the 535 W.E.A. and Trenor Drive

6    properties were held by holding companies that are *not* in bankruptcy.   "It is

7    well established that stays pursuant to § 362(a) are limited to debtors and do not

8    encompass non-bankrupt co-defendants."  *Teachers Ins. & Annuity Ass'n of Am. v.*

9    *Butler*, 803 F.2d 61, 65 (2d Cir. 1986); *see also Nippon Fire & Marine Ins. Co. v.*

10   *Skyway Freight Sys., Inc.*, 235 F.3d 53, 58 (2d Cir. 2000) (quoting same).  Because

11   section 108(c) did not stop the clock as to those entities, the latest conceivable

12   deadline by which the Stadtmauers would have had to move to enforce or

13   extend their liens would have been February 2, 2021.

14       In the alternative, the Stadtmauers argue that they are not subject to

15   C.P.L.R. 6214(a)'s 90-day window because C.P.L.R. 6214 does not apply to their

16   purported liens on the 535 W.E.A. and Trenor Drive properties.  Rather, the

17   applicable section is N.Y. C.P.L.R. 6216, which governs "[l]ev[ies] upon real

property," imposes no 90-day time bar to institute a special proceeding, and

instead requires only that:

> [t]he sheriff shall levy upon any interest of the defendant in real
> property by filing with the clerk of the county in which the property
> is located a notice of attachment . . . . The clerk shall record and index
> the notice in the same books, in the same manner and with the same
> effect, as a notice of the pendency of an action.

N.Y. C.P.L.R. 6216; *see also United States v. Lin Hu*, No. 08 Cr. 425 (BMC), 2011 WL

5884918, at *4 (E.D.N.Y. Nov. 23, 2011) ("[Under section 6216,] a creditor may

obtain a lien on real property by obtaining a prejudgment attachment order and

filing a notice of attachment with the county clerk."), *aff'd sub nom. United States

v. Church & Dwight Co.*, 510 F. App'x 55 (2d Cir. 2013) (summary order). The

Stadtmauers failed to raise this argument in the bankruptcy court, except in one

passing reference in their response, dated March 8, 2021, in support of their $2

million offer to the Trustee to purchase the claims asserted in the State Court

Action. *See* Joint App'x at 233–34. Nor did the Stadtmauers' counsel raise this

argument at the April 23, 2021 Sale Hearing, or object to the bankruptcy court's

application of N.Y. C.P.L.R. 6214 and its lengthy analysis as to why the

Stadtmauers had failed to comply with the statute's requirements. The argument

is therefore waived. *See In re Johns-Manville Corp.*, 759 F.3d 206, 219 (2d Cir. 2014)

1 (holding that failure to raise argument in the bankruptcy court resulted in waiver

2 and declining to exercise discretion to consider the argument); *United States v.*

3 *Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("It is a settled appellate rule that issues

4 adverted to in a perfunctory manner, unaccompanied by some effort at

5 developed argumentation, are deemed waived."); *Niagara Mohawk Power Corp. v.*

6 *Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) (same).

7 In sum, the bankruptcy court did not abuse its discretion in concluding

8 that the Stadtmauers' asserted liens were in bona fide dispute and therefore did

9 not bar the Trustee from settling the Stadtmauers' asserted claims pursuant to

10 Bankruptcy Code sections 363(b)(1) and (f)(4). We affirm the district court's

11 judgment to that effect, albeit on the alternative grounds we have articulated. *See*

12 *Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 396 n.2 (2d Cir. 2018) ("[W]e

13 are free to affirm on any ground that finds support in the record, even if it was

14 not the ground upon which the trial court relied." (internal quotation marks and

15 citation omitted)).

16 ## II.     Approval of the Settlement Under *Iridium*

17 We turn next to the Stadtmauers' broader contention that the bankruptcy

18 court abused its discretion in approving the Settlement reflecting the terms of the

April 22 Offer. We conclude that the bankruptcy court acted within its discretion

under the well-established framework of *In re Iridium Operating LLC*, 478 F.3d 452

(2d Cir. 2007).

A.     Legal Framework

"On motion by the trustee and after notice and a hearing, the [bankruptcy]

court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The

court should approve a "proposed settlement [if it] is both 'fair and equitable'

and in the best interests of the estate." *In re Liu*, 166 F.3d 1200, 1200 (2d Cir. 1998)

(summary order) (quoting 10 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. rev.)). In *In*

*re Iridium*, this Court spelled out seven factors to consider when deciding

whether a settlement is fair and equitable and in the best interest of the estate:

> (1) the balance between the litigation's possibility of success and the
> settlement's future benefits;
>
> (2) the likelihood of complex and protracted litigation, with its
> attendant expense, inconvenience, and delay, including the difficulty
> in collecting on the judgment;
>
> (3) the paramount interests of the creditors, including each affected
> class's relative benefits and the degree to which creditors either do
> not object to or affirmatively support the proposed settlement;
>
> (4) whether other parties in interest support the settlement;

47

1    (5) the competency and experience of counsel supporting, and the
2    experience and knowledge of the bankruptcy court judge reviewing,
3    the settlement;

4

5    (6) the nature and breadth of releases to be obtained by officers and
6    directors; and

7

8    (7) the extent to which the settlement is the product of arm's length
9    bargaining.

10

11   478 F.3d at 462 (internal quotation marks and citations omitted and alterations

12   adopted).  While the bankruptcy court must reach an "informed, independent

13   judgment," *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v.*

14   *Anderson*, 390 U.S. 414, 424 (1968), "the responsibility of the bankruptcy judge,

15   and ours upon review, is not to decide the numerous questions of law and fact

16   raised by appellants but rather to canvass the issues and see whether the

17   settlement falls below the lowest point in the range of reasonableness," *In re*

18   *Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985) (internal quotation marks

19   omitted and alterations adopted).

20   B.    <u>Analysis</u>

21        There is no dispute that the fourth, fifth, and seventh *Iridium* factors are

22   met.  The Stadtmauers expressly concede that the Trustee and his counsel were

23   experienced, and that Bankruptcy Judge Drain was well-qualified to preside over

24   the bankruptcy proceedings.  *See* Appellants' Br. at 54.  They further do not press

1   any argument that any interested party besides them failed to support the

2   Settlement or that the Settlement was not the product of arm's length bargaining.

3   We therefore proceed to review the bankruptcy court's analysis of the remaining

4   *Iridium* factors.  *See id.* at 47–54; *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d

5   Cir. 2006) (arguments not raised on appeal are waived).[17]

6   ***Balance between the litigation's possibility of success and the settlement's***

7   ***future benefits***.  The bankruptcy court did not abuse its discretion in finding that

8   the Settlement's future benefits outweighed the possibility that the Stadtmauers

9   may succeed in their litigation.   The court saw numerous infirmities, some of

10  which we discussed above, in the Stadtmauers' theory that they held valid

11  judicial liens giving them first priority in recovering on their fraudulent-

12  conveyance and alter-ego claims.  Moreover, the court decided that the Trustee

13  had "potential bankruptcy law defenses" against the attachment reaching "the

14  proceeds of the [bankruptcy] estate's cause[s] of action."  App'x at 301:3–5.

15      The Stadtmauers object that the bankruptcy court improperly ignored the

16  state court's determination, made prior to removal of the State Court Action to

---

[17] In the Nordlicht appellees' view, "the [d]istrict [c]ourt noted that [the Stadtmauers] essentially conceded six of the seven *Iridium* factors" except for the first.  Nordlicht Appellees' Br. at 37. Our reading does not confirm such a broad view.

1 bankruptcy court, that the Stadtmauers were likely to win on their claims.

2 Indeed, they insist that the state court's attachment order of February 18, 2020

3 against the Properties should have been "treated as an order of the [b]ankruptcy

4 [c]ourt" "by operation of law."  Appellants' Br. at 48 (citing *Torah Soft Ltd. v.*

5 *Drosnin*, 224 F. Supp. 2d 704, 710 (S.D.N.Y. 2002)).  We disagree.  To be sure,

6 "[t]he law of the case doctrine *generally* applies to decisions made by a state court

7 prior to removal to federal district court."  *Drosnin*, 224 F. Supp. 2d at 710

8 (emphasis added).  However, "[t]he law of the case doctrine . . . does not apply to

9 tentative or preliminary rulings."  *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118,

10 129 n.8 (1st Cir. 2006) (citation omitted).  Attachment orders fall into the category

11 of preliminary rulings because, under New York law, "[a]ttachment is a

12 provisional remedy."  *Hume*, 28 N.Y.S.3d at 126.  The bankruptcy court was

13 therefore not bound by any ruling in the preceding State Court Action.

14   The Stadtmauers further argue that the bankruptcy court improperly (1)

15 failed to credit their chances of success in the litigation; (2) gave undue weight to

16 bankruptcy defenses already rejected at earlier stages of the litigation; and (3)

17 disregarded third-party discovery obtained before the bankruptcy petition.  The

18 Stadtmauers do not flesh out these arguments, and we see no obvious error in

the bankruptcy court's "canvass[ing of] the[se] issues." *In re Teltronics*, 762 F.2d

at 189. We therefore see no reason not to defer to the informed judgment of the

bankruptcy court. *See In re Cousins*, No. 09 Civ. 1190 (RJS), 2010 WL 5298172, at

*3 (S.D.N.Y. Dec. 22, 2010) (Sullivan, *Judge*) ("[A] bankruptcy court is in the best

position, as the . . . ongoing supervisory court for the bankruptcy proceeding, to

determine whether a compromise is in the best interest of the estate and is fair

and equitable." (quoting *In re Global Vision Prods., Inc.*, No. 09 Civ. 374 (BSJ), 2009

WL 2170253, at *3 (S.D.N.Y. July 14, 2009) (alterations adopted)).

Nor did the bankruptcy court abuse its discretion in assessing the

Settlement's future benefits. At the April 23 Sale Hearing, the Trustee

represented to the bankruptcy court that the April 22 Offer for $2.5 million

"[was] in the best interest of the estate." App'x at 261:20–21. The court noted

that "[t]he Trustee . . . has concluded that the April 22 proposal is the highest and

best." *Id.* at 296:8–10. And even though a "[b]ankruptcy [c]ourt . . . need not

conduct an independent investigation in formulating its opinion as to the

reasonableness of a settlement" and can instead "give weight to the Trustee's

informed judgment that a compromise is fair and equitable," *In re Drexel*

*Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991), the

1    bankruptcy court here independently "evaluated the two [competing] proposals

2    to do [its] own assessment as to whether the Trustee has properly exercised his

3    judgment in recommending acceptance of the April 22 proposal," App'x at

4    296:21–24.  The court "agree[d] with the Trustee's assessment" both because the

5    April 22 Offer "[was] significantly higher," and "payment [was] to be made

6    actually even sooner than the Stadtmauers' [proposed] payment." *Id.* at 296:24–

7    297:5.

8            And importantly, the court concluded that the April 22 Offer was superior

9    because under its terms, Barbara Nordlicht (1) indemnified the $2.5 million

10   payment and (2) would reimburse the estate for any legal fees incurred from

11   defending against the Stadtmauers' asserted legal claims.  In the bankruptcy

12   court's assessment of the facts, these two provisions effectively nullified the risk

13   to the bankruptcy estate arising from the Stadtmauers' litigation.  If the

14   Stadtmauers succeed in their claim that they hold valid, higher-priority liens,

15   those liens would reach only the $2.5 million proceeds for which the

16   Stadtmauers' claims were settled.  Because those proceeds are indemnified dollar

17   for dollar, the estate and its creditors (other than the Stadtmauers) will be

18   unaffected.  Moreover, the reimbursement provision insulates the estate from

1  legal fees in defending against the Stadtmauers' asserted claims. *See* App'x at

2  297:8–298:15; *see also id.* at 298:16–299:2 (bankruptcy court stating that, in its view,

3  there was only a "modest" risk that the Stadtmauers would recover the $2.5

4  million proceeds, especially in light of the $2.5 million indemnity). We agree

5  with the bankruptcy court's detailed, independent assessment, which exceeded

6  what is necessary to ensure that Settlement did not "fall[] below the lowest point

7  in the range of reasonableness." *Teltronics*, 762 F.2d at 189 (quoting *In re W.T.*

8  *Grant Co.*, 699 F.2d at 608).

9      The Stadtmauers resist this conclusion by cursorily asserting that the

10  Settlement's future benefits were minimal (and thus outweighed even by a

11  modest chance of success in the subsequent litigation) because substantially more

12  money was to be recovered than under the April 22 Offer. These protestations

13  amount to a request to substitute our judgment on matters committed to the

14  bankruptcy court's discretion. We decline to do so.

15      ***Likelihood of complex, protracted, and costly litigation.*** The bankruptcy

16  court determined that the April 22 Offer, with its reimbursement provision,

17  meaningfully reduced the estate's cost of litigating, an important consideration

18  because "the Trustee ha[d] little to no cash with which to pursue the underlying

53

litigation claims." App'x at 295:7–9. Thus, even though litigation may turn out

to be long and complex (as in fact, it has in this case), the estate would at least be

insulated from its costs. In any event, the assessment of how much money the

Trustee had available for pursuing litigation was a factual determination that,

because it was not clearly erroneous, we will not disturb on appeal.

*Paramount interests of creditors and the extent of creditors' support of, or*

*objections to, the settlement*. The bankruptcy court correctly observed that no

creditors other than the Stadtmauers objected to the Settlement, either by filing

such an objection or during the Sale Hearing. In fact, two creditors with

"substantial claims in this case" had voiced their affirmative support of the

Settlement. *See id.* at 296:10–15. The Stadtmauers offer no argument to the

contrary beyond a conclusory assertion that the April 22 Offer was not fair and

equitable or in the creditors' best interest.

*The nature and breadth of releases to be obtained by officers and directors*.

The non-Trustee Appellees argue, and the district court held, that this *Iridium*

factor is inapplicable because it concerns only "releases to be obtained by officers

and directors." Non-Trustee Appellees' Br. at 44–45; *see also* Spec. App'x at 39–40

(quoting *In re Iridium*, 476 F.3d at 462). We agree. The Stadtmauers have offered

1   no authority to the contrary, either on appeal or in the district court, but

2   conclusorily insist that such a reading of this factor "makes no sense in the

3   context of this settlement."  Appellants' Reply Br. at 28.

4        In sum, all six applicable *Iridium* factors weigh in favor of a finding that the

5   Settlement flowing from the April 22 Offer was fair and equitable and in the best

6   interest of the estate.  The bankruptcy court did not abuse its discretion in

7   finding the same.  We therefore affirm the district court's holding to that effect.

8        **III.    The Settlement's Comportment with *Jevic***

9        The Stadtmauers further argue that the Settlement violates the "basic

10  system of priority" in bankruptcy as articulated by the Supreme Court in

11  *Czyzewski v. Jevic Holding Corporation*, 580 U.S. 451, 457 (2017).  Under that

12  system, "[s]ecured creditors are highest on the priority list, for they must receive

13  the proceeds of the collateral that secures their debts," whereas "general

14  unsecured creditors" are "low-priority creditors" whose claims are satisfied only

15  after the claims of secured creditors are satisfied in full.  *Id.*  The Stadtmauers

16  maintain that they are secured creditors for approximately $15 million by virtue

17  of their purported liens on the 535 W.E.A. and Trenor Drive properties and thus

have priority over the defendants and proposed defendants to the State Court

Action, who are unsecured creditors.

Based on this theory, the Stadtmauers seem to make two separate

arguments supporting their assertion that the Settlement contravenes *Jevic*. First,

the $2.5 million paid to the estate by Barbara Nordlicht for distribution to

unsecured creditors impermissibly skips over the Stadtmauers' secured claims,

which must be satisfied in full before unsecured claims are satisfied. Second, the

$2.5 million indemnity guaranteed by Barbara Nordlicht also violates *Jevic*'s

priority scheme because that money, too, should first be used to satisfy the

Stadtmauers' secured claims in full before satisfying any unsecured claims. Both

arguments are meritless.

Instead, we agree with the district court that claiming a secured interest in

the settlement proceeds based on the Stadtmauers' purportedly valid liens "is a

nonstarter." Spec. App'x at 33. For all the reasons discussed above, the

bankruptcy court did not abuse its discretion in determining that the validity of

the liens is in dispute. We leave aside the issue whether *Jevic*, which analyzed a

structured dismissal of a bankruptcy action, applies to sale hearings under

sections 363(b) and (f) at all. We assume without deciding that it does. *See, e.g.,*

*In re Veg Liquidation, Inc.*, 931 F.3d 730, 739 (8th Cir. 2019) (observing that "*Jevic*

involved a structured dismissal and did not hold that § 363 sales must conform

to normal priority rules" without deciding the issue). Until they have

established in the underlying bankruptcy proceedings that their liens are valid,

their claims are not secured. And as unsecured creditors, they have no priority

over other unsecured creditors.

The Stadtmauers respond that "[n]othing in *Jevic*'s ruling or reasoning

suggests that a settlement agreement may skip asserted priorities so long as some

dispute is asserted." Appellants' Br. at 41. But *Jevic*'s holding did turn on the

fact that all relevant claims' priority was undisputed. *Jevic* held that, unless the

affected creditors consent, a bankruptcy court's approval of a structured

dismissal of a Chapter-11 action must comply with the same priority rules

ordinarily employed in a regular dismissal.[18] 580 U.S. at 464. The Supreme

Court based its reasoning on the principled view that *final* distributions of estate

value—such as those ordered in connection with a structured dismissal—must

---

[18] A typical Chapter-11 dismissal restores the estate to the financial status quo it was in before the bankruptcy petition. Where such a "perfect restoration of the [prepetition] status quo [is] difficult or impossible," bankruptcy courts use a "structured dismissal" to depart from "a Chapter 11 dismissal's ordinary restorative consequences." *Jevic*, 580 U.S. at 456.

follow the Bankruptcy Code's basic priority rules.  *See id.* at 455 ("A distribution

scheme ordered in connection with the *dismissal* of a Chapter 11 case" must

generally follow "the basic priority rules that apply under the primary

mechanisms the [Bankruptcy] Code establishes for *final* distributions of estate

value." (emphases added)).  *Jevic* went on to say that such constraints likely did

not apply to "*interim* distribution[s] of settlement proceeds," as it would be more

"difficult to employ the rule of priorities [there] because . . . the claims against

[the estate] are *not yet fully resolved*."  *Id.* at 467 (emphasis in original, internal

quotation marks omitted and alterations adopted).

That is precisely the case here.  As the bankruptcy court repeatedly

emphasized, the approval of the Settlement at the Sale Hearing was not a final

disposition of the claims against the estate.  *See, e.g.*, App'x at 277:19–20 ("[T]his

is not an adversary proceeding where I determine merits of the attachment."); *id.*

at 292:5–7 ("Importantly, the sale [of the Stadtmauers' claims] would be as is

with no representations or warranties as to the merits of the claims."); *id.* at

298:20–22 ("[T]his is a record of a summary proceeding but not a proceeding to

ultimately determine the nature of the Stadtmauers' interest. . . .").  Accordingly,

the Stadtmauers' assertion that their lien secures their claims and gives them

priority over the unsecured creditors is, indeed, "yet [to be] fully resolved."

*Jevic*, 580 U.S. at 467 (internal quotation marks omitted). Any distributions of

proceeds from the Settlement were therefore *interim* distributions, evading *Jevic*'s

application of ordinary priority rules. Instead, the Stadtmauers are free to

pursue precisely the recourse that the petitioners in *Jevic* could not: assert the

validity and priority of their claims at a later stage in the bankruptcy litigation.

The Settlement's indemnity provision, too, does not upend *Jevic*'s

principles of creditor priority in bankruptcy, albeit for a different reason. Even if

the Stadtmauers' liens are valid, the district court correctly observed that, under

the Bankruptcy Code, if a creditor's claim is "secured by a lien on property in

which the estate has an interest," it "is a *secured* claim *to the extent of the value of*

*such creditor's interest in the estate's interest in such property*." 11 U.S.C. § 506(a)(1)

(emphasis added). Here, the relevant "property" in which the estate has an

interest and to which the liens extend is the $2.5 million that was paid to the

estate to settle the estate's claims (including the State Causes of Action) against

the Settling Parties. The estate's interest—and therefore, the interest secured by

the Stadtmauers' liens—can extend no further precisely because the underlying

claims were released for an agreed-upon amount of $2.5 million after extensive

negotiations between the Trustee and relevant parties and several escalating

offers.  *See, e.g., Kayo v. Fitzgerald*, 91 F. App'x 714, 715–16 (2d Cir. 2004)

(summary order) (value of settled claim is ordinarily fixed by the agreed-upon

settlement amount).  By contrast, the estate has no interest in the indemnity

conditionally promised to creditors by Barbara Nordlicht.  Any indemnity

payment by Barbara Nordlicht to the estate would occur only if the Stadtmauers

have already collected from the estate on their claim secured by their liens.  The

indemnity is not "property in which the estate has an interest" and thus subject

to the Stadtmauers' liens, 11 U.S.C. § 506(a)(1), because the estate receives any

indemnity payments *only if* the Stadtmauers have already taken an equal amount

from the estate.  Put differently, the Stadtmauers' liens cannot secure their claims

twice: first as to the $2.5 million Settlement proceeds, and then again as to

payments seeking to backstop any diminution of the $2.5 million proceeds.  The

bankruptcy court and district court grasped the root of this issue when they

reasoned that the Stadtmauers' liens could not reach the assets of Barbara

Nordlicht, a non-party to the State Court Action, who in effect entered an

independent contractual relationship with the Settling Parties through the

indemnity provision.  *See* App'x at 283:18–21 (bankruptcy court asking:  If "the

1    lien doesn't attach to [Barbara Nordlicht's] property. . . . how can you have a

2    prejudgment attachment with respect to a lawsuit where she's not a

3    defendant?"); Spec. App'x at 34 (district court concluding that "[b]ecause

4    Appellants have no claim whatsoever to a lien over Ms. Nordlicht's

5    indemnification, they will not be entitled to [it by virtue of a secured claim]").

6    Accordingly, her indemnity cannot count toward the "value of [the

7    Stadtmauers'] interest in the estate's interest in such property" under Bankruptcy

8    Code section 506(a)(1).[19]

9       We therefore affirm the district court's affirmance of the bankruptcy

10    court's ruling that the Settlement did not run afoul of *Jevic*.

11       **IV.    The Settlement's Comportment with Due Process**

12       We turn finally to the Stadtmauers' assertion that they were deprived of

13    their constitutional right to due process because the bankruptcy court, at the

---

[19] The Stadtmauers assert that their "liens must attach to any and all proceeds of the sale or disposition of their interests" regardless of their source. Appellant's Reply Br. at 22. Holding otherwise, they argue, would upend basic creditor priorities in bankruptcy "whenever a party makes a 'gift' to junior creditors." *Id.* But Barbara Nordlicht is *not* a party, and in that respect, a payment's source does matter. A lien cannot extend to property of individuals or entities who were never parties to the litigation transferred to bankruptcy court. The Stadtmauers' lower-court authorities are inapposite, as neither of them involve the indemnification of a creditor's claims. *See In re Bygaph, Inc.*, 56 B.R. 596 (Bankr. S.D.N.Y. 1986); *In re Grossinger Assocs.*, 156 B.R. 8 (Bankr. S.D.N.Y. 1993).

1 April 23 Sale Hearing, permitted the Trustee to sell their claims despite being

2 secured by valid liens. They argue that such a disposition of the Stadtmauers'

3 property rights was impermissible in a summary proceeding under Federal

4 Rules of Bankruptcy Procedure 2002 and 9019, and should have been decided in

5 an adversary proceeding pursuant to Bankruptcy Rule 7001(2) instead. *See* Fed.

6 R. Bankr. P. 7001(2) ("An adversary proceeding is . . . . (2) a proceeding to

7 determine the validity, priority, or extent of a lien or other interest in property").

8 Again, we disagree with the Stadtmauers. Rule 7001(2) is inapplicable

9 because the bankruptcy court did not "determine the validity, priority, or extent

10 of [the Stadtmauers'] lien[s]." Fed. R. Bankr. P. 7001(2). Nor did it finally

11 dispose of any of the Stadtmauers' asserted property rights. As the court stated,

12 "this is not an adversary proceeding where I determine merits of the

13 attachment." App'x at 277:19–20; *see also id.* at 298:20–22 ("[T]his is a record of a

14 summary proceeding but not a proceeding to ultimately determine the nature of

15 the Stadtmauers' interest. . . ."). Indeed, the bankruptcy court's determination

16 that a "bona fide dispute," 11 U.S.C. § 363(f)(4), existed as to the validity of the

17 Stadtmauers' liens necessarily implies that the court did *not* issue a final ruling as

18 to the liens' validity. The Stadtmauers may assert, in future stages of the

bankruptcy proceeding, that their claims are secured by virtue of their

attachment orders.  Indeed, the fact that Barbara Nordlicht provided a $2.5

million indemnity as part of the Settlement seems to contemplate the possibility

that the Stadtmauers could so prevail.  And in the event the bankruptcy court

determines their claims are not secured, the Stadtmauers can continue to assert

those claims as unsecured claims.

The district court correctly determined that the Stadtmauers were not

deprived of their due process rights.

## CONCLUSION

We have considered the parties' remaining arguments on appeal and

conclude that they are without merit.  For the reasons explained above, we

AFFIRM the district court's order and judgment and REMAND for further

proceedings consistent with this opinion.